## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| ALLEN NEUMARK, on behalf of himself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>SWEDISH MATCH NORTH AMERICA LLC,<br><br>*Defendant.* | Case No. 3:24-cv-821<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND STATE ANTITRUST LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Allen Neumark, on behalf of himself and all others similarly situated, brings this Class Action Complaint (the "Action") against Defendant Swedish Match North America LLC ("Swedish Match") and unnamed co-conspirator Phillip Morris International Inc. ("Phillip Morris") under the federal and state antitrust laws, as well as under the doctrine of unjust enrichment, seeking actual damages, treble damages, a declaratory judgment, injunctive relief, disgorgement of profit into a constructive trust, reasonable costs and attorneys' fees, pre- and post-judgment interest, and any relief that this Court deems just and proper, as follows:

I.     INTRODUCTION

1.     Unnamed Co-Conspirator Phillip Morris, one of the companies known to comprise "Big Tobacco," produces Marlboro and other similar products (as well as smokeless alternatives). One such smokeless alternative product is called "Zyn," which is the subject of this Action.  Zyn is marketed, manufactured and/or sold by Phillip Morris' affiliate or subsidiary Defendant Swedish Match.

2.      Zyn is a modern oral nicotine pouch ("MON").[1]  According to Phillip Morris' main competitor British American Tobacco, these products are "pouches which contain high purity nicotine, water and other high-quality ingredients, including cellulose fib[er]s, flavoring and sweeteners.  Customers place the disposable pouch between their gum and upper lip, typically for around 30 minutes, during which nicotine and flavors are released and the nicotine is absorbed [orally.]"[2]  Currently, according to Defendants, Zyn is sold in ten different varieties/flavors as well as in two different strengths.[3]

3.      Tins containing Zyn appear as follows:


[4]

4.      Zyn pouches appear as follows:

---

[1] https://www.cspdailynews.com/tobacco/dryft-alleges-swedish-match-drove-it-market#:~:text=In%20November%202020%2C%20the%20U.S.,its%20global%20MON%20brand%2C%20Velo., (last accessed Nov. 3, 2024).

[2] https://www.bat.com/science-and-research/modern-oral, (last accessed, Nov. 3, 2024).

[3] https://us.zyn.com/about-zyn/, (last accessed, Nov. 3, 2024).

[4] *Id.*



5.      The rise of Zyn in the United States is best marked by Zyn's massive market share, which is estimated to be at least 80% of the market for MON products within the domestic United States ("Relevant Market").[6]  Currently, Swedish Match's Zyn sells billions of dollars-worth of MON products within the United States, as marked by the steady increase in annual sales numbers of Zyn (which retail currently for about $6 per tin):

        a.   2018: 12.7 million tins

        b.   2019: 50.4 million tins

        c.   2020: 130 million tins

        d.   2021: 198 million tins

        e.   2022: 237 million tins

        f.   2023: 384 million tins

        g.   2024 (projected): 580 million tins

---

[5] *Id.*

[6] https://www.cspdailynews.com/tobacco/dryft-alleges-swedish-match-drove-it-market#:~:text=In%20November%202020%2C%20the%20U.S.,its%20global%20MON%20brand%2C%20Velo., (last accessed, Nov. 3, 2024).

6.       The rapid ascent of Zyn, however, is not due to business acumen or the natural progression of being a first-mover within the Relevant Market.  Zyn gained its monopoly power through a series of two anticompetitive acts, which allowed it to acquire and insulate the highly profitable monopoly that Defendant created.  These anticompetitive acts, as part of an overarching conspiracy to gain monopoly power in the Relevant Market, both individually and collectively violate the federal and state antitrust laws.

7.       *First*, Zyn was developed by Swedish Match's European counterpart, Swedish Match AB, when it acquired the patents and trade secrets needed to produce Zyn from a European company and investor, respectively, TillCe AB ("TillCe") and Thomas Ericsson between 2013 and 2016.[7]  According to litigation between TillCe and Swedish Match regarding the trade secrets needed to produce Zyn, the parties entered into an agreement whereby a Swedish Match subsidiary would acquire the trade secrets from TillCe in March of 2016.[8]

8.       The Zyn products became astronomically popular in the United States, with a steady increase in sales dating from first introduction to the Relevant Market in 2018 and continuing through the present day.[9]  This cued Swedish Match's anticompetitive defense of the Zyn product when TillCe tried to create a similar product called DRYFT which would rival Zyn in the United States.  According to TillCe, "Swedish Match filed a series of costly, time consuming and baseless legal actions against DRYFT to impede DRYFT's ability to compete, raise DRYFT's costs, limit investment by third parties, distract its business focus, interfere with its business

---

[7] *Pinkerton Tobacco Co., LP, et al. v. Kretek International, Inc. and Dryft Sciences, LLC*, Case No. 2:20-cv-8729-SB (MRWx) (C.D. Ca. 2020), at ECF No. 91 (First Amended Complaint, or "FAC").

