**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| ALLEN NEUMARK and ERIC GREENWOOD on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SWEDISH MATCH NORTH AMERICA LLC and PHILIP MORRIS INTERNATIONAL INC.,<br><br>*Defendants.* | Case No. 3:24-cv-00821-DJN-EDVA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT AND STATE ANTITRUST LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Allen Neumark and Eric Greenwood ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint (the "Action") against Defendants Swedish Match North America LLC ("Swedish Match") and Philip Morris International Inc. ("Philip Morris") (together, "Defendants") pursuant to the federal and state antitrust laws, and the common law doctrine of unjust enrichment, seeking actual damages, treble damages, a declaratory judgment, injunctive relief, disgorgement of profits into a constructive trust, reasonable costs and attorneys' fees, pre- and post-judgment interest, and any relief that this Court deems just and proper, and in support thereof allege as follows:

## I. INTRODUCTION

1. This litigation is about two "Big Tobacco" giants cutting a deal to monopolize a market and to split the spoils amongst each themselves.

2. Philip Morris, one of the companies known to comprise "Big Tobacco," produces Marlboro cigarettes, smokeless alternatives, and other similar products. One such smokeless alternative product is called "Zyn," which is the subject of this Action.

3. Zyn is marketed, manufactured and/or sold by Philip Morris' affiliate or subsidiary Swedish Match (which, before being acquired by Philip Morris, was a Big Tobacco giant in its own right).

4. Zyn is a modern oral nicotine pouch ("MON").[1] According to one of Philip Morris' main competitors, British American Tobacco, MONs are "pouches which contain high purity nicotine, water and other high-quality ingredients, including cellulose fib[er]s, flavoring and sweeteners. Customers place the disposable pouch between their gum and upper lip, typically for around 30 minutes, during which nicotine and flavors are released and the nicotine is absorbed [orally.]"[2] Currently, according to Defendants, Zyn is sold in ten different varieties/flavors as well as in two different strengths.[3]

5. Tins containing Zyn appear as follows:

[1] *Dryft Alleges Swedish Match Drove It Off the Market*, CPS Daily News (Aug. 23, 2022) https://www.cspdailynews.com/tobacco/dryft-alleges-swedish-match-drove-it-market#:~:text=In%20November%202020%2C%20the%20U.S.,its%20global%20MON%20brand%2C%20Velo., (last accessed Nov. 3, 2024).

[2] British American Tobacco - Modern oral, https://www.bat.com/science-and-research/modern-oral, (last accessed, Nov. 3, 2024).

[3] Zyn website - *About Zyn*, https://us.zyn.com/about-zyn/, (last accessed, Nov. 3, 2024).



[4]

6. Zyn pouches appear as follows:



[5]

7. The rise of Zyn in the United States is best marked by Zyn's massive market share, which is estimated to be at least 80% of the market for MON products within the domestic United States ("Relevant Market").[6]

---

[4] *Id.*

[5] *Id.*

[6] *Dryft Alleges Swedish Match Drove It Off the Market*, CPS Daily News (Aug. 23, 2022), https://www.cspdailynews.com/tobacco/dryft-alleges-swedish-match-drove-it-market#:~:text=In%20November%202020%2C%20the%20U.S.,its%20global%20MON%20brand%2C%20Velo., (last accessed, Nov. 3, 2024).

8. Currently, Swedish Match sells billions of dollars-worth of MON products within the United States, as marked by the steady increase in annual sales numbers of Zyn:

a. 2018: 12.7 million tins

b. 2019: 50.4 million tins

c. 2020: 130 million tins

d. 2021: 198 million tins

e. 2022: 237 million tins

f. 2023: 384 million tins

g. 2024 (projected): 580 million tins

9. The rapid ascent of Zyn, however, is not due to business acumen or the natural progression of being a first-mover within the Relevant Market. Rather, Zyn gained its monopoly power through an unlawful acquisition by Philip Morris.

10. Although MON products arrived in the United States in 2014, in 2019, Philip Morris still had no market share in the Relevant Market.[7] On December 3, 2019, then-chief executive officer (Andre Calantzopoulos) of Philip Morris expressed the tobacco giant's initial interest in entering the Relevant Market at the Morgan Stanley Global Consumer & Retail Conference in New York, New York.[8] While all of Philip Morris' competitors were developing similar MON products driven by shifting consumer preferences to utilize smokeless nicotine products, investors wondered about Philip Morris' lack of a presence in the Relevant Market.

---

[7] https://www.tobaccotactics.org/article/newer-nicotine-and-tobacco-products-philip-morris-international/#ttref-note-27 (last accessed, Jan. 29, 2025).

[8] *See, e.g.*, https://web.archive.org/web/20191204124011/https:/philipmorrisinternational.gcs-web.com/static-files/e410ef84-50c3-490d-a6b4-dab352f02279, (last accessed Jan. 29, 2025).

Upon being asked about Philip Morris' plans to develop a MON product, Calantzopoulos stated that the MON market was "an emerging category … which we are looking at as well."[9] This demarcated a shift in Philip Morris' business strategy to aggressively pursue entrance into the MON market.

11. Calantzopoulos and Philip Morris acted quickly to monopolize the Relevant Market: acquiring two major competitors in the Relevant Market within a year of each other.

12. *First,* On May 7, 2021, Philip Morris acquired Danish MON manufacturer AG Snus AS, which sold a MON product called "Shiro."[10] This allowed Philip Morris to initially penetrate the market although the Shiro product did not really catch on. Shiro was reformulated in early 2022 and then, eventually, was discontinued (in favor of Zyn).[11]

13. *Then,* on May 11, 2022, unchecked by regulatory authorities, Philip Morris next acquired the market leader (Zyn) in the Relevant Market by purchasing an 93% stake in Swedish Match for $16 billion.[12] This allowed Philip Morris to quickly capture a substantial market share, and it quickly overtook the Relevant Market.

