**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| ALLEN NEUMARK and ERIC GREENWOOD on behalf of themselves and all others similarly situated, *Plaintiffs*, v. SWEDISH MATCH NORTH AMERICA LLC, and PHILIP MORRIS INTERNATIONAL INC., *Defendants*. | Civil Action No. 3:24-cv-00821 Judge David J. Novak |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................ 3

    A.  The Products and the Alleged Relevant Market ................................................ 3

    B.  PMI's Transaction with Swedish Match ........................................................... 4

    C.  PMI's Prior Transaction with AG Snus............................................................. 5

    D.  Supply of MON Products in the United States .................................................. 5

PROCEDURAL BACKGROUND......................................................................................... 6

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    A.  The Federal Antitrust Claims Fail Because Plaintiffs Do Not Plausibly Allege
           Harm to Competition .......................................................................................... 8

        i.    Plaintiffs Do Not Plausibly Allege the Transaction Violated the Clayton Act............. 9

        ii.   The Sherman Act Section One Claim Fails for the Same Reasons as the
             Clayton Act Claim............................................................................................... 15

        iii.  The Same Allegations also Fail under Section Two of the Sherman Act .................. 17

    B.  The State Antitrust and Unfair Trade Claims Fail with the Federal Claims ..................... 18

    C.  Plaintiffs' Generic "Unjust Enrichment" Claims Do Not Meet the Pleading Standard.... 19

    D.  Various State Law Claims Fail for Additional Reasons.................................................. 20

CONCLUSION..................................................................................................................... 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alcazar v. Va. Dep't of Corr.*,
No. 3:24-cv-307, 2024 WL 4009631 (E.D. Va. Aug. 30, 2024) ...............................................7

*Altria Group, Inc.*,
No. 9393, 2022 WL 622476 (F.T.C. Feb. 23, 2022) ...................................................... 11-12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................7

*B.A.T. Indus., Ltd.*,
No. 9135, 1984 WL 565384 (F.T.C. Dec. 17, 1984) ...............................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ...................................................................................................16

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008) ...................................................................................8, 23

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ...................................................................................9

*Demartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) ...................................................................11

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ...................................................................................8, 16

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984) ...................................................................................16

*Dryft Sciences, LLC, v. Swedish Match N. Am., LLC*,
No. 2:22-cv-05355, 2022 WL 18231687 (C.D. Cal. Nov. 18, 2022) ...................................6

*Eastman v. Quest Diagnostics Inc.*,
   724 F. App'x 556 (9th Cir. 2018) ................................................................... 17-18

*Fraser v. Major League Soccer, LLC*,
   284 F.3d 47 (1st Cir. 2002) .................................................................................17

*FTC v. Atl. Richfield*,
   549 F.2d 289 (4th Cir. 1977) ...................................................................... *passim*

*FTC v. Cmty. Health Sys., Inc.*,
   736 F. Supp. 3d 335 (W.D.N.C. 2024) ................................................................11

*FTC v. Meta Platforms, Inc.*,
   654 F. Supp. 3d 892 (N.D. Cal. 2023) .........................................................11, 13

*FTC v. Steris Corp.*,
   133 F. Supp. 3d 962 (N.D. Ohio 2015)................................................................11

*Giarratano v. Johnson*,
   521 F.3d 298 (4th Cir. 2008) .................................................................................7

*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010) ....................................................................9, 12, 14

*Haskins v. Va. Dep't of Soc. Servs.*,
   No. 3:22cv456, 2022 WL 17574073 (E.D. Va. Dec. 9, 2022) .................................8

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)......................................................................................18, 20

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015).....................................................................20

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-MD-2481, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014)..........................19

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012).......................................................... 20, 22-23

*In re Digit. Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)..............................................................20-21

*In re Flonase Antitrust Litig.*,
   692 F. Supp. 2d 524 (E.D. Pa. 2010) ...............................................................20-21

*In re K-Dur Antitrust Litig.*,
    No. 01–1652, 2008 WL 2660780 (D.N.J. Feb. 28, 2008) ........................................................21

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019)........................................................................................23

*In re Novartis and Par Antitrust Litig.*,
    No. 18 Civ. 4361, 2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019) ...........................................22

*In re Plavix Indirect Purchaser Antitrust Litig.*,
    No. 1:06-cv-226, 2011 WL 335034 (S.D. Ohio Jan. 31, 2011)..............................................19

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
    No. CV 19-7532, 21-20451, 2024 WL 2861865 (D.N.J. June 6, 2024)........................... 18-19

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    No. 13-MD-2445, 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017)..............................................19

*In re Tamoxifen Citrate Antitrust Litig.*,
    277 F. Supp. 2d 121 (E.D.N.Y. 2003) ...................................................................................19

*In re Terazosin Hydrochloride Antitrust Litig.*,
    160 F. Supp. 2d 1365 (S.D. Fla. 2001) ..................................................................................21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...........................................................................20, 23

*In re Treasury Sec. Auction Antitrust Litig.*,
    No. 15-2673, 2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021)..................................................19

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) .................................................................................................17

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ............................................................................ 1, 8, 16-17

*Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    638 F.2d 1255 (5th Cir. 1981) ...............................................................................................12

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)..............................................................................................................15

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ..................................................................................19

*SCPH Legacy Corp. v. Palmetto Health, Prac. Partners in Healthcare, Inc.*,
No. 3:16-CV-2863, 2017 WL 1437329 (D.S.C. Feb. 24, 2017) ........................................ 10-11

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ................................................................................21, 23

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ..............................................................................................................17

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
782 F. Supp. 2d 1059 (E.D. Cal. 2011) ................................................................................16

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) ..................................................................................................9

*Tenneco, Inc. v. FTC*,
689 F.2d 346 (2d Cir. 1982) ..................................................................................................12

*Thompson Everett v. Nat. Cable Advert., L.P.*,
57 F.3d 1317 (4th Cir. 1995) ............................................................................................8, 16

*Turner v. Va. Dep't of Med. Assistance Servs.*,
301 F. Supp. 3d 637 (E.D. Va. 2018) ...................................................................................16

*United States v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018) ........................................................................................9

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) ..............................................................................................................11