[8] *Id.*

[9] *Infra, at* ¶ 5.

relationships and opportunities and effectively *drive it from the market by forcing it to sell its business at a discount*."[10]  Indeed, before Swedish Match took legal action (which was ultimately settled by the parties), DRYFT had an estimated $458 million valuation which dropped to less than $150 million – the price at which DRYFT was sold to British American Tobacco.[11]

9.      *Second*, once Swedish Match drove a core competitor from the Relevant Market until it was unable to compete in a meaningful way, Swedish Match agreed to an anticompetitive agreement with Phillip Morris.  Phillip Morris, which now focuses its new tobacco product development on "smokeless" products, eliminated itself as a competitor of Swedish Match in exchange for $16 billion whereby Swedish Match would become an affiliate or indirect subsidiary of Phillip Morris on May 11, 2022.[12]  Unchecked by regulatory authorities, this de facto acquisition of Zyn gave Phillip Morris and Swedish Match unlawful monopoly power, and therefore dominance, in the Relevant Market.

10.     This individual and collective conduct was anticompetitive, and its effects are enduring.  Defendant's conduct has illegally restrained competition in the Relevant Market in violation of the federal and state antitrust laws.  As a direct and proximate result of Defendant's anticompetitive conduct, prices for Zyn products were raised, fixed, maintained and/or stabilized at supracompetitive levels.  Additionally, the harm caused to DRYFT as an actual competitor as well as the harms caused by Phillip Morris neutralizing itself as a nascent competitor are still felt to this day.  There is limited robust competition in the Relevant Market because Defendant throttled

---

[10] https://www.cspdailynews.com/tobacco/dryft-alleges-swedish-match-drove-it-market#:~:text=In%20November%202020%2C%20the%20U.S.,its%20global%20MON%20brand%2C%20Velo., (last accessed, Nov. 3, 2024).

[11] *Id.*

[12] https://www.reuters.com/business/philip-morris-launches-16-bln-cash-offer-swedish-match-2022-05-11/, (last accessed Nov. 3, 2024).

competition in a way that reduces output, the incentive to innovate and the desire of new entrants to compete in the Relevant Market.

11.     Indeed, the creation of a monopoly in the Relevant Market has harmed consumers seeking to quit smoking through the use of Zyn's products.

12.     Presently, consumers struggle to gain access to Zyn products due to potentially deliberate underproduction of Zyn by Phillip Morris in order to artificially drive demand and higher prices.

13.     According to Phillip Morris, the shortage is caused by Washington D.C.'s attorney general investigating the sale of Zyn being sold online as being in violation of D.C.'s ban on flavored nicotine.[13]  However, this defies logic.  Zyn's major distribution channels are not purely online – but Zyn products can be found in gas stations and other convenience stores around the country.  Elimination of a channel of distribution does not impact supply, it impacts the distribution of said supply.  As stated by Zyn in a now deleted Facebook post on July 1, 2024: "[w]e've heard the chatter and want you to know there have been no manufacturing disruptions to US Zyn operations.  We know locations are experiencing low inventory of Zyn, and we can assure you that the dedicated teams behind America's #1 nicotine pouch are working tirelessly to increase production capacity as quickly as possible."[14]

14.     Because of this potentially pretextual "shortage," Defendants are charging substantially higher prices for the Zyn products that are sold at retail.[15]  These supracompetitive

---

[13] https://www.npr.org/2024/08/21/nx-s1-5068090/what-is-zyn-nicotine-pouches-fda, (last accessed, Nov. 3, 2024).

[14] https://vaping360.com/vape-news/7291/zyn-shortages-production-capacity-cant-meet-demand/, (last accessed, Nov. 3, 2024).

[15] *Id.*

prices would not exist but for the conduct taken by Defendants to unlawfully acquire and insulate its monopoly.

15.     Against this backdrop, Plaintiff Neumark and Class members, purchasers of Zyn at retail from May 11, 2022 through the present day ("Class Period") bring this indirect purchaser class action against Defendant Swedish Match due to Defendant's unlawful acquisition of a monopoly in the Relevant Market through their anticompetitive agreement with Phillip Morris for violations of Sections 1 and 2 of the Sherman Act ("Sherman Act"), Section 7 of the Clayton Act ("Clayton Act"), the state antitrust laws, as well as the doctrine of unjust enrichment, and seek actual damages, treble damages, a declaratory judgment, injunctive relief, disgorgement of profit into a constructive trust, reasonable costs and attorneys' fees, pre- and post-judgment interest, and any relief that this Court deems just and proper.

## II.     JURISDICTION. VENUE and INTERSTATE COMMERCE

16.     *Subject Matter Jurisdiction.*  Plaintiff brings this Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as under the state antitrust laws and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337 and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiff Neumark asserts claims arising under the federal antitrust laws, as Plaintiff Neumark brings this Action to remedy violations of the Clayton Act and Sherman Act.  This Court has supplemental jurisdiction over Plaintiff Neumark's state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

17.     Additionally, this Court also has subject matter jurisdiction over Plaintiff Neumark's state law claims under the Class Action Fairness Act of 2005 ("CAFA"). *See*, 28 U.S.C. § 1332(d).  This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000.00 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendant.  Namely, Plaintiff Neumark is a Florida resident whereas Defendant is headquartered here, in Virginia.