14. Indeed, at its core, these acquisitions turned the Relevant Market on its head – making it nearly impossible to regain the ground that Philip Morris would catch on its competitors.

---

[9] https://www.tobaccotactics.org/article/newer-nicotine-and-tobacco-products-philip-morris-international/#ttref-note-27, (last accessed, Jan. 29, 2025).

[10] https://www.marketscreener.com/quote/stock/PHILIP-MORRIS-INTERNATION-2836703/news/Philip-Morris-International-Inc-NYSE-PM-acquired-AG-SNUS-AS-from-Gundersen-family-for-38-million-33402234/, (last accessed Jan. 29, 2025).

[11] https://www.tobaccotactics.org/article/newer-nicotine-and-tobacco-products-philip-morris-international/#ttref-note-27, (last accessed, Jan. 29, 2025).

[12] https://www.reuters.com/business/philip-morris-launches-16-bln-cash-offer-swedish-match-2022-05-11/, (last accessed Nov. 3, 2024).

Philip Morris' flurry of acquisitions resulted in the elimination of one market player (Shiro) in favor of the dominant market player (Zyn).

15. The agreement between Swedish Match and Philip Morris to cede control of Zyn to Philip Morris while withdrawing Shiro from the Relevant Market harmed competition in the Relevant Market, a highly concentrated one with few notable players.

16. As a result of these unlawful acquisitions, there is limited robust competition in the Relevant Market because Defendants throttled competition in a way that reduces output, the incentive to innovate and the desire of new entrants to compete in the Relevant Market.

17. This individual and collective conduct was anticompetitive, and its effects are persistent and enduring. Defendants' conduct has illegally restrained competition in the Relevant Market in violation of the federal and state antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, prices for Zyn products were raised, fixed, maintained and/or stabilized at supracompetitive levels.

18. Indeed, the creation of a monopoly in the Relevant Market has harmed consumers seeking to quit smoking through the use of Zyn's products in the form of higher prices and quality reduced by the fact that there are no competitors in the Relevant Market that have the ability to compete with Philip Morris and Swedish Match.

19. Against this backdrop, Plaintiffs Neumark and Greenwood as well as Class members, purchasers of Zyn at retail from May 11, 2022 through the present day ("Class Period") bring this indirect purchaser plaintiff consumer antitrust class action against Philip Morris and Swedish Match due to Defendants' unlawful acquisition of a monopoly in the Relevant Market for violations of Sections 1 and 2 of the Sherman Act (the "Sherman Act"), Section 7 of the Clayton Act (the "Clayton Act"), the state antitrust laws, and the common law doctrine of unjust

enrichment, and seek actual damages, treble damages, a declaratory judgment, injunctive relief, disgorgement of profit into a constructive trust, reasonable costs and attorneys' fees, pre- and post-judgment interest, and any relief that this Court deems just and proper.

## II. JURISDICTION, VENUE, and INTERSTATE COMMERCE

20. *Subject Matter Jurisdiction.* Plaintiffs bring this Action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as pursuant to state antitrust laws and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337 and 1367. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs bring this Action to remedy violations of the federal antitrust laws, the Clayton Act and Sherman Act. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

21. Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). This Court has subject matter jurisdiction pursuant to CAFA because the amount in controversy exceeds the sum of $5,000,000.00 (exclusive of costs and interest), there are more than 100 putative members of the Class, and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendants. Plaintiff Neumark is domiciled in Florida and Plaintiff Greenwood is domiciled in New York. Defendant Swedish Match is a limited liability company organized and existing under the laws of Delaware and headquartered in Virginia, and Defendant Philip Morris is a Delaware corporation and headquartered in Connecticut.

22. *Personal Jurisdiction.* This Court has personal jurisdiction over the litigants because Defendant Swedish Match is headquartered in Virginia, registered to do business in Virginia, has an appointed agent for service of process in Virginia, and harmed consumers located in Virginia through its conduct complained of herein. Further, Defendant Philip Morris is registered to do business in Virginia and has harmed consumers located in Virginia through its conduct complained of herein.

23. This court also has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permits bringing an antitrust lawsuit against any corporation in any district where that corporation may be found or transacts business as well as allows process in such cases to be served in any district where that corporation may be found.

24. *Venue.* This District is the proper venue for this litigation because Defendants transact business and/or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged of in this Action, also causes harm to consumers located in Virginia.

25. *Interstate Commerce.* Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition and consumers alike by raising prices, restricting output and throttling innovation.

## III. PARTIES

*Plaintiff Allen Neumark*

26. Plaintiff Neumark is domiciled in Miami-Dade County, Florida.

27. Plaintiff Neumark, during the Class Period, has used and continues to use Zyn products which were purchased by him at retail. As a result of Defendants' monopolistic and anticompetitive conduct, Plaintiff Neumark has paid and continues to pay higher prices for Zyn.

But for Defendants' conduct, Plaintiff Neumark would pay lower or non-supracompetitive prices in the Relevant Market for Zyn products.

*Plaintiff Eric Greenwood*

28. Plaintiff Greenwood is domiciled in Rockland County, New York.

29. Plaintiff Greenwood, during the Class Period, has used and continues to use Zyn products which were purchased by him at retail. As a result of Defendants' monopolistic and anticompetitive conduct, Plaintiff Greenwood has paid and continues to pay higher prices for Zyn. But for Defendants' conduct, Plaintiff Greenwood would pay lower or non-supracompetitive prices in the Relevant Market for Zyn products.