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974) ..............................................................................................................10

*United States v. Marine Bancorp., Inc.*,
418 U.S. 602 (1974) ...................................................................................................... 11-12, 14

*United States v. Siemens Corp.*,
621 F.2d 499 (2d Cir. 1980) ..................................................................................................11

*Vantico Holdings S.A. v. Apollo Mgmt., LP*,
247 F. Supp. 2d 437 (S.D.N.Y. 2003) ...................................................................................16

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ..............................................................................................................17

*White Consol. Indus., Inc. v. Whirlpool Corp.,*
    781 F.2d 1224 (6th Cir. 1986) ...........................................................................16

### State Cases

*State of Cal. ex rel. Van de Kamp v. Texaco, Inc.,*
    46 Cal. 3d 1147 (1988) ......................................................................................21

### Federal Statutes

15 U.S.C. § 1 .................................................................................................. 15-16

15 U.S.C. § 2 ........................................................................................................17

15 U.S.C. § 18 ........................................................................................................9

### State Statutes

740 Ill. Comp. Stat. Ann. 10/7 ...........................................................................20

Alaska Stat. Ann. § 45.50.577 ............................................................................22

Ark. Code Ann. § 4-75-315(b) ............................................................................22

Idaho Code Ann. § 48-108(2) .............................................................................22

Wash. Rev. Code. Ann. § 19.86.080(3) ..............................................................22

Wyo. Stat. Ann. § 40 4 114.2 ..............................................................................22

### Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (5th ed. 2024) ..............................................11

## INTRODUCTION

The heart of Plaintiffs' Original Complaint was that Swedish Match engaged in "sham" litigation to eliminate competition for the sale of modern oral nicotine products (MON) in the United States. But Plaintiffs scuttled that core theory after Swedish Match filed a Motion to Dismiss. Instead, Plaintiffs now rest their Amended Complaint—and this entire case—on the flimsy allegation that the acquisition of Swedish Match by companies affiliated with Philip Morris International, Inc. (PMI) somehow violated antitrust law. But these allegations remain meritless, and it is now time to dismiss this action with prejudice. Plaintiffs' amendments confirm this case will never be viable no matter how many times it is re-pled.

Harm to competition is "the essence of an antitrust violation." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012). But Plaintiffs' own allegations refute any plausible inference that PMI's purchase of Swedish Match (the Transaction) caused competitive harm in the U.S. market for MON (the Relevant Market). As the Amended Complaint explains, Swedish Match allegedly had a high share in the Relevant Market, but PMI had no competing product in the United States and thus no share in the Relevant Market. Said differently, Defendants were not horizontal competitors, so the Transaction could not increase market concentration. The combined business had the same alleged high market share post-Transaction as Swedish Match did pre-Transaction, and competition in the Relevant Market did not change.

Without allegations that the Transaction caused a loss of horizontal competition between the merged parties or increased market concentration, Plaintiffs must rest their case on a "potential competition" theory, a tenuous claim at the outer bounds of antitrust law. To make out a claim based on this uncommon theory, Plaintiffs need to allege that PMI would have independently entered the market but for its merger with Swedish Match, and that the lack of

such entry by PMI substantially lessened competition. *FTC v. Atl. Richfield*, 549 F.2d 289, 294-95 (4th Cir. 1977). Plaintiffs do neither. Far from sufficiently alleging that PMI had a plan or ability to enter on its own, Plaintiffs allege numerous barriers that would have hindered PMI from independently selling MON in the U.S. absent the Transaction. ¶¶ 32, 38, 55, 58.

No matter what antitrust theory the Plaintiffs cast, the Amended Complaint contains only conclusory allegations and antitrust buzzwords, but no factual allegations plausibly suggesting the challenged Transaction harmed competition. To the contrary, Plaintiffs describe a marketplace with product variety, ever-increasing output, and intense price competition—the opposite of a market suffering from competitive malaise due to antitrust wrongdoing. ¶¶ 54, 56, 70. Because the Amended Complaint fails to plausibly allege any competitive harm, it fails under Section Seven of the Clayton Act, as well as Sections One and Two of the Sherman Act.

Plaintiffs' state-law claims fare no better. The state antitrust claims fail for the same reason as the federal claims, and the generic unjust enrichment claims fail because they are premised on inadequately pled antitrust claims. Numerous additional deficiencies under various state laws also warrant dismissal of individual state-law claims, but the Court need not even reach those issues.

Plaintiffs have now had the opportunity to amend their complaint with guidance from Swedish Match's Motion to Dismiss. Having failed to plausibly allege any claims in their second attempt, Plaintiffs' action should be dismissed with prejudice.

## FACTUAL BACKGROUND[1]

### A.    The Products and the Alleged Relevant Market[2]

Plaintiffs alleged a Relevant Product Market for antitrust purposes that only includes MON.  ¶ 34.  MON products "provide a unique and preferrable [*sic*] alternative to cigarettes, smokeless tobacco and even smoking cessation items (*e.g.*, gums or lozenges)."  *Id.*  According to Plaintiffs, "MON products . . . contribute to public health as safer, non-combusted, tobacco-leaf free alternatives for consumers."  ¶ 33.  One MON product now produced by PMI subsidiary Swedish Match is ZYN.  ¶ 3.  ZYN is the most popular MON product in the United States.  ¶ 7.

Geographically, Plaintiffs limit the Relevant Market to the United States.  ¶ 32.  They allege there are substantial barriers to entering the United States with a MON product, including "unique barriers" such as "regulatory limitations" and typical barriers such as the "cost of development, manufacturing and distribution."  ¶ 38.  Plaintiffs go out of their way to emphasize these alleged barriers, and even allege that Defendants "exploited" them in furtherance of their objectives.  *Id.*  Due to these barriers, "there were only five brands of Food and Drug Administration-compliant MON products in the Relevant Market as of August 8, 2016."  ¶ 38.

---

[1] For purposes of this motion under Federal Rule of Civil Procedure 12(b)(6), these facts are drawn from the Amended Complaint.  "¶" citations are to paragraphs in the Amended Complaint, except where noted.  Defendants do not concede or endorse the accuracy of any of these allegations.  Given the posture under Rule 12, this brief uses the generic terms "Philip Morris" or "PMI" to refer to Philip Morris entities and "Swedish Match" to refer to Swedish Match entities even though more precise corporate definitions apply.