18.     *Personal Jurisdiction.*  This Court has personal jurisdiction over the litigants because Defendant is headquartered in Virginia, registered to do business in Virginia, has an appointed agent for service of process in Virginia, and harmed consumers located in Virginia through its conduct complained of herein.

19.     *Venue.*  This District is the proper venue for this litigation because Defendant transacts business or has registered agents in this District.  Venue is also proper in this District because Defendant's conduct, as alleged of in this Action, causes harm to consumers located in Virginia.

20.     *Interstate Commerce.*  Defendant's conduct as alleged herein substantially affects interstate trade and commerce by harming competition and consumers alike by raising prices, restricting output and throttling innovation.

III.     PARTIES

*Plaintiff Allen Neumark*

21.     Plaintiff Neumark is a resident of Miami-Dade County, Florida.

22.     Plaintiff Neumark, during the Class Period, has used and continues to use Zyn products which are purchased at retail.    As a result of Defendant's monopolistic and

anticompetitive conduct, Plaintiff Neumark has paid and continues to pay higher prices for Zyn. But for Defendant's conduct, Plaintiff Neumark would pay lower or non-supracompetitive prices in the Relevant Market for Zyn products.

*Defendant Swedish Match North America LLC*

23.     Defendant Swedish Match is a limited liability company organized and existing under the laws of Delaware with a principal place of business located in Richmond, Virginia. Specifically, Swedish Match is located at Two James Center, 1021, E Cary St. Ste 1600, Richmond, Virginia, 23219.

*Unnamed Co-Conspirator Phillip Morris International Inc.*

24.     Unnamed Co-Conspirator Phillip Morris International Inc. is a Delaware corporation with its principal place of business located in Connecticut.

IV.     FACTUAL ALLEGATIONS

*The Relevant Market and Monopoly Power*

25.     *Relevant Geographic Market.*   Due to regulatory, and other constraints, the geographic scope for the Relevant Market is the entirety of the United States.  MON products have been sold in all fifty states for many years, and Swedish Match and DRYFT (as well as other competitors) have been competing for consumers of MON products since 2016.

26.     *Relevant Product Market.*   Smoking articles (*e.g.,* cigarettes and cigars) and smokeless tobacco (*e.g.,* snus, moist snuff, chewing tobacco) deliver nicotine from tobacco.  Use of both type of products, however, is associated with health hazards not necessarily related to the delivery of nicotine itself.  For example, tobacco smoke exposes users and secondhand persons to numerous combustion-related toxicants, and both smoking, as well as the use of tobacco, exposes users to carcinogens found in tobacco leaves.  Accordingly, MON products contributes, like Zyn,

8

contribute to public health as safer, non-combusted, tobacco-leaf free alternatives for consumers. MON products are offered with different flavors and at different doses of nicotine.

27.   MON products are distinct.  Indeed, MON products became increasingly attractive to consumers as a cigarette and/or smokeless tobacco replacement because of a unique design, their convenience, their elimination of physical externalities (such as airborne smoke or saliva) and the fact that they are non-combustible.  Because MON products provide a unique and preferrable alternative to cigarettes, smokeless tobacco and even smoking cessation items (*e.g.,* gums or lozenges) they are not reasonable substitutes for MON products.  MON products constitute the Relevant Market's Product Market.

28.   Taken together, the Product Market and the Geographic Market collectively make up the "Relevant Market" as defined by this Complaint.

29.   *Monopoly Power.*  For reasons unrelated to busines acumen or product quality, within the Relevant Market, Swedish Match has obtained a market share of at least 80%.[16] Swedish Match presently has, and has always had, the highest-priced product within the Relevant Market.[17]

30.   Swedish Match is part of a much larger, deeper pocketed organization – its parent company, Swedish Match AB.[18]  Swedish Match AB is listed on the Nasdaq Stockholm and most of its sales are located either within the Geographic Market (the United States) or within the Scandinavian countries.[19]  Swedish Match AB, in its own right, is known as a member of "Big

---

[16] *Dryft Sciences, LLC v. Swedish Match North America, LLC*, Case No. 2:22-cv-05355-SB-MRW (C.D. Ca. 2022), at ECF No. 57, Para. 21.