*Defendant Swedish Match North America LLC*

30. Defendant Swedish Match is a limited liability company organized and existing under the laws of Delaware with a principal place of business located in Richmond, Virginia.

*Defendant Philip Morris International Inc.*

31. Defendant Philip Morris International Inc. is a Delaware corporation with its principal place of business located in Connecticut.

## IV. FACTUAL ALLEGATIONS

### *The Relevant Market and Monopoly Power*

32. *Relevant Geographic Market.* Due to regulatory and other constraints, the geographic scope for the Relevant Market is the entirety of the United States. MON products have been sold in all fifty states for many years going as far back as 2014.

33. *Relevant Product Market.* Smoking articles (*e.g.,* cigarettes and cigars) and smokeless tobacco (*e.g.,* snus, moist snuff, chewing tobacco) deliver nicotine from tobacco. Use of both types of products, however, is associated with health hazards not necessarily related to the

delivery of nicotine itself. For example, tobacco smoke exposes users and secondhand persons to numerous combustion-related toxicants, and both smoking, as well as the use of tobacco, exposes users to carcinogens found in tobacco leaves. Accordingly, MON products like Zyn contribute to public health as safer, non-combusted, tobacco-leaf free alternatives for consumers. MON products are offered with different flavors and at different doses of nicotine.

34. MON products are highly distinct. Indeed, MON products became increasingly attractive to consumers as a cigarette and/or smokeless tobacco replacement because of a unique design, their convenience, their elimination of physical externalities (such as airborne smoke or saliva) and the fact that they are non-combustible. Because MON products provide a unique and preferrable alternative to cigarettes, smokeless tobacco and even smoking cessation items (*e.g.,* gums or lozenges) there are not reasonable substitutes for MON products. MON products constitute the Relevant Market's Product Market.

35. Taken together, the Product Market and the Geographic Market collectively make up the "Relevant Market" as defined by this Complaint.

36. *Monopoly Power.* For reasons unrelated to business acumen or product quality, Swedish Match (and therefore Philip Morris) has obtained a market share of at least 80% within the Relevant Market.[13]

37. Swedish Match is part of a much larger, deeper pocketed organization – its parent company, Swedish Match AB.[14] Swedish Match AB is listed on the Nasdaq Stockholm and most of its sales are located either within the Geographic Market (the United States) or within the

[13] *Dryft Sciences, LLC v. Swedish Match North America, LLC*, Case No. 2:22-cv-05355-SB-MRW (C.D. Ca. 2022), at ECF No. 57, Para. 21.

[14] *Id.*

Scandinavian countries.[15] Swedish Match AB, in its own right, is known as a member of "Big Tobacco." In November of 2022, Philip Morris, also a member of "Big Tobacco," purchased approximately 93% of Swedish Match AB for approximately $16 billion.[16]

38. To favor its unlawful monopoly goals and objectives, Philip Morris and Swedish Match exploited various unique barriers to entry into the Relevant Market, in addition to the usual barriers (*e.g.,* cost of development, manufacturing and distribution, etc.) which also apply here. For example, in light of regulatory limitations, there were only five brands of Food and Drug Administration-compliant MON products in the Relevant Market as of August 8, 2016, including Swedish Match's Zyn, Dryft's DRYFT, Modoral/British American Tobacco's Velo, Burger Sohne/Altria Group, Inc.'s "on!" product, and Rogue Holdings LLC/Swisher International Inc.'s Rogue.[17]

39. *Hypothetical Monopolist Test.* The Relevant Market satisfies the test for market definition used by federal antitrust agencies known as the SSNIP test. The test asks whether a hypothetical monopolist in a proffered market could impose small but significant (typically 5%) non-transitory price increases without causing a substantial number of customers to switch to alternative products or services such that the price increases would be unprofitable to the monopolist. If the SSNIP is profitable, the relevant market is properly defined.

40. Here, the SSNIP test is satisfied. As Philip Morris and Swedish Match continue to raise prices on consumers of its Zyn products, like Plaintiffs and Class members, they can do so

---

[15] *Id.*

[16] *Id.*

[17] *Id.,* at 20.

(and actually do so) without driving Zyn consumers from the Relevant Market and without sacrificing profit.

41. Furthermore, Philip Morris and Swedish Match have market power in the Relevant Market. This is because Defendants can dictate supracompetitive prices across the entirety of the Relevant Market as competitors cannot meaningfully compete and overcome barriers to entry without charging higher prices.

*Industry Background*

42. In the late 1990's and early 2000's, the horrid effects of tobacco use came to light in the United States and changed society. Millions of Americans have suffered from various illnesses associated with smoking of tobacco – indeed, tobacco use kills half of its users who do not quit, it kills more than 8 million people globally on an annual basis as well as 1.3 million people who are exposed to second-hand smoke.[18]

43. In the early 2000's, the World Health Organization formed a task force called the "WHO FCTC Protocol to Eliminate the Illicit Trade of Tobacco Products (ITP)," which is "the key supply side policy to reduce tobacco use and its health and economic consequences."[19]

44. In 2007, WHO introduced a cost-effective initiative to implement demand reduction provisions of the WHO FCTC protocol called MPOWER, which promoted six new anti-tobacco measures:

a. Monitor tobacco use and prevention policies (globally);

b. Protect people from tobacco use;

c. Offer to help quit tobacco use;

---

[18] https://www.who.int/news-room/fact-sheets/detail/tobacco, (last accessed January 30, 2025).