[2] This motion does not address the validity of Plaintiffs' alleged Relevant Market.  Defendants preserve all arguments related to all elements of Plaintiffs' claims.

B.    **PMI's Transaction with Swedish Match**

Swedish Match launched the MON product ZYN in the U.S. in 2014, giving it "a significant advantage as a result of having been one of the first MON products in the Relevant Market." ¶¶ 51, 55. PMI did not enter the Relevant Market until it purchased Swedish Match, before which PMI had "no real presence" and "no market share in the Relevant Market." ¶¶ 10, 66; *accord* Original Compl. ¶ 47, ECF No. 1 (before the Transaction, PMI was "virtually . . . a non-competitor with 0% market share").[3]

The Amended Complaint alleges that PMI faced investor pressure to get into this new product category. ¶ 59. In the words of one PMI executive, the MON market was "an emerging category . . . which we are looking at." ¶ 10. However, according to Plaintiffs, PMI was stymied by the various barriers to entry. ¶¶ 32, 38. Ultimately, PMI decided to purchase Swedish Match, which already had a popular MON product on the U.S. market. ¶ 38.

Plaintiffs allege that PMI obtained 93% ownership of Swedish Match on May 11, 2022, and ultimately acquired the remainder for over $16 billion in total. ¶¶ 13, 63. Plaintiffs claim

---

[3] PMI did not sell tobacco or MON products in the United States before the Transaction. *See, e.g.*, Philip Morris International Inc., Quarterly Report (Form 10-Q) 13 (June 30, 2021) ("Philip Morris International Inc. is a holding company incorporated in Virginia, U.S.A. . . . whose subsidiaries and affiliates and their licensees are engaged in the manufacture and sale of cigarettes and other nicotine-containing products, including reduced-risk products, in markets *outside* of the United States of America.") (emphasis added). PMI was spun out of Altria Group, Inc. in 2008 and is an entirely different company from Philip Morris USA. *See* Philip Morris International, Inc., Quarterly Report (Form 10-Q) 9-10 (Mar. 31, 2008). Altria subsidiary Philip Morris USA retained the tobacco business in the United States, including the Marlboro brand. *See* Altria Group, Inc., Annual Report (Form 10-K) 2 (Dec. 31, 2023). PMI still does not sell Marlboro or other combustible products in the United States, so Plaintiffs' allegations regarding Marlboro sales, ¶ 2, must refer to sales of Marlboro outside the United States.

the Transaction was "unchecked" by regulators, ¶ 13, but that can only mean that it was not

*blocked*, as public sources confirm antitrust regulators reviewed it and did not challenge it.[4]

### C.    PMI's Prior Transaction with AG Snus

Prior to the Transaction, on May 7, 2021, PMI had "acquired *Danish* MON manufacturer

AG Snus AS, which sold a MON product called 'Shiro.'"  ¶ 12 (emphasis added).  Plaintiffs do

not allege that Shiro was ever available for sale in the United States.  *See* ¶ 38 (listing the five

brands of MON products in the United States, which does not include Shiro).  As Plaintiffs

previously alleged, "Shiro never came to market in the United States."  Original Compl. ¶ 46; *see*

*also id.* ¶ 47 (alleging PMI had 0% market share).  More generally, "the Shiro product did not

really catch on" anywhere in the world.  ¶ 12.  Plaintiffs do not allege that PMI ever had plans to

sell Shiro in the United States.

### D.    Supply of MON Products in the United States

No later than 2019, "all of Philip Morris' competitors were developing similar MON

products driven by shifting consumer preferences to utilize smokeless nicotine products."  ¶ 10.

This effort by other suppliers produced a competitive marketplace with ever-increasing output in

the United States and an array of products despite the alleged barriers to entry.  Overall, "[s]ales

of nicotine pouches, including flavored [nicotine] punches [*sic*], increased from 126 million [tins

sold] in August 2019 to 808 million [tins sold] in March 2022."  ¶ 56 (brackets in original).

Today, an array of MON products are available in the United States.  *See* ¶ 54.  ZYN alone is

---

[4] *See, e.g.*, Philip Morris International Inc., Current Report (Form 8-K) Ex. 99-1 (Aug. 9, 2022)
(stating that the U.S. antitrust HSR waiting period had expired); European Commission Press
Release IP/22/6372, Mergers: Commission approves Philip Morris International's acquisition of
Swedish Match, subject to condition (Oct. 24, 2022) (announcement by European antitrust
regulator requiring divestiture for approval of Transaction).

"sold in ten different varieties/flavors as well as in two different strengths." ¶ 4. Between 2018 and 2024, ZYN output in the United States expanded from 12.7 million tins to a projected 580 million tins—with a growth rate of anywhere from 20% to 300% year-to-year over that period. ¶ 8. MON products are also available in the U.S. at a range of prices. While ZYN is one of the higher-priced products, other brands are available for less than half the price of ZYN. ¶ 70.

## PROCEDURAL BACKGROUND

As described in Swedish Match's prior Motion to Dismiss, Plaintiffs' Original Complaint was cribbed from a long-resolved dispute between Swedish Match and a competitor. *See* Memo. in Support of Mtn. to Dismiss 5, ECF No. 23. The competitor had filed an antitrust claim alleging monopolization by sham litigation in an attempt to obtain leverage for settling Swedish Match's intellectual property infringement and misappropriation claims. The court in those cases identified "serious challenges to [the antitrust suit's] viability" and directed the plaintiff there to amend its complaint. *Dryft Sciences, LLC v. Swedish Match N. Am.*, *LLC*, No. 2:22-cv-05355, 2022 WL 18231687, at *1 (C.D. Cal. Nov. 18, 2022). The *Dryft* plaintiff did so, but the antitrust suit and underlying intellectual property dispute were resolved before a ruling on the second motion to dismiss.