[17] *Id.*

[18] *Id.*

[19] *Id.*

Tobacco." In November of 2022, Phillip Morris, also a member of "Big Tobacco," purchased approximately 93% of Swedish Match AB for approximately $16 billion.[20]

31.     To favor its unlawful monopoly goals and objectives, Swedish Match exploited various unique barriers to entry into the Relevant Market, in addition to the usual barriers (*e.g.,* cost of development, manufacturing and distribution, etc.) which also apply here. For example, in light of regulatory limitations, there were only five brands of Food and Drug Administration-compliant MON products in the Relevant Market as of August 8, 2016, including Swedish Match's Zyn, Dryft's DRYFT, Modoral/British American Tobacco's Velo, Burger Sohne/Altria Group, Inc.'s "on!" product, and Rogue Holdings LLC/Swisher International Inc.'s Rogue.[21]

32.     *Hypothetical Monopolist Test.* The Relevant Market satisfies the test for market definition used by federal antitrust agencies known as the SSNIP test. The test asks whether a hypothetical monopolist in a proffered market could impose small but significant (typically 5%) non-transitory price increases without causing a substantial number of customers to switch to alternative products or services such that the price increases would be unprofitable to the monopolist. If the SSNIP is profitable, the relevant market is properly defined.

33.     Here, the SSNIP test is satisfied. As Swedish Match continues to raise prices on consumers of its Zyn products, like Plaintiff Neumark and Class members, it can do so (and actually does so) without driving Zyn consumers from the Relevant Market and without sacrificing profit.

34.     Furthermore, Swedish Match has market power in the Relevant Market. This is because Swedish Match can dictate supracompetitive prices across the entirety of the Relevant

---

[20] *Id.*
[21] *Id.,* at 20.

Market as competitors cannot meaningfully compete and overcome barriers to entry without charging higher prices.

<u>*Swedish Match Has Unlawfully Monopolized the Relevant Market*</u>

35.     Zyn has acquired and protected its monopoly power through two anticompetitive acts, leading to a highly profitable monopoly.  These anticompetitive acts, both taken individually and collectively, are part of an overarching conspiracy to gain monopoly power in the Relevant Market in violation of the federal and state antitrust laws.

36.     *Swedish Match Drives Zyn's Key Competitors from the Relevant Market.*  As previously stated (*Infra*, at ¶ 31), DRYFT was one of five initial competitors in the Relevant Market.  DRYFT offered unique and distinct advantages over Zyn's products and posed the largest threat to Zyn's existence – leading to Zyn working diligently to drive DRYFT from the Relevant Market.  According to DRYFT, these acts were taken "with the specific intent to impact price, supply and competition" and, more specifically, "to drive competitors from the Relevant Market[] and to maintain or increase [Swedish Match's] market share and market power in the Relevant Market[] with the knowledge that it was doing so."[22]

37.     According to DRYFT, DRYFT's distinct advantages were:

a.     *Lower Prices.*  DRYFT sold at lower prices than Zyn did, undercutting Zyn's market share.  In 2020, for example, Zyn sold for ten to twenty cents per pouch whereas DRYFT's price per pouch was about half the price (as were other competitors).[23]

---

[22] *Id.,* at 22.

[23] *Id.,* at 28.

b. *Different Active Ingredients.*  DRYFT was a MON product that used a compound called nicotine polacrilex as opposed to nicotine salts, which are what is used by Zyn.  Nicotine polacrilex is not subject to patent protection.  As such, no intellectual property rights existed to protect the use of nicotine polacrilex in MON products.[24]  Nicotine polacrilex has advantages over nicotine salts, as it is a safer, more widely used version of nicotine.[25]

c. *More Options for Dose Offerings.*  DRYFT's pouches contained either two, four or seven milligrams of nicotine per pouch whereas Zyn (and other brands) offered only three and six milligrams of nicotine per pouch.[26]

d. *More Product Per Purchase.*  DRYFT's product offerings included 20 pouches per container whereas Zyn, for example, only contains 15.[27]

e. *More Innovative Packaging.* DRYFT's consumer-friendly packaging was also smaller, sleeker and contained sections where a consumer could segregate pouches in the same receptacle that stored their remaining unused pouches (a patented invention).[28]

38.    However, rather than compete on the merits and attempt to use innovation, more competitive pricing and better product options to win over market share, Swedish Match engaged in a campaign to destroy DRYFT as a competitor.

---

[24] *Id.,* at 25.

[25] *Id.,* at 28.

[26] *Id.,* at 26.

[27] *Id.,* at 28.

[28] *Id.*

39.     According to TillCe, "Swedish Match filed a series of costly, time consuming and baseless legal actions against DRYFT to impede DRYFT's ability to compete, raise DRYFT's costs, limit investment by third parties, distract its business focus, interfere with its business relationships and opportunities and effectively *drive it from the market by forcing it to sell its business at a discount*."[29]  These costly, time consuming legal actions challenged the patents and trade secrets used in order to develop and produce the DRYFT MON product.