[19] *Id.*

d. Warn about the dangers of tobacco;

e. Enforce bans on tobacco advertising, promotion and sponsorship; and

f. Raise taxes on tobacco.[20]

45. Collectively, these measures have effectively saved millions of lives by either reducing the amount of people who use smokable tobacco or by ensuring that potential at-risk smokers never pick up a cigarette to begin with. Indeed, according to the WHO's 2021 report on tobacco use, 5.3 billion people globally are now protected by MPOWER's initiatives.[21]

46. As a result of MPOWER and other initiatives, "smoking prevalence among people aged over 15 years has fallen from 22.7% to 17.5%."[22] And while that drop off is significant, the economic burden on the global healthcare system as a result of smoking costs over $1.4 trillion per year.[23]

47. Against this backdrop, MPOWER's global initiatives have caused a precipitous drop off in the purchasing of cigarettes, as "global cigarette sales [have been] declining [since] 2012 and have continued ever since, even as the global population has grown."[24] Critically, MPOWER's initiatives have saved more than 37 million lives – including the lives of millions of Americans.[25]

---

[20] *Id.*

[21] https://iris.who.int/bitstream/handle/10665/343287/9789240032095-eng.pdf?sequence=1&isAllowed=y, (last accessed, Jan. 30, 2029).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

48. The reality for Big Tobacco then, and for Defendants, is that the tobacco-using consumer base's shifting preferences included a harsh and rapid movement away from purchasing traditional tobacco products – like cigarettes. And, as the WHO stated in its 2021, "[a]s cigarette sales have fallen, tobacco companies have been aggressively marketing new products" to take the place of cigarettes."[26] To that end, WHO states "[w]henever tobacco companies have faced a major threat, they have introduced new products promising they would be less harmful than conventional cigarettes. Ultimately, they just undermine progress while providing the industry with a new way to make money."[27]

49. One such product is the MON product, the type of product at issue here.

*The Rise of Zyn*

50. Nicotine pouches were initially produced for the first time by Niconovum in the Scandinavian countries beginning in 2008.[28] Quickly, and consistent with the aggressive acquisition strategies deployed by Big Tobacco companies, Niconovum was acquired one year later in 2009 by British American Tobacco (f/k/a RJ Reynolds), eventually making the MON product available in the United States and across all of Europe.[29]

---

[26] *Id.*

[27] *Id.*

[28] https://prilla.com/us/blog/the-history-of-zyn-nicotine-pouches#:~:text=ZYN%20was%20released%20in%20the%20US%20in%202014.&text=In%20comparison%2C%20other%20big%2Dname,weren't%20released%20until%202019., (last accessed Jan. 30, 2025).

[29] *Id.*

51. In 2014, Swedish Match (f/k/a Svenska Tobaksmonopolet and Svenska Tandsticks Aktiebolaget), introduced its own MON product in the United States – rivaling the MON product first introduced by then-RJ Reynolds.[30]

52. Consistent with the drop off in the use of smokable tobacco in the United States due to the shifts in consumer preferences, MON products became enormously popular extremely quickly.

53. According to the Centers for Disease Control and Prevention, Big Tobacco followed the same exact playbook used to sell cigarettes in order to build a market for MON products.

54. Using a variety of flavors, colorful packaging and marketing strategies similar to those used previously, advertising for MON products targeted a new demographic: younger people.[31] Coupled with the fact that high levels of nicotine are extremely addictive, the early entrants into the Relevant Market were able to gain a chokehold over consumers who otherwise would have gravitated to cigarettes had there not been such a substantial drop off in cigarette sales starting in 2012.[32]

55. Essentially, MON product users, like Plaintiffs and Class members, were a captive market: addicted to a product that was marketed and promoted as being safer than cigarettes. This gave Swedish Match's Zyn product a significant advantage as a result of having been one of the first MON products in the Relevant Market.

---

[30] *Id.*

[31] https://www.cdc.gov/tobacco/nicotine-pouches/index.html, (last accessed Jan. 30, 2025).

[32] *Id.*

56. This strategy has worked. Led by Zyn, the "[s]ales of nicotine pouches, including flavored [nicotine] punches, increased from 126 million [tins sold] in August 2019 to 808 million [tins sold] in March 2022."[33] And, with respect to younger people – over 320,000 middle school and high school aged students reported using Zyn products in the past year, according to the Centers for Disease Control.[34]

*Defendants Unlawfully Monopolize the Relevant Market*

57. By 2019, Swedish Match's sales of Zyn were significant (selling over 50 million tins of the Zyn product in the United States) and investors in the tobacco industry began to take notice – including Philip Morris.

58. Early on, Swedish Match had to have been identified by Philip Morris as a promising target for some sort of agreement, joint venture or merger as a result of its rapidly increasing market share and popularity with consumers.

59. On December 3, 2019, Philip Morris first expressed the tobacco giant's initial interest and willingness to enter the Relevant Market at the Morgan Stanley Global Consumer & Retail Conference in New York, New York.[35] While all of Philip Morris' competitors were developing similar MON products driven by shifting consumer preferences to utilize smokeless nicotine products (*e.g.*, Swedish Match's Zyn product and British American Tobacco's similar MON product), investors wondered about Philip Morris' lack of a presence in the Relevant Market. Upon being asked about Philip Morris' plans to develop a MON product, then-CEO of Philip

[33] https://www.cdc.gov/mmwr/volumes/73/wr/mm7335a3.htm?s_cid=mm7335a3_w, (last accessed, Jan. 30, 2025).

[34] *Id.*

[35] *See, e.g.*, https://web.archive.org/web/20191204124011/https:/philipmorrisinternational.gcs-web.com/static-files/e410ef84-50c3-490d-a6b4-dab352f02279, (last accessed Jan. 29, 2025).