Thus, when Plaintiffs here filed their Original Complaint nearly two years later, they had the advantage of two complaints and two sets of briefing on motions to dismiss in the *Dryft* litigation. They relied on these materials in their Original Complaint, copying extensively from the *Dryft* complaints, and tacking on the claim related to the Transaction. Swedish Match moved to dismiss, explaining why the sham litigation claim was barred by *Noerr-Pennington* immunity and the Transaction claim did not allege harm to competition. *See* Memo. in Support of Mtn. to Dismiss, ECF No. 23.

Rather than seeing the Original Complaint through, Plaintiffs quickly informed Swedish Match of their intention to amend under Federal Rule of Civil Procedure 15(a)(1)(B). The parties agreed to a new briefing schedule, ECF Nos. 24, 25, 29, and Plaintiffs filed the Amended Complaint. ECF No. 26. Plaintiffs dropped the sham litigation claim, eliminating the main allegation from the Original Complaint. Plaintiffs instead chose to focus on puffing up their secondary Transaction claim, and they added Swedish Match's affiliate Philip Morris International Inc. as a named defendant.

Although Swedish Match's original 28-page motion addressing every claim was a comprehensive roadmap to amendment, Plaintiffs again fail to make plausible allegations to support their claims in the Amended Complaint. As that failure demonstrates, there is no viable case here, and the Amended Complaint should be dismissed with prejudice.

## LEGAL STANDARD

A complaint must be dismissed under Rule 12(b)(6) if it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* But the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotations omitted). Formulaic recitation of the elements of a claim is likewise insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While allegations of material fact are generally assumed true, "th[is] tenet . . . is inapplicable to legal conclusions." *Alcazar v. Va. Dep't of Corr.*, No. 3:24-cv-307, 2024 WL 4009631, at *3 (E.D. Va. Aug. 30, 2024) (Novak, J.) (quoting *Ashcroft*, 556 U.S. at 678).

7

Where a plaintiff has had the opportunity to amend a complaint, dismissal with prejudice is appropriate. *See, e.g.*, *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (holding that "the district court did not abuse its discretion in denying leave to amend" because "it is clear that amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability"); *Haskins v. Va. Dep't of Soc. Servs.*, No. 3:22cv456, 2022 WL 17574073 (E.D. Va. Dec. 9, 2022) (Novak, J.) (dismissing amended complaint with prejudice).

## ARGUMENT

### A.    The Federal Antitrust Claims Fail Because Plaintiffs Do Not Plausibly Allege Harm to Competition

It is well settled that harm to competition is "the essence of an antitrust violation." *Loren Data*, 501 F. App'x at 282; *see also Atl. Richfield*, 549 F.2d at 295 ("Section 7 requires a showing of reasonable probability that a merger will have anticompetitive effects.") (cleaned up); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (to violate Section One of the Sherman Act, conduct "must harm the competitive *process* and thereby harm consumers") (emphasis in original); *Thompson Everett v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (similar for Section Two). Yet Plaintiffs allege no competitive harm here. Instead, they confirm that, when PMI purchased Swedish Match, PMI had "no real presence" and "no market share" in the Relevant Market, ¶¶ 10, 66, so the Transaction could not harm existing competition. The allegation that PMI and Swedish Match were not competitors dooms all of Plaintiffs' claims that the Transaction reduced actual competition, and no amendment could change that. Plaintiffs similarly fail to plead a potential competition claim, which would require allegations that PMI was going to independently enter the Relevant Market and that the decision not to do so substantially lessened competition.

8

      **i.  Plaintiffs Do Not Plausibly Allege the Transaction Violated the Clayton Act**

      **a.  Plaintiffs Do Not Plausibly Allege Increased Concentration Resulting From a Merger of Horizontal Competitors**

Section Seven of the Clayton Act prohibits transactions the effect of which "may be substantially to lessen competition." 15 U.S.C. § 18; *Atl. Richfield*, 549 F.2d at 293. Typically, Section Seven challenges relate to horizontal transactions between competitors that increase market concentration. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018), *aff'd* 916 F. 3d 2019 (D.C. Cir. 2019) (explaining that in "the typical horizontal merger case under Section 7," the plaintiff attempts "to show that the proposed merger would . . . result in a significant increase in the concentration of firms in [the] market") (internal quotations omitted). Therefore, a plaintiff will usually establish a presumptive anticompetitive effect by "'showing that the transaction [led] to undue concentration,'" which is "typically done by comparing the market's concentration before and after the merger." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021) (quoting *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017)).

According to Plaintiffs' own allegations, PMI was not selling any MON products in the United States at the time of the Transaction, ¶¶ 10, 66, and Plaintiffs do not allege that PMI had any share of the Relevant Market. *See also* Original Compl. ¶¶ 46-47. That means PMI and Swedish Match were not competitors in the Relevant Market at the time of the Transaction, and the Transaction could not have increased market concentration. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763-64 (9th Cir. 2018) (affirming dismissal of Section Seven claim because merger of a U.S. supplier with a company that could not sell into the United States did not increase concentration in the U.S. market); *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233

(8th Cir. 2010) (transactions involving noncompetitors "do[] not reduce the number of competitors or raise concentration in the market[]").

Although Plaintiffs at times obscure Shiro's absence from the U.S. market with wordplay, that cannot overcome their own admissions that Shiro was never sold in the Relevant Market and therefore was not a competitor before the Transaction. *See* ¶¶ 10, 66; *accord* Original Compl. ¶¶ 46-47. For instance, Plaintiffs use the generic term "market," which could mean any market anywhere, when they assert that PMI used Shiro to "initially penetrate the market"—while carefully avoiding "U.S. Market" or "Relevant Market" (which they limit to the United States). ¶¶ 12, 32. Plaintiffs also allege that Shiro "did not really catch on," ¶¶ 38, 61, and that purchasing Swedish Match gave PMI "control of Zyn . . . while withdrawing Shiro from the Relevant Market." ¶ 15. The only way to read those allegations and the conspicuous absence of market share allegations for Shiro consistently with Plaintiffs' admissions noted above—*i.e.*, that "Shiro never came to market in the United States," and PMI had "0% market share," Original Compl. at ¶¶ 46-47— is that Shiro "did not really catch on" outside of the United States and was simply never available in the United States.