40.     Specifically, the actions, according to DRYFT, included (but not limited to):[30]

a.  In 2016, sending multiple letters and making baseless and harassing accusations against DRYFT's manufacturers, forcing the necessity to engage counsel to defend against the accusations;

b.  In 2017, sending letters that included baseless causes of action;

c.  In 2017, failing to negotiate in good faith regarding a settlement that would dispose of the conflict;

d.  In 2020, filing an ITC action which Swedish Match voluntarily dismissed that year because an ITC staff attorney agreed with DRYFT that the patent claims made by Swedish Match did not encompass the DRYFT product;

e.  In 2020, filing a patent infringement action in California that resulted in a "complete and unequivocal loss" for Swedish Match;

f.  In 2020, filing an action in Kentucky which was ultimately dismissed for being brought in an improper venue;

---

[29] https://www.cspdailynews.com/tobacco/dryft-alleges-swedish-match-drove-it-market#:~:text=In%20November%202020%2C%20the%20U.S.,its%20global%20MON%20brand%2C%20Velo., (last accessed, Nov. 3, 2024).

[30] *Dryft Sciences, LLC,* at ECF No. 57, Para. 71.

41.     According to DRYFT, Swedish Match "chose to aggressively abuse multiple legal processes [] to harass and financially devastate a smaller competitor by ensnaring it in baseless legal complications."  Before Swedish Match took legal action (which was ultimately settled by the parties), DRYFT had an estimated $458 million valuation which dropped to less than $150 million – the price at which DRYFT was sold to British American Tobacco.[31]

42.     Notably, Swedish Match did not pursue the same depths of aggressive conduct against other competitors in the Relevant Market.  According to DRYFT, Swedish Match focused on DRYFT because "Dryft was the most attractive to customers given its various unique innovative features and pricing[.]"[32]  DRYFT stated in its antitrust litigation against Swedish Match that:

> Dryft was a small, independent company with a limited number of employees and one part-time in-house counsel.  During the pendency of the ITC, California and Kentucky actions, Dryft executives devoted hours every day to working on the company's defense, liaising with outside counsel and attempting to reassure potential investors or acquirers (as well as suppliers, customers and vendors) that Dryft was not a bad actor.  Moreover, capital that otherwise would have been reinvested in the business, including key sales and marketing efforts to obtain additional customers and better shelf-placement for DRYFT, as well as a new manufacturing facility, was diverted to defending the company.  **[Swedish Match's] unlawful and anticompetitive actions thus reduced or destroyed competition in the Relevant Market or created the dangerous probability of doing so**.[33]

43.     Indeed, according to investment reports by analysts, including Jefferies Research Services: "the elimination of Dryft as a competitor reduced competition relative to what it would have been."[34]

---

[31] *Id.,* at 72.

[32] *Id.,* at 75.

[33] *Id.,* at 105 (emphasis added).

[34] *Id.,* at 119.

44.     *Swedish Match's Anticompetitive Agreement with Phillip Morris.* Once Swedish Match drove a core competitor (DRYFT) from the Relevant Market until it was unable to compete in a meaningful way, Swedish Match agreed to an anticompetitive agreement with Phillip Morris.

45.     Phillip Morris, which currently focuses its new tobacco product development on "smokeless" products, eliminated itself as a competitor of Swedish Match in exchange for $16 billion whereby Swedish Match would become an affiliate or indirect subsidiary of Phillip Morris on May 11, 2022.[35]

46.     Indeed, prior to the acquisition of Swedish Match, and, therefore, of the right to distribute Zyn in the United States, Phillip Morris had its own MON product that competed horizontally with Zyn outside of the United States.  In May of 2021, a year prior to the acquisition of Swedish Match, Phillip Morris acquired Danish tobacconist AG Snus, which produced a MON product called Shiro.[36]  However, Shiro never came to market in the United States, which further insulated Zyn's monopoly power.  By 2022, Phillip Morris stated in its annual report that Zyn had "indefinite life due to the fast growth and leading position of the brand on the market."[37]

47.     Unchecked by regulatory authorities, this de facto acquisition of Zyn gave Phillip Morris and Swedish Match unlawful monopoly power, and therefore dominance, in the Relevant Market.  The 2022 purchase of Swedish Match by Phillip Morris immediately gave it monopoly power in the United States after virtually being a non-competitor with 0% market share just one year prior to the acquisition in 2021.

---

[35] https://www.reuters.com/business/philip-morris-launches-16-bln-cash-offer-swedish-match-2022-05-11/, (last accessed Nov. 5, 2024).

[36] https://www.tobaccotactics.org/article/nicotine-pouches/, (last accessed Nov. 5, 2024).

[37] *Id*.

*Antitrust Injury*

48.     The effect of Swedish Match's conduct economically injures consumers who use Zyn as well as competitors in the Relevant Market.

49.     *Harm to Competition.*  The harm Swedish Match imposes on competition is made no more clear than its acts against DRYFT – a blatant attempt to drive an up-and-coming competitor from the Relevant Market in order to build a moat around and protect its own monopoly.