Morris Andre Calantzopoulos stated that the MON market was "an emerging category … which we are looking at as well."[36] This demarcated a shift in Philip Morris' business strategy to aggressively pursue entrance into the MON market.

60. Philip Morris acted quickly to monopolize the Relevant Market: acquiring two major competitors in the Relevant Market within a year of each other.

61. *First*, Philip Morris acquired Danish MON manufacturer AG Snus AS, which sold a MON product called "Shiro."[37] This allowed Philip Morris' to initially penetrate the market – though the Shiro product did not really catch on, was reformulated in early 2022 and then, eventually, was discontinued (in favor of Zyn).[38] This was Philip Morris' opening salvo into the Relevant Market – essentially testing the waters to see what it could get away with and ultimately driving Shiro as a competitor to Zyn out of the Relevant Market.

62. *Then,* on May 11, 2022, unchecked by regulatory authorities, Philip Morris next acquired market leader (Zyn) in the Relevant Market by purchasing an 93% stake in Swedish Match for $16 billion.[39] This eliminated competition any between Philip Morris and Swedish Match for MON products and it instantaneously gave Philip Morris monopoly power in the Relevant Market.

---

[36] https://www.tobaccotactics.org/article/newer-nicotine-and-tobacco-products-philip-morris-international/#ttref-note-27, (last accessed, Jan. 29, 2025).

[37] https://www.marketscreener.com/quote/stock/PHILIP-MORRIS-INTERNATION-2836703/news/Philip-Morris-International-Inc-NYSE-PM-acquired-AG-SNUS-AS-from-Gundersen-family-for-38-million-33402234/, (last accessed Jan. 29, 2025).

[38] https://www.tobaccotactics.org/article/newer-nicotine-and-tobacco-products-philip-morris-international/#ttref-note-27, (last accessed, Jan. 29, 2025).

[39] https://www.reuters.com/business/philip-morris-launches-16-bln-cash-offer-swedish-match-2022-05-11/, (last accessed Nov. 3, 2024).

63. The merger itself was consummated in late November 2022 through a stock acquisition by Philip Morris's Philip Morris Holland Holdings B.V. entity of over 90% of Swedish Match's Swedish Match AB stock which was being traded on the Nasdaq Stockholm.[40] One month later, Swedish Match AB was delisted from Nasdaq Stockholm; and by February 28, 2023, Philip Morris Holland Holdings B.V. had acquired 100% ownership of Swedish Match AB.[41]

64. According to Swedish Match, the reason the merger took place is because both Philip Morris and Swedish Match 'believed in a smokeless future' and even pushed the narrative that "[Defendants] provide safer alternatives to cigarettes."[42]

65. To be clear, Defendants' acts to monopolize the Relevant Market through an illegal agreement were a direct response to the change in consumer sentiment about the dangers of smoking tobacco and were merely an attempt to plug in a new product to make up for the lost sales that this change caused. This is a case about the desire to generate revenue, not a benevolent act by Big Tobacco to provide new and safer products.

66. These acts benefited both Defendants tremendously. Philip Morris was able to penetrate a market it had no real presence in and which it knew was rapidly developing and growing; and Swedish Match, in exchange for neutralizing itself as a competitor of its Big Tobacco rival, was able to reap the financial rewards of being bought out for $16 billion.

67. At the end of the day, Defendants have acquired and protected their monopoly power through anticompetitive acts, leading to a highly profitable monopoly. These anticompetitive acts, both taken individually and collectively, are part of an overarching

---

[40] https://www.swedishmatch.com/globalassets/documents/presentations/2023_companypresentation_swedishmatch_en.pdf, (last accessed Jan. 30, 2025).

[41] *Id.*

[42] *Id.*

conspiracy to gain monopoly power in the Relevant Market in violation of the federal and state antitrust laws.

*Antitrust Injury*

68. The effect of Swedish Match's conduct economically injures consumers who use Zyn as well as competitors in the Relevant Market.

69. *Harm to Competition.* The anticompetitive acquisition of Swedish Match by Philip Morris was and remains harmful to competition. Rather than compete on the merits using the endless arsenal of "Big Tobacco" advantages and resources that Philip Morris has, Philip Morris instead struck a deal with its Big Tobacco competitor to monopolize the Relevant Market. Conversely, the anticompetitive acquisition of Swedish Match by Philip Morris allowed Swedish Match to profit financially from a monopoly position that otherwise would not have existed but for the conduct alleged herein.

70. *Harm to Consumers.* The harm that Defendants cause to consumers, like Plaintiff and Class members, is substantial and includes: (1) supracompetitive prices by virtue of the fact that Defendants can charge whatever it pleases after removing price competition by nascent and actual competitors that have downward pricing pressure, (2) higher prices (as much as double the price) for less product than other competitors with alternative products in the Relevant Market, (3) loss of innovation and superior product as a result of Defendants' conduct, which literally removed more innovative competitors from the market and (4) because of Defendants' dominant position and the insulation that its anticompetitive conduct gave to its monopoly, a throttled incentive to compete.

71. Additionally, the higher and/or supracompetitive prices that Plaintiffs and Class members pay for Zyn products are dictated by Philip Morris – who has control over the prices

charged in the Relevant Market not just on its website (which no longer distributes Zyn products in the United States) but at retail.[43]

72. Furthermore, there have been shortages whereby Defendants are unable to meet demand. These shortages are caused by Philip Morris' monopoly position and the monopoly's inability to accommodate the needs of the Relevant Market (*i.e.,* consumer demand for MON products) as the sole entity in control of a nearly 80% market share. This too causes harm to consumers, as they are unable to get MON products due to Defendants' dominant market position and their failure to meet the needs of the market.