Hypothetically, even had Plaintiffs incorrectly alleged that Shiro had *some* presence in the United States, that would not be sufficient to plausibly infer that the Transaction harmed competition. At a minimum, Plaintiffs would still need to plausibly allege that Shiro's presence was meaningful from a competitive standpoint, and that it was poised to become or remain a material competitive constraint. Plaintiffs do nothing of the sort. *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 502-04 (1974) (affirming finding that merger was lawful under Section Seven where acquired company had only 1% of coal reserves in relevant market); *SCPH Legacy Corp. v. Palmetto Health, Prac. Partners in Healthcare, Inc.*, No. 3:16-CV-2863, 2017

10

WL 1437329, at *5 (D.S.C. Feb. 24, 2017), *aff'd sub nom. SCPH Legacy Corp. v. Palmetto Health*, 724 F. App'x 275 (4th Cir. 2018) (dismissing Clayton and Sherman Act claims for failure to allege antitrust injury); *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1062-64, 1066 (N.D. Cal. 2023) (dismissing Section Seven claims where plaintiffs did not substantiate conclusory allegations the merger would be anticompetitive); *FTC v. Cmty. Health Sys., Inc.*, 736 F. Supp. 3d 335, 370 (W.D.N.C. 2024) (declining to enjoin merger where large post-transaction market share was driven by one party's existing size, not the merger).

### b.  Plaintiffs Do Not Plausibly Allege a Potential Competition Theory

Without a merger between actual horizontal competitors, Plaintiffs are left only with a tenuous "potential competition" theory, which they fail to adequately plead.  *See United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 639 (1974) (reserving the question as to whether this theory is viable); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973) (same). Potential competition theories are rarely successful.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 901.1e (5th ed. 2024) ("[O]ne apparent reason that the Supreme Court abandoned [potential competition theories] in the 1970s was its belief that addressing them required undue speculation.").  Indeed, a district court recently surveyed potential competition cases to assess whether the doctrine is viable; of the cases surveyed, the potential competition claims failed in an overwhelming majority and there has not been a successful claim in over four decades. *See FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892, 926 (N.D. Cal. 2023).[5]

---

[5] Citing plaintiff losses in *United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) (affirming denial of preliminary injunction because proof of entry was inadequate); *Atl. Richfield*, 549 F.2d 289 (same); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) (same); *Altria Group,*

To plead a potential competition theory, a plaintiff must allege that "the merger forecloses the acquiring firm's future *de novo* entry into the acquired firm's market ('actual potential competition')" or that the firm's presence on the periphery and the threat it may enter the market "induced competitors in the acquired firm's market to perform more competitively ('perceived potential competition')." *Ginsburg*, 623 F.3d at 1233-34.  Despite the roadmap provided in Swedish Match's first Motion to Dismiss, the Amended Complaint still fails to plead any facts plausibly meeting the requirements for such a claim.

The "actual potential competition" theory only applies where a firm would have entered the market independently but for the transaction at issue.  *See Marine Bancorp.*, 418 U.S. at 640-41; *Ginsburg*, 623 F.3d at 1234 ("actual potential competition" requires that the transaction "foreclose[d] the acquiring firm's future *de novo* entry into the acquired firm's market"). Therefore, courts require allegations showing that the firm "has available feasible means for entering the [] market other than by [the transaction]; and [] that those means offer a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." *Marine Bancorp.*, 418 U.S. at 633.  The Fourth Circuit requires "strict proof of any anticompetitive effect" and "certain" or "unequivocal" evidence of intended entry. *Atl. Richfield*, 549 F.2d at 294-95.  An actual potential competition claim also requires

---

*Inc.*, No. 9393, 2022 WL 622476, at *215 (F.T.C. Feb. 23, 2022) ("Complaint Counsel failed to aver or demonstrate a reasonable probability that Respondent Altria's efforts would result in its competing in the e-cigarette market in the near future, or even identify any reasonable range of time by which such alleged competitive entry was probable to occur."); *B.A.T. Indus., Ltd.*, No. 9135, 1984 WL 565384 (F.T.C. Dec. 17, 1984) (finding no harm to competition based on lack of proof of probable entry); *Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982) (setting aside FTC's order based on lack of substantial evidence of likely entry); *Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255 (5th Cir. 1981) (vacating FTC's order based on insufficient evidence of reasonably probable entry).

allegations ruling out other potential market entrants because a transaction that removes one possible entrant has no competitive impact if others could enter. *Id.* at 300 (dismissing "actual potential competition" claim where there were numerous other potential and actual entrants).

By any standard, the Amended Complaint does not plead any facts to support the elements of an actual potential competition claim. Plaintiffs allege that PMI's former CEO characterized the MON market as "an emerging category . . . which we are looking at as well," and then some years later PMI purchased two MON suppliers at a cost of more than $16 billion. ¶¶ 10-13, 59. As discussed above, Plaintiffs allege that PMI attempted to sell Shiro in a vague "market" somewhere in the world, but not in the United States, which is the Relevant Market. ¶ 12. Nor do Plaintiffs allege that PMI had the necessary capabilities—such as regulatory approval, U.S. distribution, or MON marketing expertise—to enter the Relevant Market. Without those capabilities, PMI could not have plausibly entered the Relevant Market even if it had wanted to do so. Instead, Plaintiffs merely gesticulate at PMI's alleged "arsenal of 'Big Tobacco' advantages and resources" without explaining what those are or how PMI could have conceivably used them to enter the Relevant Market. ¶ 69. *See Meta Platforms Inc.*, 654 F. Supp. 3d at 928 (establishing likelihood of entry requires identifying unique capabilities needed to enter; general appeals to financial and engineering capabilities are insufficient).