50.     Furthermore, the anticompetitive acquisition of Swedish Match by Phillip Morris is also harmful to competition.  Rather than compete using the endless arsenal of "Big Tobacco" advantages and resources that Phillip Morris has, Phillip Morris eliminated itself as a nascent and actual competitor in the Relevant Market.  Conversely, the anticompetitive acquisition of Swedish Match by Phillip Morris allowed Swedish Match to profit financially from a monopoly position that otherwise would not have existed but for the conduct alleged herein.

51.     *Harm to Consumers.*  The harm that Swedish Match causes to consumers is substantial and includes: (1) supracompetitive prices by virtue of the fact that Swedish Match can charge whatever it pleases after removing price competition by nascent and actual competitors that have downward pricing pressure, (2) higher prices (as much as double the price) for less product than other competitors with alternative products in the Relevant Market, (3) loss of innovation and superior product as a result of Swedish Match's conduct, which literally removed more innovative competitors from the market and (4) because of Swedish Match's dominant position and the insulation that its anticompetitive conduct gave to its monopoly, a throttled incentive to compete.

52.     Additionally, the higher and/or supracompetitive prices that Plaintiff Neumark and Class members pay for Zyn products are dictated by Phillip Morris – who has direct control over the prices charged in the Relevant Market not just on its website (which no longer distributes Zyn products in the United States) but at retail.[38]  Furthermore, the alleged "shortages" whereby Swedish Match is unable to meet demand are caused squarely by Phillip Morris' monopoly position and the monopoly's inability to accommodate the needs of the Relevant Market (*i.e.,* consumer demand for MON products) as the sole entity in control of a nearly 80% market share. This too causes harm to consumers, as they are unable to get MON products due to Swedish Match's dominant market position and its failure to meet the needs of the market.

## V.     CLASS ACTION ALLEGATIONS

53.     This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23.  Plaintiff Neumark brings this class action on behalf of himself and all other similarly situated individuals.  The nationwide class Plaintiff Neumark seeks to represent is defined as follows:

> **Nationwide Class.**  All natural persons, businesses, entities and corporations in the United States who purchased Zyn at retail during the Class Period.

54.     In the alternative to the nationwide classes, Plaintiff Neumark seeks to represent the following statewide sub-class:

> **State Sub-Class.**  All natural persons, businesses, entities and corporations in the United States who live in states or territories that have *Illinois Brick* repealer antitrust statutes[39] who purchased Zyn at retail during the Class Period.

---

[38] https://vaping360.com/vape-news/7291/zyn-shortages-production-capacity-cant-meet-demand/, (last accessed, Nov. 5, 2024).

[39] Arizona, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia and Wisconsin.

55.     Excluded from the Classes are (1) Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (2) Plaintiff's counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

56.     Plaintiff Neumark reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

57.     *Numerosity.*  Both the Nationwide Class and the State Class are so numerous that joinder would be impracticable.

58.     *Commonality.*  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.   These common questions of law and fact include, without limitation:

     i.   Whether Defendant violated the antitrust laws;

     ii.   Whether Defendant engaged in anticompetitive conduct;

     iii.   Whether Defendant was unjustly enriched;

     iv.   Whether Plaintiff was harmed;

     v.   Whether Plaintiff is entitled to declaratory relief and injunctive relief to end Defendant's conduct; and

     vi.   Whether Plaintiff and Class members are entitled to damages and other relief.

59.     *Typicality.*  Plaintiff Neumark's claims are typical of those of other Class members because Plaintiff Neumark, like every other Class member, was harmed by way of the anticompetitive conduct a alleged herein.   Plaintiff Neumark, like all other Class members, were injured by Defendant's uniform conduct.   Plaintiff Neumark is advancing the same claims and

legal theories on behalf of himself and all other Class members, such that there are no defenses unique to Plaintiff Neumark.  The claims of Plaintiff Neumark and those of the other Class members arise from the same operative facts and are based on the same legal theories.

60.     *Adequacy of Representation.*  Plaintiff Neumark will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff Neumark seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff Neumark has retained counsel experienced in antitrust class action litigation, and Plaintiff Neumark intends to prosecute this action vigorously.

61.     *Superiority of Class Action.*  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

62.     The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

63.     Adequate notice can be given to Class members directly using information maintained in the parties' records.

64.     *Predominance.*  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

65.     This proposed class action does not present any unique management difficulties.

VI.     CAUSES OF ACTION

## FIRST CAUSE OF ACTION

VIOLATIONS OF THE SHERMAN ANTITRUST ACT

SECTION 1 – (RESTRAINT OF TRADE)

(Nationwide Class -- For Declaratory and Injunctive Relief)

66.     Plaintiff Neumark realleges and repeats each and every allegation from paragraphs 1-65 as if fully set forth herein.

67.     Swedish Match violated Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) by entering into, furthering and/or enforcing unreasonable restraints of trade through an agreement, contract, combination or conspiracy.  Swedish Match entered into these agreements, contracts, combinations or conspiracies in order to restrain trade, to control prices and exclude competition and to willfully acquire and maintain monopoly power for Zyn in the Relevant Market.