## V. CLASS ACTION ALLEGATIONS

73. This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals. The nationwide class Plaintiffs seek to represent is defined as follows:

> **Nationwide Class.** All natural persons, businesses, and entities in the United States who purchased Zyn at retail during the Class Period.

74. In the alternative to the nationwide classes, Plaintiffs seek to represent the following statewide sub-class:

> **State Sub-Class.** All natural persons, businesses, and entities in the United States who live in states or territories that have *Illinois Brick* repealer antitrust statutes[44] and purchased Zyn at retail during the Class Period.

---

[43] https://vaping360.com/vape-news/7291/zyn-shortages-production-capacity-cant-meet-demand/, (last accessed, Nov. 5, 2024).

[44] Arizona, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia and Wisconsin.

75. Excluded from the Classes are (1) Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; (2) Plaintiffs' counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

76. Plaintiffs reserve the right to modify or amend the definition of the proposed Class and State Sub-Class before the Court determines whether certification is appropriate.

77. *Numerosity.* Both the Class and the State Sub-Class are so numerous that joinder would be impracticable.

78. *Commonality.* There are questions of law and fact common to each Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

i. Whether Defendants violated the antitrust laws;

ii. Whether Defendants engaged in anticompetitive conduct;

iii. Whether Defendants were unjustly enriched;

iv. Whether Plaintiffs were harmed;

v. Whether Plaintiffs are entitled to declaratory relief and injunctive relief to end Defendants' conduct; and

vi. Whether Plaintiffs and Class members are entitled to damages and other relief.

79. *Typicality.* Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the anticompetitive conduct as alleged herein. Plaintiffs, like all other Class members, were injured by Defendants' uniform conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and

all other Class members, such that there are no defenses unique to Plaintiffs. The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

80. *Adequacy of Representation.* Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

81. *Superiority of Class Action.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class members' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

82. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

83. Adequate notice can be given to Class members directly using information maintained in the parties' records.

84. *Predominance.* The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

85. This proposed class action does not present any unique management difficulties.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATIONS OF THE SHERMAN ANTITRUST ACT
### SECTION 1 – (RESTRAINT OF TRADE)
### (Nationwide Class -- For Declaratory and Injunctive Relief)

86. Plaintiffs reallege and repeat each and every allegation from paragraphs 1-87 as if fully set forth herein.

87. Defendant Swedish Match violated Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) by entering into, furthering and/or enforcing unreasonable restraints of trade through an agreement, contract, combination or conspiracy with Philip Morris. Swedish Match and Philip Morris entered into these agreements, contracts, combinations or conspiracies in order to restrain trade, to control prices and exclude competition and to willfully acquire and maintain monopoly power for Zyn in the Relevant Market.

88. In 2022, as alleged above, Swedish Match entered into an agreement with Philip Morris which eliminated Philip Morris as a competitor in exchange for control over Swedish Match and Swedish Match's Zyn products within the Relevant Market. This agreement includes a long-term arrangement whereby Zyn is produced and distributed by Swedish Match, but profits are shared by Defendants, former horizontal competitors in the Relevant Market.

89. Defendants' conduct has had an anticompetitive effect in the Relevant Market including by keeping others out of the Relevant Market, which maintained the supracompetitive prices that Plaintiffs and the Nationwide Class paid for Zyn.

90. Defendants' conduct has no legitimate business purpose or pro-competitive benefits – consumers have less options, pay higher prices and are forced to buy less innovative and creative MON products.

91. There are less restrictive alternatives to the restraints Defendants imposed on the Relevant Market.

92. Defendants' conduct has a substantial impact on interstate commerce.

93. Plaintiffs and the Nationwide Class have been or will be injured as a result of Defendants' unlawful combination, contract, conspiracy, agreement, and conduct.

94. For example, Plaintiffs and the Nationwide Class have paid more for Zyn than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

95. Plaintiffs and the Nationwide Class have suffered and will continue to suffer the type of injuries that the antitrust laws were intended to prevent.

96. Plaintiffs and the Nationwide Class have been and will be harmed due to the lack of competition in the Relevant Market caused by Defendants' conduct.

97. Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

98. Plaintiffs and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

99. The balance of hardships supports issuing injunctive relief, and the public interest is not disserved by a permanent injunction.

100. Accordingly, Plaintiffs and the Nationwide Class seek declaratory and injunctive relief, as well as reasonable costs and attorneys' fees, with respect to this cause of action.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF THE SHERMAN ANTITRUST ACT
### SECTION 2 – (MONOPOLIZATION/ATTEMPTED MONOPOLIZATION)
### (Nationwide Class -- for Declaratory and Injunctive Relief)

101. Plaintiffs reallege and repeat each and every allegation from paragraphs 1-87 as if fully set forth herein.

102. Defendants have willfully acquired and maintained monopoly power for Zyn in the Relevant Market.

103. Zyn has an over 80% market share – giving it monopoly power. Alternatively, Zyn has the power to control prices or exclude competition in the Relevant Market.

104. Defendants' monopoly power for Zyn in the Relevant Markets was accomplished through predatory, exclusionary and anticompetitive conduct, including but not limited to an anticompetitive agreement whereby Philip Morris would acquire Swedish Match, eliminate itself as a horizontal competitor and split the profits with Swedish Match.

105. Attempted Monopolization. Alternatively, Defendants attempted to acquire a monopoly through the above-stated conduct and came dangerously close to unlawfully gaining monopoly power.