In fact, far from plausibly alleging that PMI possessed the necessary capabilities to enter the Relevant Market independently, Plaintiffs instead identify numerous factors that would have discouraged, if not outright prevented, PMI's *de novo* entry: "unique barriers to entry" and "regulatory limitations," ZYN's "significant [competitive] advantage as a result of having been one of the first MON products in the Relevant Market," and ZYN's "rapidly increasing market share and popularity with consumers." ¶¶ 38, 55, 58. Plaintiffs also assert that "[e]arly on,

13

Swedish Match had to have been identified by Philip Morris as a promising target for some sort of agreement, joint venture or merger."  ¶ 58.  The natural inference from these allegations is that PMI determined it could not enter the Relevant Market organically, and instead opted to spend billions of dollars purchasing Swedish Match to enter and satisfy shareholder interest in the category.

Moreover, even had Plaintiffs adequately alleged that PMI would have entered the Relevant Market, they would also need to show that the decision to instead acquire Swedish Match "substantially lessen[ed] competition."  *Atl. Richfield*, 549 F.2d at 299; *Marine Bancorp.*, 418 U.S. at 633 (alleged potential entrant must "offer a substantial likelihood of ultimately producing deconcentration of that market").  If the potential for other additional companies entering the market is not ruled out, it is "unlikely" that loss of one potential entrant "would have a significant anticompetitive effect."  *Atl. Richfield*, 549 F.2d at 300.  Plaintiffs cannot have it both ways.  Either there are high barriers to entry as Plaintiffs allege, and PMI could not have entered without the Transaction.  Or, contrary to Plaintiffs' allegations, there are low barriers to entry, but then Plaintiffs have not explained why other companies could not have entered.  Either way, Plaintiffs have not alleged harm to competition, and the claim should be dismissed.

Plaintiffs also fail to plead a "perceived potential competition" theory.  Under the "perceived potential competition" theory, the mere potential that a firm could enter the market drives current market participants to compete more aggressively, and the transaction eliminating the potential market entrant diminishes that competition.  *Ginsburg*, 623 F.3d at 1234.  But, again, Plaintiffs have failed to allege any facts suggesting that PMI could realistically enter the U.S. market, much less any competitive response to the possibility of PMI's entry.

### c. Other Allegations Undercut any Notion that Competition was Harmed

Although Plaintiffs' *lack* of allegations plausibly supporting competitive harm is dispositive, Plaintiffs' own description of existing competition within the Relevant Market leaves no doubt about the implausibility of their antitrust claims. In most Section Seven cases, the plaintiff must make arguments about *probable* competitive harm in the future to enjoin the merger. But here, Plaintiffs have the advantage of being able to draw from actual competition in the Relevant Market for more than two years since the Transaction. Yet by Plaintiffs' own admissions, the Relevant Market remains highly competitive. For example, Plaintiffs acknowledge the availability of multiple brands with products in a range of flavors and strengths, steady and substantial increases in output, and the continued availability of MON options far cheaper than ZYN. ¶¶ 34, 56, 70. Other than conclusory assertions of "supracompetitive prices," "loss of innovation," and "shortages," ¶¶ 70-72—which are all flatly contradicted by specific allegations about availability of less expensive MON products, wide variety, and voluminous supply—Plaintiffs offer no indication that the Transaction lessened competition or harmed consumers at all. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (explaining that "reduced output, increased prices, or decreased quality in the relevant market" constitute direct evidence of harm to competition). Under any theory, the Section Seven claim should be dismissed with prejudice because it does not meet the requirements of *Twombly*, and no amendments could cure these deficiencies.

### ii. The Sherman Act Section One Claim Fails for the Same Reasons as the Clayton Act Claim

A violation of Section One of the Sherman Act, 15 U.S.C. § 1, requires (1) "a contract, combination, or conspiracy"; (2) "that imposed an unreasonable restraint of trade"; and (3) causes an "antitrust injury," *i.e.*, "injury of the type the antitrust laws were intended to prevent

and that flows from that which makes defendants' acts unlawful." *Dickson*, 309 F.3d at 202-03; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Thompson Everett*, 57 F.3d at 1320; *Turner v. Va. Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 646 (E.D. Va. 2018). Thus, a plaintiff must allege that the defendant's conduct "harm[s] the competitive *process* and thereby harm[s] consumers." *Dickson*, 309 F.3d at 206 (emphasis in original); *see also Loren Data*, 501 F. App'x at 282 (same); *Thompson Everett*, 57 F.3d at 1325 ("[O]nly injury caused by damage to the competitive process may form the basis of an antitrust claim."); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1079 (E.D. Cal. 2011) (dismissing Section One and Section Two claims where "plaintiff alleges that other competitors existed in the market" and "[t]he allegations do not state that (or how) the [alleged misconduct] drove out independent competition").

For all the same reasons Plaintiffs failed to plead a Section Seven violation, they also failed to plead a Section One violation, and the Section One claim should be dismissed with prejudice. *See, e.g.*, *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 486 (5th Cir. 1984) ("[B]ecause we conclude . . . that the acquisition . . . did not violate section seven of the Clayton Act, a fortiori, no combination occurred in violation of section one of the Sherman Act."); *White Consol. Indus., Inc. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986) ("[T]he plaintiffs' failure to sustain proof of potential anticompetitive effects under Section 7 of the Clayton Act precludes them from successfully establishing proof of a conspiracy in restraint of trade under the more vigorous standard for Section 1 of the Sherman Act."); *Vantico Holdings S.A. v. Apollo Mgmt., LP*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003) ("Because § 1 of the Sherman Act looks to the probable effects of an agreement, there is no substantive difference between the standards underlying a violation of § 7 and § 1.").

### iii. The Same Allegations also Fail under Section Two of the Sherman Act

Plaintiffs also make conclusory allegations that the Transaction constituted unlawful monopolization or attempted monopolization under Section Two of the Sherman Act. ¶¶ 102, 105. To plead a claim under Section Two of the Sherman Act, 15 U.S.C. § 2, a plaintiff must plausibly allege that the defendant had monopoly power in a properly defined relevant market and that it engaged in "anticompetitive *conduct*" to maintain that monopoly power. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original); *see also Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173-75 (4th Cir. 2014). The anticompetitive conduct requirement applies to "both monopolization and attempt claims." *Kolon Indus.*, 748 F.3d at 178 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 806a, at 412 (3d ed. 2008)); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("[T]o demonstrate attempted monopolization a plaintiff must prove [] that the defendant has engaged in predatory or anticompetitive conduct.").