68.     As alleged above, Swedish Match entered into an agreement in 2022 with Phillip Morris which eliminated Phillip Morris as a nascent and actual competitor in exchange for control over Swedish Match and Swedish Match's Zyn products within the Relevant Market.  This agreement includes a long-term arrangement whereby Zyn is produced and distributed by Swedish Match but profits are shared by former horizontal competitors in the Relevant Market, Swedish Match and Phillip Morris.

69.     Defendant's conduct has had an anticompetitive effect in the Relevant Market.

70.     Defendant's conduct has no legitimate business purpose or pro-competitive benefits – consumers have less options, pay higher prices and are forced to buy less innovative and creative MON products.

71.     There are less restrictive alternatives to the restraints Defendant imposed on the Relevant Market.

72.     Defendant's conduct has a substantial impact on interstate commerce.

73.     Plaintiff has been or will be injured as a result of Defendant's conduct.

74.     Plaintiff has suffered and will continue to suffer the type of injuries that the antitrust laws were intended to prevent.  Plaintiff has been and will be harmed due to the lack of competition in the Relevant Market caused by Defendant's conduct.

75.     Plaintiff seeks declaratory and injunctive relief, as well as reasonable costs and attorneys' fees, with respect to this cause of action.

### SECOND CAUSE OF ACTION

VIOLATIONS OF THE SHERMAN ANTITRUST ACT

SECTION 2 – (MONOPOLIZATION/ATTEMPTED MONOPOLIZATION)

(Nationwide Class -- for Declaratory and Injunctive Relief)

76.     Plaintiff Neumark realleges and repeats each and every allegation from paragraphs 1-65 as if fully set forth herein.

77.     Defendant has willfully acquired and maintained monopoly power for Zyn in the Relevant Market.

78.     Zyn has an over 80% market share – giving it monopoly power.  Alternatively, Zyn has the power to control prices or exclude competition in the Relevant Market.

79.     Swedish Match's monopoly power for Zyn in the Relevant Markets was accomplished through predatory, exclusionary and anticompetitive conduct, including but not limited to: (1) using litigation and other tactics to drive competitors into financial ruin and neutralize players in the Relevant Market, and (2) agreeing to an anticompetitive agreement with Phillip Morris whereby Phillip Morris would acquire Swedish Match, eliminate itself as a horizontal competitor and split the profits with Defendant.

80.     Alternatively, Defendant attempted to acquire a monopoly through the above-stated conduct and came dangerously close to unlawfully gaining monopoly power.

81.     Defendant's conduct has foreclosed consumer and competitor access to the Relevant Market.

82.     Defendant's conduct has a substantial effect on interstate commerce.

83.     Plaintiff has been injured as a result of Defendant's conduct.

84.     Plaintiff has suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent.   Plaintiff has been injured by the harm to competition in the Relevant Market as a result of Defendant's conduct.

85.     Plaintiff seeks declaratory and injunctive relief, as well as reasonable costs and attorneys' fees, with respect to this cause of action.

### THIRD CAUSE OF ACTION

VIOLATIONS OF THE CLAYTON ANTITRUST ACT

SECTION 7 (UNLAWFUL MERGER)

(Nationwide Class -- for Declaratory and Injunctive Relief)

86.     Plaintiff Neumark realleges and repeats each and every allegation from paragraphs 1-65 as if fully set forth herein.

87.     The effect of the acquisition by Phillip Morris of Swedish Match is to substantially lessen competition or tend to create a monopoly in the Relevant Market in violation of Section 7 of the Clayton Act.

88.     Unless enjoined, the acquisition continues to have the following deleterious effects:

a.  Restraining actual and potential competition between Phillip Morris and Swedish Match;

b.  The elimination of Phillip Morris as a significant competitor with the resources to compete with Swedish Match in a non-trivial way;

c.  The elimination of competition by other firms;

d.  Higher prices;

e.  Reduced quality, choice and innovation; and

f.  A general throttling of intrabrand competition.

89.     By reason of this violation of law, Plaintiff Neumark is threatened with the loss or damage to property in the form of higher prices for Zyn products and diminished product quality and innovation.

90.     Plaintiff Neumark is entitled to bring suit under Section 16 of the Clayton Antitrust Act to obtain permanent injunctive relief against this acquisition and to recover the costs of suit, as well as a reasonable attorneys' fee.

91.     There are no procompetitive justifications for Defendant's agreement and any proffered justification, to the extent legitimate, could have been achieved through less restrictive means.

## FOURTH CAUSE OF ACTION

VIOLATIONS OF THE STATE ANTITRUST LAWS

(State Sub-Class -- for Actual and Treble Damages)

92.     Plaintiff Neumark realleges and repeats each and every allegation from paragraphs 1-65 as if fully set forth herein.