106. Defendants' conduct has foreclosed consumer and competitor access to the Relevant Market.

107. Defendants' conduct has a substantial effect on interstate commerce.

108. Plaintiffs and the Nationwide Class have been injured as a result of Defendants' conduct.

109. Plaintiffs and the Nationwide Class have suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent.

110. Plaintiffs have been injured by the harm to competition in the Relevant Market as a result of Defendant's conduct.

111. Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

112. Plaintiffs and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

113. The balance of hardships supports issuing injunctive relief, and the public interest is not disserved by a permanent injunction.

114. Accordingly, Plaintiffs and the Nationwide Class seek declaratory and injunctive relief, as well as reasonable costs and attorneys' fees, with respect to this cause of action.

## <u>THIRD CAUSE OF ACTION</u>

### VIOLATIONS OF THE CLAYTON ANTITRUST ACT
### SECTION 7 (UNLAWFUL MERGER)
### (Nationwide Class -- for Declaratory and Injunctive Relief)

115. Plaintiffs reallege and repeat each and every allegation from paragraphs 1-87 as if fully set forth herein.

116. The effect of the acquisition by Philip Morris of Swedish Match is to substantially lessen competition or tends to create a monopoly in the Relevant Market in violation of Section 7 of the Clayton Act.

117. Unless enjoined, the acquisition continues to have the following deleterious effects:

a. Restraining actual and potential competition between Philip Morris and Swedish Match;

b. The elimination of a significant competitor with the resources to compete in the Relevant Market in a non-trivial way;

c. The elimination of competition by other firms;

d. Higher prices;

e. Reduced quality, choice and innovation; and

f. A general throttling of intrabrand competition.

118. By reason of this violation of law, Plaintiffs are threatened with the loss or damage to property in the form of higher prices for Zyn products and diminished product quality and innovation.

119. Plaintiffs, as frequent purchasers of the Zyn products over the Class period and into the foreseeable future, are entitled to bring suit pursuant to Section 16 of the Clayton Antitrust Act to obtain permanent injunctive relief against this acquisition and to recover the costs of suit, as well as a reasonable attorneys' fee.

120. There are no procompetitive justifications for Defendants' agreement and any proffered justification, to the extent legitimate, could have been achieved through less restrictive means.

121. Plaintiffs and the Nationwide Class have been injured as a result of Defendants' conduct.

122. Plaintiffs and the Nationwide Class have suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent.

123. Plaintiffs have been injured by the harm to competition in the Relevant Market as a result of Defendant's conduct.

124. Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

125. Plaintiffs and the Nationwide Class have suffered irreparable injury that remedies at law are inadequate to compensate.

126. The balance of hardships supports issuing injunctive relief, and the public interest is not disserved by a permanent injunction.

127. Accordingly, Plaintiffs and the Nationwide Class seek declaratory and injunctive relief, as well as reasonable costs and attorneys' fees, with respect to this cause of action.

## FOURTH CAUSE OF ACTION

### VIOLATIONS OF THE STATE ANTITRUST LAWS
### (State Sub-Class -- for Actual and Treble Damages)

128. Plaintiffs reallege and repeat each and every allegation from paragraphs 1-87 as if fully set forth herein.

129. The anticompetitive conduct as alleged herein violates the state antitrust laws of the following states for the same reason that they violate federal antitrust laws.

130. Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state unfair competition statutes listed below.

131. Each of these statutes are substantially similar, seek the same kind of relief and intend to protect against the same harm that other antitrust statutes (both federal and state) were codified to redress.

132. Accordingly, Plaintiff and State Sub-Class members seek all forms of available relief under these statutes, including actual damages, treble damages and reasonable costs and attorneys' fees.

Arizona's Arizona Uniform State Antitrust Act
Ariz. Rev. Stat. § 44-1401

133. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

134. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

135. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.

136. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

137. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

California's Cartwright Act
Cal. Bus. & Prof. Code § 16700

138. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

139. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

140. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

141. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Connecticut's Antitrust Act
Conn. Gen. Stat. § 35-24

142. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

143. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

144. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

145. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>District of Columbia's Antitrust Act</u>
D.C. Code § 28-4501

146. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

147. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

148. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

149. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>Florida's Deceptive and Unfair Trade Practices Act</u>
Fla. Stat. § 501.201(2)

150. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

151. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

152. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they

otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

153. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Illinois' Antitrust Act
740 Ill. Comp. Stat. Ann. 10/3(1)

154. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

155. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

156. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

157. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Iowa's Competition Law
Iowa Code § 553.1

158. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

159. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

160. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

161. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Kansas' Restraint of Trade Act
Kan. Stat. Ann. § 50-101

162. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

163. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

164. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

165. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Maine's Antitrust Statute
Me. Rev. Stat. Ann. Title 10 § 1101

166. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

167. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

168. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

169. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Maryland's Antitrust Statute
Md. Code Ann. § 11-204(a)

170. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

171. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

172. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they

otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

173. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Michigan's Antitrust Reform Act
Mich. Comp. Laws § 445.771

174. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

175. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

176. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

177. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Minnesota's Antitrust Law
Minn. Stat. §§ 325D.49 & 325D.57, *et seq.*

178. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

179. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

180. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

181. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>Mississippi's Antitrust Statute</u>
Miss. Code Ann. § 75-21-1

182. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

183. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

184. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

185. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>Nebraska's Junkin Act (Unlawful Restraint of Trade Act)</u>
Neb. Rev. Stat. § 59-801

186. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

187. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

188. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

189. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>Nevada's Unfair Trade Practices Act</u>
Nev. Rev. Stat. § 598A.010

190. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

191. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

192. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they

otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

193. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>New Hampshire's Antitrust Statute</u>
N.H. Rev. Stat. Ann. Title XXXI § 356

194. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

195. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

196. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

197. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>New Mexico's Antitrust Act</u>
N.M. Stat. Ann. § 57-1-1

198. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

199. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

200. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

201. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

New York's Donnelly Act
N.Y. Gen. Bus. Law § 340

202. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

203. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

204. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

205. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

North Carolina's General Statutes –
Monopolies, Trusts and Consumer Protection
N.C. Gen. Stat. § 75-1

206. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

207. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

208. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

209. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

North Dakota's Uniform State Antitrust Act
N.D. Cent. Code § 51-08.1-01

210. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

211. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

212. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they

otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

213. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Oregon's Antitrust Law
Or. Rev. Stat. § 646.705

214. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

215. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

216. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

217. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Puerto Rico's Anti-Monopoly Act
P.R. Laws Title 10 § 260

218. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

219. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

220. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

221. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

<u>Rhode Island's Antitrust Act</u>
6 R.I. Gen. Laws § 6-36-1

222. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

223. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

224. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

225. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

South Dakota's Antitrust Statute
S.D. Codified Laws § 37-1-3.1

226. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

227. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

228. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

229. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Tennessee's Trade Practices Act
Tenn. Code § 47-25-101

230. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

231. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

232. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they

otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

233. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Utah's Antitrust Act
Utah Code Ann. § 76-10-3101

234. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

235. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

236. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

237. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

West Virginia's Antitrust Statute
W. Va. Code § 47-18-1

238. During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory. Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

239. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

240. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

241. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

242. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

Wisconsin's Antitrust Act
Wis. Stat. § 133.01

243. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

244. Defendants' conduct has had the following impact: price competition for MON products in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of MON products.

245. As a direct and proximate result of Defendants' unlawful conduct, members of the State Sub-Class have been injured in their property in that they paid more for Zyn than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further injury.

246. Accordingly, Plaintiffs and State Sub-Class members seek all forms of available relief under this statute including, but not limited to, damages, their cost of suit, including reasonable attorneys' fees.

**<u>FIFTH CAUSE OF ACTION</u>**

UNJUST ENRICHMENT
(Nationwide Class -- for Disgorgement of Profits)

247. Plaintiffs reallege and repeat each and every allegation from paragraphs 1-87 as if fully set forth herein.

248. Plaintiffs and the Nationwide Class members paid higher prices for Zyn than those that would have otherwise occurred in a market free of Swedish Match and Philip Morris' conduct.

249. Plaintiffs and the Nationwide Class members each conferred a benefit upon Defendants with their money. Specifically, they paid for Zyn. In doing so, they indirectly paid Swedish Match and Philip Morris through a retailer. In exchange for paying for Zyn, Plaintiffs and the Nationwide Class members received overpriced Zyn products.

250. Defendants knew that Plaintiffs and the Nationwide Class members conferred a benefit which Defendants indirectly accepted. Defendants profited heavily from these transactions.

251. Defendants would not have profited, and continue to profit, as much as they have but for their anticompetitive conduct, for which Plaintiffs and the Nationwide Class members were entirely unaware.

252. Under principles of equity and good conscience, Defendants should not be entitled to retain the money made through these unconscionable acts.

253. Plaintiffs and the Nationwide Class members have no other adequate remedy at law.

254. As a direct and proximate result of Defendants' conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Zyn in the Relevant Market.

255. Defendants have benefited from their unlawful acts and it would be inequitable, based on unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the Nationwide Class for Zyn.

256. Plaintiffs and the Nationwide Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

257. Plaintiffs and the Nationwide Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Nationwide Class may make claims on a pro rata basis.

258. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Defendants' sales of Zyn.

## VII. RELIEF REQUESTED

259. To remedy these illegal acts, Plaintiffs request the following relief:

a. Certify the Class and appoint Plaintiffs as the representatives of the Class and Sub-Class;

b. Declare, find, adjudge and decree that the agreement of Defendants Swedish Match and Philip Morris is unlawful and violates the federal and state antitrust laws and, therefore, must either result in a permanent divestiture or is enjoined;

c. Award Plaintiffs the costs of their suit, including reasonable attorneys' fees;

d. Award Plaintiffs their damages, in the amount to be determined by a jury, inclusive of treble damages as provided by the antitrust laws;

e. Granting to Plaintiffs and Class any such and other relief to which they may be entitled and which this Court deems just and proper.

## VIII. JURY TRIAL DEMANDED

260. Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

DATED: February 10, 2025

Respectfully Submitted,

/s/ Lee A. Floyd
Lee A. Floyd (VSB No. 88459)
Justin M. Sheldon (VSB No. 82632)
BREIT BINIAZAN, PC
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
Tel: (804) 351-9040
Fax: (904) 351-9170
Lee@bbtrial.com
Justin@bbtrial.com

Jeffrey K. Brown*
Blake Hunter Yagman (admitted *pro hac vice*)
LEEDS BROWN LAW, P.C.
One Old Country Road, Suite #347
Carle Place, New York 11514
Tel: (516) 873-9550
jbrown@leedsbrownlaw.com
byagman@leedsbrownlaw.com

James L. Ferraro*
James L. Ferraro, Jr.*
Natalia Salas*
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel: (305) 375-0111
jferraro@ferrarolaw.com

james@ferrarolaw.com
nsalas@ferrarolaw.com

Jason Sultzer (admitted *pro hac vice*)
Jeremy Francis (admitted *pro hac vice*)
Scott Evan Silberfein (admitted *pro hac vice*)
SULTZER & LIPARI, PLLC
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
francisj@thesultzerlawgroup.com
silberfeins@thesultzerlawgroup.com

*Attorneys for Plaintiffs and the Proposed Classes*