As with Section One claims, under Section Two, conduct is only anticompetitive if it harms "the competitive *process* and thereby harm[s] consumers." *Loren Data*, 501 F. App'x at 282 (emphasis in original) (affirming dismissal of monopolization claim). While courts recognize "merger to monopoly" *may* satisfy the conduct requirement for Section Two, the bar for that theory is even higher than for a Clayton Act Section Seven claim. *See Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 61 (1st Cir. 2002) (noting that merger challenges are usually brought under Section Seven, which requires "much less" than Section Two); *see also Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) (noting that "[i]n some instances, the merging of competitors to form a monopoly may violate § 2 of the Sherman Act," though plaintiffs "must still demonstrate how the acquisitions unreasonably restricted competition").

Having failed to meet the requirements under Clayton Act Section Seven and Sherman Act Section One, Plaintiffs likewise fail under Sherman Act Section Two. There was no merger to monopoly because Plaintiffs allege PMI had "no market share" and "no real presence" in the Relevant Market, ¶¶ 10, 66, consistent with their prior allegation that "Shiro never came to market in the United States," Original Compl. ¶ 46. Even disregarding these allegations, Plaintiffs have not sufficiently alleged harm to competition under *Twombly*. Indeed, courts have dismissed claims even where plaintiffs alleged an actual increase in market concentration, which is far more than Plaintiffs have done here. *See, e.g.*, *Eastman*, 724 F. App'x at 559 (dismissing monopolization claim based on transaction that "increased [defendant's] market share by [] 6.6 percent"). As explained above, PMI's absence from the Relevant Market at the time of the Transaction means Plaintiffs have not pled the elimination of a competitor or harm to competition. *See id.* Merely transferring Swedish Match's alleged "monopoly" to PMI, ¶¶ 36-37, did not reduce competition. No amendment could cure these deficiencies, so the Section Two claim should be dismissed with prejudice.

**B.    The State Antitrust and Unfair Trade Claims Fail with the Federal Claims**

To circumvent the bar on indirect purchasers recovering antitrust damages under federal law, *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), Plaintiffs seek damages only under the antitrust and unfair trade practices laws of various states. They allege violations of those state laws "for the same reason" as the federal antitrust claims. ¶ 129. These claims should be dismissed because Plaintiffs do not plausibly allege harm to competition under federal law, as described above, and state antitrust and unfair trade practices laws are interpreted consistently with federal antitrust law. *See In re Revlimid & Thalomid Purchaser Antitrust Litig.*, No. CV 19-7532, 21-20451, 2024 WL 2861865, at *108-09 (D.N.J. June 6, 2024) (dismissing state claims mirroring federal allegations because the state statutes at issue "contain explicit harmonization

provisions" or "have been interpreted, according to courts within that state, in accordance with federal antitrust law"); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006) ("Plaintiffs fail to state a claim under the Sherman Act, and since the state antitrust law claims are based on the same allegations, those claims are also dismissed."); *In re Plavix Indirect Purchaser Antitrust Litig.*, No. 1:06-cv-226, 2011 WL 335034, at *5 (S.D. Ohio Jan. 31, 2011) (dismissing state antitrust and unfair trade practices claims that mirrored federal claims); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4642285, at *11-12 (E.D. Pa. Oct. 17, 2017) (same); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002), *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810 (4th Cir. 2003) (same).  Plaintiffs have not suggested, much less explained, how any state claims could survive independently of the deficient federal claims.

### C.    Plaintiffs' Generic "Unjust Enrichment" Claims Do Not Meet the Pleading Standard

Plaintiffs do not adequately allege unjust enrichment because their antitrust claims—the only conduct they allege was "unjust"—fail for the reasons explained above.  Because Plaintiffs' antitrust claims fail, Defendants' underlying acts could not have led to *unjust* enrichment, and the claims should be dismissed.  *See, e.g.*, *In re Revlimid*, 2024 WL 2861865, at *111 (dismissing all unjust enrichment claims because they were premised on dismissed antitrust claims); *In re Treasury Sec. Auction Antitrust Litig.*, No. 15-2673, 2021 WL 1226670, at *16-17 (S.D.N.Y. Mar. 31, 2021) (same); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) (same).

19

### D.    Various State Law Claims Fail for Additional Reasons

There are further problems in the Amended Complaint with respect to certain state claims, though the Court need not reach those issues because all of the federal and state claims should be dismissed for the reasons explained above.

<u>Antitrust claims alleged under Puerto Rico and Illinois law should be dismissed because those states do not permit an indirect purchaser class to seek damages.</u>  In *Illinois Brick*, the Supreme Court held that only direct purchasers could seek antitrust damages under federal law. *See* 431 U.S. at 728-29.  Because many state "antitrust laws [] are harmonized with federal law or 'overwhelmingly' look to federal law for guidance," the same rule applies to state laws unless a state has expressly decided to deviate from that standard.  *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011); s*ee also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 232 (S.D.N.Y. 2012) (explaining states that have "not expressly passed *Illinois Brick* repealer legislation or interpreted [their] law in such a way as to override the rule of *Illinois Brick* [are] presumed to have decided to follow federal law, including the *Illinois Brick* limitation on indirect purchaser claims") (alterations in original).  Puerto Rico has no repealer statute and follows *Illinois Brick*.  *See, e.g.*, *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 252 (D. Conn. 2015) ("Puerto Rico follows the rule of *Illinois Brick* and all indirect-purchaser claims under its antitrust law are dismissed."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1188 (N.D. Cal. 2009) (dismissing Puerto Rico claim because "[t]he Court [was] reluctant to find standing in the absence of an explicit *Illinois Brick* repealer, either by statute or case law").  Under Illinois law, while indirect purchasers may seek antitrust damages, they may not do so as a class.  740 Ill. Comp. Stat. Ann. 10/7; *see also, e.g.*, *In re Flonase Antitrust Litig.,* 692 F. Supp. 2d 524, 539 (E.D. Pa. 2010) (dismissing Illinois antitrust

claims "[b]ecause the indirect purchaser class action claims in this case would be precluded under the Illinois Antitrust Act").