93.     The anticompetitive conduct as alleged herein violates the state antitrust laws of the following states for the same reason that they violate federal antitrust laws.

a.  *Arizona's Arizona Uniform State Antitrust Act;*

b.  *California's Cartwright Act;*

c.  *Connecticut's Antitrust Act;*

d.  *Florida's Deceptive and Unfair Trade Practices Act;*

e.  *Illinois' Antitrust Act;*

f.  *Iowa's Iowa Competition Law;*

g.  *Kansas' Restraint of Trade Act;*

h.  *Minnesota's Antitrust Law;*

i.  *Mississippi's Antitrust Statute;*

j.  *The Nebraska Junkin Act;*

k.  *Nevada's Unfair Trade Practices Act;*

l.  *New Hampshire's Antitrust Statute;*

m.  *The New Mexico Antitrust Act;*

n.  *The North Carolina General Statutes;*

o.  *The North Dakota Uniform State Antitrust Act;*

p.  *Oregon's Antitrust Law;*

q.   *The Puerto Rican Anti-Monopoly Act;*

r.   *The Rhode Island Antitrust Act;*

s.   *South Dakota's Antitrust Statute;*

t.   *The Tennessee Trade Practices Act;*

u.   *The Utah Antitrust Act, and*

v.   *Wisconsin's Antitrust Act*

94.     Each of these statutes are substantially similar, seek the same kind of relief and intend to protect against the same harms that other antitrust statutes (both federal and state) were codified to redress).

95.     Accordingly, Plaintiff Neumark and Class members seek all forms of available relief under these statutes, including actual damages, treble damages and reasonable costs and attorneys' fees.

**FIFTH CAUSE OF ACTION**

UNJUST ENRICHMENT

(Nationwide Class -- for Disgorgement of Profits)

96.     Plaintiff Neumark realleges and repeats each and every allegation from paragraphs 1-65 as if fully set forth herein.

97.     Plaintiff Neumark and Class members paid higher prices for Zyn than what would have otherwise occurred in a market free of Swedish Match's conduct.

98.     Plaintiff Neumark and Class members conferred a benefit upon Defendant with their money.  Specifically, they paid for Zyn.  In doing so, they indirectly paid Swedish Match through a retailer.  In exchange for paying for Zyn, Plaintiff Neumark and Class members received

overpriced Zyn products.  Defendant knew that Plaintiff Neumark and Class members conferred a

benefit which Defendant indirectly accepted.  Defendant profited heavily from these transactions.

99.     Defendant would not have profited as much as they have and continue to profit but

for their anticompetitive conduct, for which Plaintiff Neumark and Class members were entirely

unaware.

100.     Under principles of equity and good conscience, Defendant should not be entitled

to retain the money made through these unconscionable acts.

101.     Plaintiff Neumark and Class members have no other adequate remedy at law.

102.     As a direct and proximate result of Defendant's conduct, Plaintiff Neumark and

Class members have suffered injury (and will continue to suffer injury) including in the form of

higher prices in the Relevant Market.

103.     Defendant should be compelled to disgorge profits from this unlawful scheme into

a common fund or constructive trust, for the benefit of Plaintiff Neumark and the Class members.

In the alternative, Defendant should be compelled to return or refund the amounts that Plaintiff

and Class members overpaid for Defendant's Zyn products.

VII.    RELIEF REQUESTED

104.     To remedy these illegal acts, Plaintiff Neumark requests the following relief:

a.    Certify the Class and appoint Plaintiff Neumark as the Class' representative;

b.    Declaring, finding, adjudging and decreeing that the agreement of Defendant

Swedish Match and unnamed co-conspirator Phillip Morris is unlawful and violates

the federal and state antitrust laws and, therefore, must either result in a permanent

divestiture or is enjoined;

   c.   Declaring, finding, adjuding and decreeing that the conduct taken against DRYFT violates the federal and state antitrust laws;

   d.   Awarding to Plaintiff Neumark the costs of their suit, including reasonable attorneys' fees;

   e.   Awarding to Plaintiff Neumark their damages, in the amount to be determined by a jury, inclusive of treble damages as provided by the antitrust laws;

   f.   Granting to Plaintiff Neumark and Class any such and other relief to which they may be entitled and which this Court deems just and proper.

## VIII.   JURY TRIAL DEMANDED

105.   Plaintiff Neumark demands a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: November 18, 2024

Respectfully Submitted,

By: /s/  *Lee A. Floyd*
Lee A. Floyd, VSB #88459
**BREIT BINIAZAN, PC**
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
Telephone: (804) 351-9040
Facsimile: (804) 351-9170
Lee@bbtrial.com

Jeffrey K. Brown*
Blake Hunter Yagman*
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite #347
Carle Place, New York 11514
Telephone: (516) 873-9550
jbrown@leedsbrownlaw.com
byagman@leedsbrownlaw.com

James L. Ferraro*
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131

Telephone: (305) 375-0111
jferraro@ferrarolaw.com

Jason R. Sultzer*
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Telephone: (845) 483-7100
Facsimile: (888)749-7747
sultzerj@thesultzerlawgroup.com

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

*Pro Hac Vice* application forthcoming