     <u>Antitrust claims alleged under California law should be dismissed because the Cartwright Act does not apply to mergers.</u>  Plaintiffs' allegations, entirely based on the Transaction, do not plead a cause of action under the Cartwright Act.  *See State of Cal. ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1170 (1988) ("[N]either the Cartwright Act, nor the Unfair Practices Act, was intended to apply to a merger.").

     <u>In states that follow *Illinois Brick*, unjust enrichment claims cannot circumvent the prohibition on recovery by indirect purchasers.</u>  To prevent unjust enrichment law from undermining the prohibition against indirect purchasers recovering damages—precisely what Plaintiffs attempt here—"where the applicable state law bars antitrust actions for damages by indirect purchasers . . . a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one for unjust enrichment."  *In re K-Dur Antitrust Litig.*, No. 01–1652, 2008 WL 2660780, at *5 (D.N.J. Feb. 28, 2008); *Digit. Music*, 812 F. Supp. 2d at 413 (dismissing claims under laws of states that follow *Illinois Brick*).  "State legislatures and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to allow an end run around the policies allowing only direct purchasers to recover."  *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1380 (S.D. Fla. 2001) (internal quotations omitted); *see also Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 737 F. Supp. 2d 380, 446-47 (E.D. Pa. 2010) (dismissing Texas unjust enrichment claim because Texas state courts would not allow indirect purchasers to file claims under state antitrust or consumer protection laws); *In re Flonase*, 692 F. Supp. 2d at 542 ("Allowing indirect purchasers to recover

and recoup a benefit from the defendant under an unjust enrichment theory would circumvent the policy choice of *Illinois Brick*.").

Plaintiffs allege unjust enrichment clams "under the laws of each state in the United States as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands" based on the acts that form the grounds for their antitrust claims.  ¶¶ 247, 255.  As noted above, Puerto Rico and Illinois do not permit indirect purchaser class claims for antitrust damages.  The same is true of Delaware, Georgia, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Montana, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, and Virginia, which all follow *Illinois Brick*.  *See In re Novartis and Par Antitrust Litigation,* 18 Civ. 4361*,* 2019 WL 3841711, at *6, *8 (S.D.N.Y. Aug. 15, 2019) (granting motion to dismiss state unjust enrichment claims because Delaware, Georgia, Kentucky, Louisiana, Massachusetts, Missouri, Montana, Oklahoma, Pennsylvania, South Carolina, Texas, and Virginia follow *Illinois Brick*); *DDAVP,* 903 F. Supp. 2d at 232-33 (same for Indiana and Ohio).  Likewise, another five states permit only their attorneys general, not individual consumers, to sue on behalf of indirect purchasers: Alaska, Arkansas, Idaho, Washington, and Wyoming.  *See* Alaska Stat. Ann. § 45.50.577; Ark. Code Ann. § 4-75-315(b)(3); Idaho Code Ann. § 48-108(2); Wash. Rev. Code. Ann. § 19.86.080(3); Wyo. Stat. Ann. § 40-4114.2.  Thus, Plaintiffs' unjust enrichment claims under the laws of Alaska, Arkansas, Delaware, Georgia, Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Montana, Ohio, Oklahoma, Pennsylvania, Puerto Rico, South Carolina, Texas, Virginia, Washington, and Wyoming must be dismissed.

Certain unjust enrichment claims fail because Plaintiffs fail to allege that they conferred a direct benefit on PMI or Swedish Match.  Florida, Idaho, Maine, New York, and North Dakota all require that a defendant receive a direct benefit from a plaintiff in order to state a claim for

unjust enrichment.  But here, Plaintiffs allege that "Plaintiffs and the Nationwide Class members conferred a benefit which Defendants *indirectly* accepted."  ¶ 250 (emphasis added).  Unjust enrichment claims for these states must therefore be dismissed.  *See*, *e.g.*, *Sheet Metal Workers*, 737 F. Supp. 2d at 432 (dismissing Florida unjust enrichment claim where plaintiffs conceded they conferred no direct benefit on defendant); *id.* at 441 (same for New York); *DDAVP*, 903 F. Supp. 2d at 234 (same for Idaho); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 384 (D.R.I. 2019) (same for Maine); *TFT-LCD*, 599 F. Supp. 2d at 1191 (same for North Dakota).

## CONCLUSION

The Amended Complaint should be dismissed with prejudice.  Plaintiffs had every opportunity to experiment with various theories in an attempt to make out a case with the benefit of the roadmap provided by Swedish Match's Motion to Dismiss.  While Plaintiffs rightly jettisoned the sham litigation theory, they still cling to a transaction theory that can never work because the Transaction did not harm competition.  Plaintiffs' continued failure to state a claim confirms that "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability" and the Amended Complaint should be dismissed with prejudice.  *Cozzarelli*, 549 F.3d at 630.

Dated: March 3, 2025

*/s/ Ryan A. Shores*
Cleary Gottlieb Steen & Hamilton LLP
Ryan A. Shores (VSB No. 65934)
C. Lawrence Malm (admitted *pro hac vice*)
2112 Pennsylvania Ave, NW
Washington, DC 20037
Tel.: 202-974-1500
Fax: 202-974-1999
rshores@cgsh.com
lmalm@cgsh.com

Brian Byrne (admitted *pro hac vice*)
1841 Page Mill Road
Palo Alto, CA
Tel.: (650) 815-4110
Facsimile: (650) 815-4199
bbyrne@cgsh.com

McGuireWoods LLP
J. Brent Justus (VSB No. 45525)
Davis M. Walsh (VSB No. 84585)
Patrick F. Dillard (VSB No. 89119)
800 E. Canal St.
Richmond, Virginia 23219
Tel.: (804) 775-1000
Fax: (804) 775-1061
bjustus@mcguirewoods.com
dwalsh@mcguirewoods.com
pdillard@mcguirewoods.com

*Counsel for Defendants Swedish Match North America LLC and Philip Morris International, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of March, 2025, a true and correct copy of the foregoing was

served on all counsel of record via Notice of Electronic Filing by filing with the Court's

CM/ECF system.

*/s/ Ryan A. Shores*
Ryan A. Shores