## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**ALLEN NEUMARK, on behalf of himself**
**and all other similarly situated,**

     *Plaintiff*,

v.                                  Civil Action No. 3:24cv821 (DJN)

**SWEDISH MATCH NORTH AMERICA**
**LLC,**

     *Defendant*.


### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
### FIRST AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………………..1

FACTUAL BACKGROUND…………………………………………………………………3

LEGAL STANDARD………………………………………………………………………7

ARGUMENT…………………………………………………………………………………8

    A.  THE FEDERAL ANTITRUST CLAIMS ARE SUFFICIENTLY PLED

        a.  PLAINTIFFS SUFFICIENTLY PLEAD A VIOLATION OF SECTION SEVEN OF THE CLAYTON ACT…………………………………………..8

        b.  PLAINTIFFS SUFFICIENTLY PLEAD A VIOLATION OF SECTION ONE OF THE SHERMAN ACT……………………………………………………14

        c.  PLAINTIFFS SUFFICIENTLY PLEAD VIOLATIONS OF SECTION TWO OF THE SHERMAN ACT……………………………………………………18

            i.  MONOPOLIZATION…………………………………………………..18

           ii.  ATTEMPTED MONOPOLIZATION…………………………………18

    B.  THE STATE ANTITRUST AND UNFAIR TRADE ACT CLAIMS ARE ALSO SUFFICIENTLY PLED…………………………………………………………...20

    C.  THE PLAINTIFFS SUFFICIENTLY HAVE SUFFICIENTLY PLED CLAIMS FOR UNJUST ENRICHMENT……………………………………………………. 23

CONCLUSION…………………………………………………………………………...25

Plaintiffs Allen Neumark and Eric Greenwood (each a "Plaintiff," collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, respectfully submit this memorandum of law in opposition to the motion to dismiss (ECF No. 37) ("Def. Mot.") Plaintiffs' First Amended Class Action Complaint ("FACAC" or "Complaint") (ECF No. 26), filed by Defendants Swedish Match North America LLC ("Swedish Match") and Philip Morris International Inc. ("Philip Morris") (collectively, the "Defendants") under Fed. R. Civ. P. 12(b)(6) as follows:

## **INTRODUCTION**

This is an action to restrain the unlawful conduct of two Big Tobacco rivals, Swedish Match and Philip Morris, in stifling and suppressing competition in an up-and-coming market. FACAC, ¶ 1. Faced with the unassailable truth of a precipitous decline in the sale of global cigarette sales beginning in 2012 due to changes in smoking culture related to health concerns, Defendants shifted their efforts to focus on a new and addictive product -- the modern oral nicotine pouch ("MON"). *Id.,* ¶¶ 4, 47.

To gain a foothold in this new market, Defendants reaped the profits by using the exact same playbook used to sell cigarettes: offer a variety of flavors, colorful packaging, and target the most vulnerable demographic: youth. *Id.,* ¶¶ 53, 54.

By 2019, this dubious strategy worked for Swedish Match. Swedish Match's market-leading product, Zyn, was selling over 50 million units annually – eventually gaining an 80% market share. *Id.,* ¶¶ 7, 36, 57, 72. Quickly, Philip Morris, a historical Big Tobacco competitor of Swedish Match, realized the financial risk in falling behind in the MON market. *Id.,* ¶ 59. On December 3, 2019, PMI's then-CEO Andre Calantzaopoulos stressed the importance of PMI

making an entrance into the MON market, telling investors that the MON product is "an emerging category … which we are looking at as well." *Id.*

However, rather than compete on the merits in the MON market and develop their own MON product, Philip Morris decided instead to embark on a campaign to monopolize the market. Ultimately, Philip Morris opted to pay $16 billion to Swedish Match in order to eliminate Zyn as a competitor in the market for MON products. *Id.*, ¶¶ 13, 62. In the process, Philip Morris ceased to invest the same resources in other MON products (which it had also acquired) that were to compete horizontally with Zyn. *Id.*, ¶¶ 12, 14, 15, 61. This transaction represented and resulted in harm to the purchasers of Zyn, who faced the reduction of choices in the MON market, the reduction of price competition, the payment of supra-competitive prices for Zyn, and the stifling of innovation that would have existed if Philip Morris decided to compete fairly. *Id.*, ¶ 70.

Rather than attacking the actual substance of the FACAC, Defendants' motion spends a inordinate amount of time citing to and attacking a non-operative complaint.[1] As to the claims in the FACAC, Defendants' motion incorrectly argues that the FACAC purportedly does not allege competitive harm. However, the question of whether competitive harm is alleged is not appropriate for this stage in the litigation because it is industry specific and fact intensive, and a plaintiff only need to present a compelling case that predicts a possibility of substantial harm to competition.

---

[1] The fact that Plaintiffs' FACAC changed theories from the originally filed complaint is irrelevant for purposes of the Defendants' present motion. *See Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 455 (4th Cir. 2017) ("a properly filed amended complaint supersedes the original one and becomes the operative [complaint] in the case, it renders the original complaint of 'no effect.'"); Charles A. Wright, et al., *Federal Practice and Procedure* § 1476 (3d ed. 2002 & Supp. 2024) ("A pleading that has been amended under [Fed. R. Civ. P.] Rule 15(a) supersedes the pleading it modifies … Once an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading."). Accordingly, any reference in Defendant's motion to a non-operative complaint is irrelevant to the instant motion.

Indeed, all a plaintiff needs to show in an antitrust case such as this is that a likelihood of economic concentration in a market or that the acquisition is likely to be harmful in some manner beyond just market concentration. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *see also, Chicago Bridge & Iron Co. N.V. v. Federal Trade Commission*, 534 F.3d 410, 423 (5th Cir. 2008) (holding that a plaintiff survives a motion to dismiss in a Clayton Act Section 7 case upon making *prima facie* showing that the "transaction in question will significantly increase market concentration.").

Plaintiffs easily clear this bar: because of this transaction, Swedish Match and Philip Morris' Zyn product has an 80% market share in the MON product market and uses its monopoly power to continue to raise prices sans inter-brand price competition. FACAC, ¶¶ 36, 70. Accordingly, Defendants' heavy-handed argument that Plaintiffs do not allege anticompetitive harm is not one that should be decided at this stage. Def. Mot. at 8, 9.

The Fourth Circuit has regularly and routinely found that "[c]onduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (collecting cases); *see also,* 3 Phillip E. Areeda & Donald F. Turner, *Antitrust Law* ¶ 828a (1978). Here, Swedish Match used its monopoly power to make a deal with Philip Morris and further shrink the already-concentrated MON product market, foreclose competition, and raise prices significantly. FACAC, ¶¶ 36, 70. According to the Supreme Court, this "use of monopoly power, however lawfully acquired [in order] to foreclose competition, to gain a competitive advantage or to destroy a competitor, is unlawful." *United States v. Griffith*, 334 U.S. 100, 107 (1948); *see also, Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979) ("[t]he mere possession of monopoly power does not ipso facto condemn a market participant. But, to avoid

the proscriptions of [Section] 2, the firm must refrain at all times from conduct directed at smothering competition."); *In re Juul Labs, Inc. Antitrust Litigation*, 555 F.Supp. 3d 932 (N.D. Cal. Aug. 19, 2021), at 26-29 ("*Juul Labs*") (order denying defendants' motion to dismiss in an antitrust case on behalf of indirect purchasers of nicotine vaporizers where antitrust injury was adequately alleged in the face of the same type of agreement between two Big Tobacco rivals to combine to monopolize a market, form an agreement not to compete, and to create an impenetrable trust … such agreement later being found to have violated both federal and state antitrust laws and to be *per se* illegal.)

With this analysis in mind, the Plaintiffs have more than adequately alleged that the transaction between these Big Tobacco competitors represented and resulted in harm to the purchasers of Zyn, who faced the reduction of choices in the MON market, the reduction of price competition, the payment of supra-competitive prices for Zyn, and the stifling of innovation that would have existed if Philip Morris decided to compete fairly. FACAC, ¶ 70.  These are exactly the types of harms that the antitrust laws seek to remediate – and thus, Defendant's motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A.  RELEVANT FACTS AND THE UNLAWFUL TRANSACTION BY DEFENDANTS

***Background of the MON Product.***  In the late 1990's and early 2000's, the horrid effects of tobacco use were exposed to the public at large, leading to the development of the World Health Organization's "WHO FCTC Protocol to Eliminate the Illicit Trade of Tobacco Products (ITP)" (the "Protocol") which worked to stem tobacco consumption worldwide.  FACAC, ¶¶ 42, 43. Within 15 years of the implementation of the Protocol, smoking prevalence among people over age 15 fell from 22.7% to 17.5%.  *Id.*, ¶ 46.  And while the Protocol caused a significant drop in

smoking frequency, the financial burden on the global healthcare system on an annual basis exceeds $1.4 trillion. *Id.*

**The Rise of Zyn.** The Big Tobacco giants quickly sought new ways to recapture lost revenue as the popularity of cigarettes began to decline in 2012. *Id.,* ¶ 47. British American Tobacco (f/k/a RJ Reynolds) ("BAT") and Swedish Match would launch new, tobacco-free products which would help to stop the financial losses they were incurring. *Id.,* ¶ 51.

These products, which include Swedish Match's Zyn product, are called MONs. *Id.,* ¶ 4. According to BAT, MONs are "pouches which contain high purity nicotine [which consumers] place […] between their gum and upper lip […] during which nicotine and flavors are released and the nicotine is absorbed [orally.]" *Id.* Quickly, Zyn and other MON products caught on following the exact same playbook that Big Tobacco used to sell cigarettes by taking a highly addictive substance (here, nicotine) and using colorful packaging and marketing strategies to make Zyn and other MON products appear safer, if not, harmless. *Id.,* ¶ 54.

Today, as another district court has found, "[Zyn] delivers a potent dose of nicotine and is unreasonably dangerous […] because it creates and sustains an addiction to nicotine." *See Kelly v. Philip Morris International Inc., et al.*, Case No. 0:24-cv-60437-WPD (S.D. Fla. 2024), at ECF No. 58 (Denying a motion to dismiss denied where plaintiff alleged "[h]e was enticed by the flavors and by [Zyn's] marketing and advertising" and that "[h]e is addicted to the nicotine contained in [Zyn] and has suffered personal injuries as a result of his [Zyn] use") (Dimitrouleas, J.). The Big Tobacco playbook has worked, yet again. Within three short years, Zyn's sales numbers dramatically increased from 126 million tins sold in August of 2019 to over 808 million tins in March of 2022. *Id.,* ¶ 56.

***The Monopolistic Transaction.*** During Zyn's rise, the market for MON products was heavily concentrated and other Big Tobacco players (including Philip Morris) worked aggressively to penetrate the market. *Id.,* ¶¶ 59-61. Rather than compete on the merits and use an endless arsenal of Big Tobacco advantages and resources, Philip Morris instead chose to acquire two competitors in the concentrated market in 2021 and 2022. *Id.*, ¶¶ 61-62.

The first acquisition's market penetration was ultimately unsuccessful. *Id.,* ¶¶ 12, 61. The second acquisition by Philip Morris, its Big Tobacco rival, Swedish Match, was successful. *Id.* By purchasing Swedish Match for over $16 billion, Philip Morris completely neutralized and eliminated the largest competitor in the MON product market. *Id.* In exchange for significant financial wealth, Swedish Match was willing to cease competing in the MON product market while allowing Philip Morris to plug in a new product to make up for lost sales due to changes in consumer sentiments around the consumption of tobacco cigarettes. *Id.,* ¶¶ 65-66.

***Effects of the Transaction.*** The impacts of this acquisition were pervasive for MON product market consumers and competitors.

Competitors were harmed when two of the biggest Big Tobacco firms teamed up to occupy a monopoly market share in the highly concentrated MON product market, as opposed to competing on the merits and creating a more robust market. *Id.,* ¶ 16. As a result of this unlawful acquisition and seizure of power, there is limited competition which reduces output, the incentive to innovate and the entrant of new producers. *Id.*

Consumers were similarly harmed. With fewer choices to choose from due to the elimination of competition, Zyn uses its dominant position to impose significantly higher prices than other MON products – sometimes even as much as double the price of others. *Id.*, ¶ 70; Def. Mot. at 13. Today, Zyn has an 80% market share in the MON product market and uses its

monopoly power to continue to raise prices sans inter-brand price competition. FACAC, ¶¶ 36, 70.

## B. THE PRODUCTS AND THE RELEVANT MARKET

Plaintiffs allege both a Relevant Product Market[2] and a Relevant Geographic Market[3] for antitrust purposes. FACAC, ¶¶ 32-35. These markets were not at all contested by Defendants in Defendants' motion.

## LEGAL STANDARD

Fed. R. Civ. P. 8(a)(2) requires that a complaint includes a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Further, a complaint should not be dismissed if the allegations "raise a right to relief above the speculative level[.]" *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff need only to plead sufficient facts which "nudge" a claim "across the line from conceivable to plausible[.]" *Id.,* at 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In the Fourth Circuit, a complaint "need only give the defendant[s] fair notice of what the claim is and the grounds upon which it rests." *Coleman Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). When ruling on the motion, the Court must "accept as true all of the factual allegations

---

[2] Plaintiffs allege that the Relevant Product Market is the market for modern oral nicotine pouches which are "pouches which contain high purity nicotine, water and other high-quality ingredients, including cellulose fib[er]s, flavoring and sweeteners. [Users] place the disposable pouch between their gum and upper lip, typically for around 30 minutes, during which nicotine and flavors are released and the nicotine is absorbed [orally]." *Id.*, ¶ 4.

[3] Plaintiffs allege that the Relevant Geographic Market is the market for MON sales within the entirety of the United States. *Id.,* ¶ 32.

contained in the complaint" and to "draw all reasonable inferences in favor of the plaintiff[s]." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

Specific to antitrust cases, the Fourth Circuit and the Supreme Court have both agreed that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Advanced Health-Care Services, Inc. v Radford Community Hospital*, 910 F.2d 139, 144 (4th Cir. 1990); *quoting Hospital Building Company v. Trustees. of Rex Hospital*, 425 U.S. 738, 747 (1976).

## ARGUMENT

### A. THE FEDERAL ANTITRUST CLAIMS ARE SUFFICIENTLY PLED

#### i. PLAINTIFFS SUFFICIENTLY PLED VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT

Defendants' core argument, which is echoed throughout their motion, is that Plaintiffs fail to allege competitive harm. This is a fact intensive argument which is inappropriate for a motion to dismiss. Where Plaintiffs have alleged sufficient facts to plead violations of Section 7 regarding competitive harm, Defendants' motion should be denied.

Section 7 of the Clayton Act ("Section 7") prohibits acquisitions which have the effect to "substantially lessen competition or tend[s] to create a monopoly." 15 U.S.C. § 18. When the Clayton Act was codified, the statute was intended to prevent against anticompetitive mergers or acquisitions "in their incipiency." *Philadelphia Nat'l Bank*, 374 U.S. at 362.[4] Notably, the core question of whether competitive harm is alleged in a Section 7 claim is not appropriate for this

---

[4] While the bar for substantiality is lower for a Clayton Act violation than a more traditional Sherman Act violation, the Clayton Act still allows for both private relief and treble damages in private suits to deter anticompetitive conduct under the antitrust laws. *See FTC v. Syngenta Crop Protection AG*, 711 F. Supp. 3d 545 (M.D.N.C. Jan. 12, 2024) ("The Supreme Court has implied in dicta that Section 3 of the Clayton Act requires a lesser showing than the Sherman Act does[.]"); 15 U.S.C. § 15(a).

stage in the litigation because, like a merger analysis, such an analysis is "industry specific and fact intensive," and a plaintiff only need to present a compelling case that predicts a possibility of substantial harm to competition. *United States v. Bertelsmann SE & Co.,* 646 F. Supp. 3d 1, 46 n.33 (D.D.C. 2022).

Indeed, the bar to survive a motion to dismiss is much lower. All that a plaintiff needs to show in an antitrust case such as this at this procedural stage is a likelihood of economic concentration in a market or that the acquisition is likely to be harmful in some manner beyond just market concentration. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *see also Chicago Bridge & Iron Co. N.V. v. Federal Trade Commission*, 534 F.3d 410, 423 (5th Cir. 2008) (a plaintiff can survive a motion to dismiss in a Clayton Act Section 7 case upon making *prima facie* showing that the "transaction in question will significantly increase market concentration."). A claim under Section 7 is viable at this stage of the litigation where there is an appreciable danger of anticompetitive effects – and thus, Section 7 concerns "probabilities, not certainties" and its definition of antitrust liability is "relatively expansive." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962).

Substantive guidance on Section 7 claims suggests that "Congress was simply leaving to the courts the task of determining what specifically must be shown to establish a violation of the statute in so complex and variegated a field as mergers." Hovenkamp, Herbert and Areeda, Phillip E., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th & 5th eds. 2018-2023), at ¶ 905(b). Courts around the country have found that in this context this means a reasonable probability of substantially lessened competition. *Id*. at ¶ 1160(b) (quoting *Brown Shoe Co.*, at 323). According to the Federal Trade Commission and Department of Justice's 2023 Merger Guidelines, mergers that are illegal under Section 7 are ones which "substantially lessen

competition or trend to create a monopoly" which "increase, extend or entrench market power and deprive the public[.]" 2023 Merger Guidelines, United States Department of Justice and Federal Trade Commission (2023) (the "Merger Guidelines").

Using these principles from the Department of Justice, the FTC, as well as Areeda and Hovenkamp as context, the Fourth Circuit applies a "burden-shifting analysis" to determine under Section 7 whether competition in a relevant product market is "substantially lessened." *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703-04 (4th Cir. 2021). This burden-shifting analysis requires a showing that the merger would result in "a firm controlling an undue percentage share of the relevant market" as well as "a significant increase in the concentration of firms in that market." *Philadelphia Nat'l Bank,* 374 U.S at 361. Then, if the plaintiff makes this showing, the defendants have the chance to refute the presumption of anticompetitive effects by either (1) discrediting the market concentration evidence or (2) showing that it inaccurately predicts the merger's probable effect on competition. *See JELD-WEN*, 988 F.3d at 703-704.

Here, applying this burden-shifting analysis to this Action reveals a reasonable probability of substantially lessened competition. Here, both Defendants were massive Big Tobacco players. Initially, only five products existed in the Relevant Market. FACAC, ¶ 38. As Plaintiffs allege, before the merger, Swedish Match's Zyn product held over 80% of market share. *Id.,* ¶¶ 7, 61. Post-merger, therefore, Defendants controlled an extremely high percentage of the Relevant Market (in excess of 80% of market share). This percentage far outpaces significantly lower combined market shares which have been found by the Supreme Court to threaten undue concentration. *See, e.g. Philadelphia Nat'l Bank*, 374 U.S at 364-65 ("[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents a threat."). As the 2023 Merger Guidelines state, antitrust enforcers

"presume, unless sufficiently disproved or rebutted, that a merger between competitors that significantly increases concentration and creates or further consolidates a highly concentrated market may substantially lessen competition." *See* Merger Guidelines.

Here, Defendants do not make any attempt to disprove or rebut allegations under the burden-shifting analysis and Plaintiffs have met their burden of showing control of an undue percentage share of the relevant market and a significant increase in the concentration of the firms. Defendants' conduct as alleged in the FACAC is precisely the type of anticompetitive conduct that Section 7 of the Clayton Act was intended to protect against. *Id.* at 367 (the purpose of Section 7 is "to arrest the trend toward concentration [and] the tendency to mono[polize], before the customer's alternatives disappeared through merger."). Because Plaintiffs have pled conduct by Defendants that raises an appreciable danger of anticompetitive effects, a viable claim under Section 7 has been stated.

***Defendants' Actual Competitor Arguments Fail.*** Defendants attempt to refute this argument by arguing that Philip Morris was not an actual competitor in the market because Philip Morris' Shiro product did not catch on. Def. Mot., at 17.

Under the antitrust laws, the tactic of withdrawing from the market in favor of a combined monopoly in a relevant market has been found to be violative of the Clayton Act before, and it should be found so again here. *United States v. Aetna Inc.*, 240 F. Supp. 3d, 1, 76 (D.D.C. 2017) ("case law does not support defendants' approach of viewing competition as an on-off switch where a merging party can simply switch it off entirely by withdrawing from a market… Rather, courts routinely view competitors that may have one foot in and one foot out of the market as actual competitors, and evaluate the anticompetitive effects of a merger using the standard tools of antitrust analysis."). And, as the 2023 Merger Guidelines explain, "[m]ergers can lessen

competition when they [...] reduce the intensity with which market participants compete." *See,* Merger Guidelines, at 1. Overview. Furthermore, as the Federal Trade Commission and Department of Justice state, "[f]irms that are not currently supplying products in [a] relevant market, but have committed to entering the market in the near future, are also considered market participants." *Id,* at 4.4.A. Market Participants.

While Defendants claim that because Shiro did not effectively penetrate the market that Philip Morris was not a horizontal competitor or a market participant, this defies the government's enforcement of the antitrust laws. *Id.* Additionally, Philip Morris' Shiro product likely could not catch on in such a short period of time (barely over one year) because Zyn already occupied monopoly power in the Relevant Market. FACAC, ¶ 12. Thus, Shiro would have had no opportunity to meaningfully compete with Zyn in the first instance because of Zyn's market dominance. Relatedly, Philip Morris' multimillion dollar acquisition of Shiro was not out of goodwill. Rather, it was a failed attempt to gain a foothold in the highly concentrated market and increase its market share upon entrance. *Id.* And, finally, as Plaintiffs allege, Philip Morris withdrew the Shiro product in favor of Zyn in 2022, rendering itself as a non-competitor, even if it did not sufficiently bring this product to market in a way that meaningfully competed with Zyn. *Id.*

**Defendants' Potential Competitor Theory Also Fails.** Even assuming *arguendo* that Defendants could "switch off" competition to render themselves a non-competitor in the Relevant Market, which it cannot, Philip Morris was undoubtedly an "actual potential competitor."

The 2023 Merger Guidelines reinforce that "mergers can violate the law when they eliminate a potential entrant in a concentrated market." *See Fed. Trade Com. v. Atl. Richfield Co., 549 F.2d 289 (4th Cir. 1977);* Merger Guidelines, at 1. Overview. Indeed, Clayton Act

jurisprudence in the Fourth Circuit on potential competition theories require a showing of clear proof of a loss of a potential new entrant into a market which is controlled by a tight oligopoly – and that there must be clear proof that the firm would have in fact entered into that respective market. *Id.* The bar for this proof, as explained, is fairly low – and Plaintiffs easily surpass this bar.

In the FACAC, Plaintiffs allege that: (1) as early as December 3, 2019, Philip Morris' then-CEO publicly discussed the necessity to enter the market with investors in New York, New York; (2) on May 7, 2021, Philip Morris consummated a multimillion dollar transaction to initially penetrate the market when it bought Shiro from AG Snus AS; and (3) in early 2022, Philip Morris invested in a reformulation of this product (before it was discontinued for Zyn). FACAC, ¶¶ 10, 12.

The Supreme Court has held that a merger between two firms, each or both of which *might* have entered a relevant market, could violate Section 7. *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964). Furthermore, other courts have held in previous Section 7 cases that potential competitor's anticompetitive conduct is more than enough to surpass the low bar required at the motion to dismiss stage. *See, e.g. Yamaha Motor Co., Ltd. v. Federal Trade Commission*, 657 F.2d 971 (8th Cir. 1981) (like Philip Morris here, Yamaha was considered a potential competitor where it "had the technology needed to be a viable entrant into the United States market," significant brand name recognition, United States-based marketing experience and a previous entrance into the market); *United States v. Phillips Petroleum Company*, *et al.*, 367 F. Supp. at 1239 ("[w]here credible objective evidence shows the basic economic facts of the acquiring company's overall size, resources, capability and motivation with respect to entry into an adjacent attractive market involving a line of commerce which the firm is already heavily engaged, that

firm must be considered to be a significant potential entrant unless it is objectively demonstrated that some unique feature of the market precludes such entry. Moreover, where the market is concentrated and there are few such likely entrants, whether due to the existence of high barriers to entry or for other reasons, no further inquiry is required as to the anticompetitive effect of the acquisition and that effect must be considered substantial within the meaning of Section 7").

Here, the Court should follow the same logic as in *Yamaha Motor* and in *Phillips* and deny Defendants' motion.

Nor, as Defendants contend, are potential competitor antitrust cases "rarely successful." Def. Mot., at 11. Notably, the cases Defendants rely upon for this proposition demonstrate just the opposite.

For example, Defendants erroneously rely on *FTC v. Meta Platforms, Inc.* for the proposition that "there has not been a successful [potential competitor] claim in over four decades." *Id.*; citing *FTC v. Meta Platforms, Inc.* 654 F. Supp. 3d 892, 926 (N.D. Cal. 2023). However, in *Meta Platforms*, the Court not only denies Meta's motion to dismiss but also states, "[t]o the extent Defendants' motion to dismiss sought dismissal of the FTC's actual potential competition claim on the basis that it is 'dead-letter doctrine' […] Defendants' motion is [denied]." *Meta Platforms,* 654 F. Supp. 3d at 926.

The Section 7 claim is well pled by Plaintiffs and should survive Defendants' motion. Following this logic, any and all arguments suggesting that the other causes of action should fail because the Section 7 claim is not well pled should be denied by this Court as well.

### ii. PLAINTIFFS SUFFICIENTLY PLEAD VIOLATIONS OF THE SHERMAN ACT

Defendants found no legally cognizable or independent grounds for dismissal of Plaintiffs' Sherman Act claims and simply restate that these claims fail for the same reasons that Plaintiffs'

Clayton Act claims fail.  Def. Mot., at 15-18.  Plaintiffs' Sherman Act claims are well-pleaded and survive Defendants' motion for the same reason that Plaintiff's Clayton Act claims also survive.

**Section One of the Sherman Act (Restraint of Trade).**  Plaintiffs plausibly assert a claim alleging a restraint of trade in violation of Section 1 of the Sherman Act ("Section 1").  FACAC, ¶¶ 86-100.

Section 1 prohibits "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 1.  To state a viable claim under Section 1, a plaintiff must allege facts supporting (1) a contract, combination or conspiracy which (2) imposed an unreasonable restraint on trade. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).  Generally, Section 1 claims are analyzed under one of two theories: a *per se* theory or the Rule of Reason theory.  *See, e.g.*, *Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 598 (N.D. Cal. 2020) (citation omitted).  Plaintiffs' Section 1 claim (Count I) alleges facts which meet the alternative threshold for either theory of analysis.

Once again, Defendants' lone argument against Count I is that Plaintiffs did not allege that Defendants' conduct "harms the competitive process and thereby harm[s] consumers" and, that, "for the exact same reasons that Plaintiffs failed to plead a Section [7] violation, they also filed to plead a Section [1] violation[.]"  Def. Mot., at 16.  However, as described above, the competitive process *was* in fact harmed because of Defendants' conduct.

Plaintiffs allege that: (1) Swedish Match had monopoly power in the MON product market; (2) Philip Morris was an actual competitor (or, alternatively, a potential competitor) in the MON product market because it acquired Shiro, had the resources and technology to compete as a rival Big Tobacco firm, and the motivation to enter the MON product market, as stated by its then-CEO;

(3) Philip Morris removed itself from the MON product market in order to contribute resources to bolster Swedish Match's dominance; and (4) once competition was crushed, the Defendants raised prices substantially once Zyn safely occupied over 80% of the MON product market (because they shared the Zyn product). FACAC ¶¶ 7, 12, 14, 15, 18, 25, 27, 29, 36, 40, 59, 66, 69, 72, and 103.

As stated above, Plaintiffs more than adequately allege harm to competition at this stage to the extent that it is required. And, because Plaintiffs do so with respect to Section 7 of the Clayton Act, the same holds true regarding allegations under Section 1 of the Sherman Act Defendants themselves argue that Section 7 and Section 1 claims rise or fall together. . *See,* Def. Mot. at 16; *see, e.g. Domed Stadium Hotel, Inc. v. Holiday Inn, Inc.*, 437 F.2d 480, 486 (5th Cir. 1984) (where, because the acquisition in question did not violate Section 7, it similarly did not violate Section 1); *White Consolidated Industries, Inc. v. Whirlpool Corporation*, 781 F.2d 1224, 1228 (6th Cir. 1986) ("… failure to sustain proof of potential anticompetitive effects under Section 7 of the Clayton Act precludes [plaintiffs] from successfully establishing proof of a conspiracy in restraint of trade"); *Vantico Holdings S.A. v. Apollo Management, LP*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003) ([b]ecause [Section] 1 of the Sherman Act looks to probably effects of an agreement, there is no substantive difference between the standards underlying a violation of [Section] 7 and [Section] 1"). The same logic should be followed by this Court regarding the anticompetitive conduct as alleged by Plaintiffs regarding Defendants' illegal acquisition.

**Defendants' Conduct is Unlawful Per Se.** In Section 1 cases, engaging in anticompetitive conduct by attempting to cut up the Relevant Market amongst competitors is not only illegal under the antitrust laws but is also considered to be *per se* unlawful. *See, e.g. Broadway Music, Inc. v. Columbia Broadway Systems, Inc.*, 441 U.S. 1, 19-20 (1979) (*per se* violations of Section 1of the

Sherman Act, are "one[s] that would always or almost always tend to restrict competition and decrease output").

This is especially true, like here, where a competitor agrees to cede the playing field to its rival in return for a share of the resulting profits due to throttled competition. *See, e.g. United States v. Brown*, 936 F.2d 1042, 1044-45 (9th Cir. 1991) ("[a] market allocation agreement between competitors at the same market level is a classic per se antitrust violation"); *see also, Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002) (the per se rule allows "courts to make 'categorical judgments' that certain practices, including […] market-allocation agreements, are illegal per se").[5]

***Defendants' Conduct is Alternatively Unlawful Under the Rule of Reason.*** Similarly, Plaintiffs have adequately alleged in the alternative that Defendants' conduct is anticompetitive under the Rule of Reason theory.[6] And while a more fact-intensive inquiry is required to examine a case under the Rule of Reason theory, the allegations contained in the FACAC meet this standard because they adequately plead that there was a harm to competition evidenced by the denial of benefits to innovation, a loss of product development, and a resulting impact on prices. *See, e.g. GSI Tech. Inc., v. Cypress Semiconductor Corp.*, 2012 WL 2711040, at *7 (N.D. Cal. July 6, 2012)

---

[5] According to the United States Department of Justice, "[m]arket […] allocation schemes are agreements in which competitors divide markets among themselves." "Price Fixing, Bid Rigging and Market Allocation Schemes: What They Are and What to Look For," United States Department of Justice (Rev. Feb. 2021), at 3 ("[i]n such schemes, competing firms allocate specific customers or types of customers, products […] among themselves").

[6] Under this theory, at a later stage of the action, the fact-finder would weigh all the circumstances to decide whether the alleged restraint on competition is illegal, including "specific information about the relevant business," "the restraint's history, nature and effect," and "[w]hether the businesses involved have market power[.]" *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-886 (2007) ("the rule distinguishes between restraints with anticompetitive effects that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.")

(it is sufficient to allege at the pleadings state that "competition has been harmed in that customers have been denied the benefits of innovation[,] product development and lower prices.") (collecting cases). That is what Plaintiffs allege here. See, e.g., FACAC, ¶ 70.

Accordingly, under either the *per se* or the alternative Rule of Reason analysis, Defendant's motion to dismiss the Section 1 claim should be denied.

***Section Two of the Sherman Act (Monopolization/Attempted Monopolization).*** Plaintiffs assert two claims: (1) monopolization in violation of Section 2 of the Sherman Act; and (2) in the alternative, attempted monopolization in violation of Section 2 of the Sherman Act. Defendants' motion moves to dismiss both. Def. Mot. at 17-18.

***Monopolization.*** Section 2 of the Sherman Act ("Section 2") allows for private plaintiffs to bring claims against monopolistic behavior when that plaintiff alleges that the defendant (1) "possess[ed] monopoly power in the relevant market;" and (2) "willful[ly] acqui[red] that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).[7] In the Fourth Circuit, "[c]onduct that might otherwise be lawful may be impermissibly exclusionary under the antitrust law[s] when practiced by a monopolist." *E.I. du Pont de Nemours*, 637 F.3d at 441, 450 ("monopolization has been found [when[ defendant controlled seventy to one hundred per cent of the relevant market" and "a monopolist is not free to take certain actions that a company in a competitive … market may take, because there is no restraint on a monopolists' behavior"); *see also White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974) (same).

---

[7] Plaintiffs' FACAC alleges violations under both federal and state law, and Defendant's motion makes no distinction between the two. For purposes of this motion, the laws are treated and assumed to be the same.

Defendants' motion fails to contest the elements of Plaintiffs' well-pled monopolization claim – rather, they claim that Plaintiffs failed to allege harm to the competitive process because Philip Morris had no substantial market share at the time of the transaction. Def. Mot., at 24-25. As alleged in the FACAC, however, Plaintiffs allege that Philip Morris did initially attempt to penetrate the MON product market and withdrew any attempt to compete with the monopolist, Swedish Match, at the same time that they consummated the merger. FACAC, ¶¶ 10, 12. Furthermore, Defendants, once again, challenge Plaintiffs' well-pled allegations with the notion that, because Plaintiffs supposedly fail to meet the requirements under Section 7 that they must also fail to meet the requirements of Section 2. Def. Mot. at 17; *citing Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) ("the merging of competitors to form a monopoly may violate [Section] 2 of the Sherman Act" though plaintiffs "must still demonstrate how the acquisitions unreasonably restricted competition.").

Plaintiffs meet the necessary standard. As Plaintiffs allege, rather than compete on the merits with Swedish Match and others in the Relevant Market by developing its own alternative to Zyn, Philip Morris chose restrict competition by sidelining itself, its deep resources, and the ability to innovate, in service of Swedish Match's pre-existing monopoly. Allegations such as these meet the threshold to show anticompetitive conduct in a claim for monopolization in addition to an unlawful acquisition under Section 7 of the Clayton Act. *See, e.g. In re Juul Labs*, 555 F. Supp. 3d 932 (N.D. Cal. Aug. 2021) (denying motion to dismiss monopolization claims on similar grounds, where one competitor left the market by the time the acquisition agreement was consummated).

***Attempted Monopolization.***[8]    Plaintiffs plead, in the alternative, an attempted monopolization claim.  FACAC, ¶¶ 105-114.  The bar at the motion to dismiss stage for pleading an attempted monopolization claim is lower and requires only a showing of a dangerous possibility of actual monopolization.  *Spectrum Sports v. McQuillan*, 506 U.S. 447 (1993); *M & M Med. Supplies and Services Inc. v. Pleasant Valley Hospital, Inc.*, 981 F.2d 160, 166 (4th Cir. 1992).  Plaintiffs also satisfy these pleading requirement and Defendants' only argument is that the allegations fail for the same reasons as Section 1 and Section 2 (Monopolization) claims because they fail to allege anticompetitive conduct.  Def. Mot., at. 24-25.  However, as previously stated, this argument is entirely unfounded.

Because of the failure to evince any reason why this cause of action should purportedly be dismissed, this Court should deny Defendants' arguments.

## B.  THE STATE ANTITRUST AND UNFAIR TRADE ACT CLAIMS ARE ALSO SUFFICIENTLY PLED

Defendants move to dismiss Plaintiffs' state antitrust and unfair trade act claims on the same "failure to plead anticompetitive conduct" grounds as the three federal antitrust statutes.  Def.

---

[8] Defendants' motion fails to develop an argument or clearly demonstrate directly why the "Sherman Act (Section 2) – "Attempted Monopolization" claim should be dismissed, only stating that it is conclusory (with no other support) and implying as part of a string cite that it should be dismissed as a cause of action because no anticompetitive conduct is evidenced in the FACAC. Def. Mot. at 24.

Because of this acute failure to develop any sort of real substantive opposition to this claim, any arguments that purport to move to dismiss this claim should be waived and the Attempted Monopolization cause of action should not be dismissed. *See, e.g. Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments are waived if they are "underdeveloped, conclusory or unsupported by law"); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009 ("[p]erfunctory, underdeveloped arguments without discussion or citation to pertinent legal authority are waived[.]"); *Dahn v. Commissioner of Social Security*, 2020 WL 5554510, at *2 (W.D.N.Y. 2020) (stating that courts are not responsible for developing arguments on a party's behalf); *Flores v. Tryon*, 2017 WL 37505124, *3 n. 4 (W.D.N.Y. 2017) ("… it is not this Court's responsibility to raise and make counsel's arguments for them.").

Mot., at 18-19.  For the same reasons that Plaintiffs federal antitrust claims are sufficiently pled, the state antitrust and unfair trade act claims are sufficiently pled as well.

Plaintiffs have properly pled their federal antitrust claims and, as such, their state law claims survive.  *See, e.g. Juul Labs,* at 965-966 (motion to dismiss denied where "[e]ven if I agreed with [Defendants] that the state law claims are derivative, they cannot be dismissed because the federal claims survive").  Defendants concede this point as well.  Def. Mot., at 18.[9]

In an almost afterthought fashion, Defendants use the final pages of their brief lodging disorganized attacks on state law antitrust claims using inapposite case law.

***The Illinois Antitrust Act Permits Class Action Claims for Damages.***  Defendants improperly claim that indirect purchasers from Illinois cannot proceed as a class seeking damages. Def. Mot., at 20.  However, this is incorrect.  Indirect purchasers from Illinois regularly and often proceed in this manner, including in indirect purchaser cases heard by this Court.[10]  *See, e.g. Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 564 (7th Cir. 2011) (Justice Scalia's decision in *Shady Grove* "holds that [Fed. R. Civ. P.] Rule 23 applies to all federal civil suits, even if that prevents achieving some other objective that a court thinks is valuable"); *In re Vascepa Antitrust Litigation (Indirect Purchaser)*, 2023 U.S. Dist. LEXIS 30091 (D.N.J. 2023) ("[t]he portion of [Defendant's] motion seeking to dismiss [indirect purchaser plaintiffs] Illinois state antitrust claims based on the contrary position will thus be [denied.]"); *In re Zetia (Ezetimbe)*

---

[9] As Defendants correctly state, "state antitrust and unfair trade practices laws are interpreted consistently with federal antitrust law."  *See In re Revlimid & Thalomid Purchaser Antitrust Litigation*, 2024 WL 2861865, at *108-109 (D.N.J. June 6, 2024) (state statutes at issue "have been interpreted […] in accordance with federal antitrust law").

[10] In any event, the question of whether indirect purchasers from Illinois cannot proceed as a class would be a question for the class certification stage of this litigation as opposed to the motion to dismiss.

*Antitrust Litigation*, Case No. 2:18-md-2836 (E.D. Va. Feb. 6, 2019) (denying motion to dismiss indirect purchaser claims under the Illinois Antitrust Act because Illinois residents' rights under *Shady Grove* permit as much).

Indeed, numerous recent antitrust cases have had settlements approved by the court which permitted Illinois indirect purchaser plaintiffs to recover damages as part of a class. *See, Jones v. Varsity Brands, LLC*, 2024 U.S. Dist. LEXIS 151693 (W.D. Tn. Aug 23, 2024) (order specifically granting motion to permit Illinois indirect purchaser plaintiffs to participate in the proposed settlement; *citing In re Remicade Antitrust Litigation*, 2023 U.S. Dist. LEXIS 43284 (E.D. Pa. Mar. 15, 2023); *In re Keurig Green Mountain Single-Serve Antitrust Litigation*, 2021 U.S. Dist. LEIS 264452 (S.D.N.Y. June 2, 2021) (same) (collecting cases). Here, the same law applies, and the Illinois class members should be allowed to proceed beyond the motion to dismiss stage.

***The Puerto Rico Antitrust Act Permits Class Action Claims for Damages.*** Defendants also improperly claim that indirect purchasers from Puerto Rico cannot proceed as a class. Def. Mot., at 20. However, as this Court has found as well as the District of Puerto Rico, this is incorrect as well. *In re Zetia (Ezetimbe) Antitrust Litigation*, Case No. 2:18-md-2836 (E.D. Va. Feb. 6, 2019) ("[i]n light of the Puerto Rico Supreme Court's statements […] this Report concludes that indirect purchaser actions are permitted under the antitrust laws of [Puerto Rico]"); *citing Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (indirect purchaser actions are permitted under the Puerto Rico Antirust Act seeking damages).

As such, Defendants' argument is misplaced (and the case law Defendants cite which precede the cases cited above) should be rejected.

## C. THE PLAINTIFFS HAVE SUFFICIENTLY PLED CLAIMS FOR UNJUST ENRICHMENT

To state a claim for unjust enrichment, a plaintiff must allege receipt of a benefit by the defendants at plaintiffs' expense and that "it would be inequitable or unjust for [defendants] to accept and retain the benefit." *In re Zetia (Ezetimibe) Antitrust Litigation*, 2019 WL 1397228 at *35 (E.D. Va. Feb. 6, 2019) (motion to dismiss unjust enrichment claim denied as part of an antitrust action).

Defendants attempt to attack Plaintiffs' claims for unjust enrichment by arguing that the cause of action fails because the federal antitrust claims should be dismissed. Def. Mot., at 19. However, as discussed *infra*, Plaintiffs' federal antitrust claims are adequately pled and should not be dismissed.

Even assuming arguendo that the antitrust claims did fail – which they do not – unjust enrichment claims are independent and are not duplicative of antitrust claims because unjust enrichment has entirely different elements and a completely different theory of damages. *See, e.g.*, *Id,* at *35 (denying motion to dismiss unjust enrichment claim as part of an antitrust action); *In re Interior Molded Doors Indirect Purchaser Antitrust Litigation*, Case No. 3:18-cv-00850-JAG (E.D. Va. Sept. 18, 2019) (denying motion to dismiss unjust enrichment claims as part of an indirect purchaser antitrust action for the laws of Arizona, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Oregon and Tennessee)*; In re Credit Default Swaps Auctions Litigation*, 2023 WL 3821337 (D.N.M. 2023) (denying motion to dismiss the unjust enrichment claim as duplicative because unjust enrichment is different and has a unique theory of damages); *Los Gatos Merchantile Inc. v. E.I. Dupont de Nemours & Co.*, 2015 WL 4755335, at *25 (N.D. Cal. Aug. 11, 2015) (unjust enrichment claim allowed to proceed alongside "predicate antitrust or consumer protection claims.").

Plaintiffs adequately allege unjust enrichment damages in their well-pled FACAC based off the fact that Defendants were unjustly enriched because of the Defendants unlawful merger which resulted in a monopoly that has overcharged consumers and where Plaintiffs request a disgorgement of profits into a constructive trust (as opposed to actual damages based on a "but for" analysis of prices and overcharges for the antitrust claims). FACAC ¶¶ 132, 256-258.

Finally, Defendants claim that Plaintiffs' unjust enrichment claims also fail with respect to Florida, Idaho, Maine, New York, and North Dakota purchasers because Plaintiffs and Class members did not confer a direct benefit on Defendants in those states. Def. Mot., at 29-30. However, this is a complete misunderstanding of Plaintiffs' unjust enrichment claim. Unjust enrichment claims are properly brought against entities such as Defendants when a consumer purchases a product from a distributor (as in this case) as opposed to directly from a manufacturer. *See, In re Zetia (Ezetimbe) Antitrust Litigation*, Case No. 2:18-md-2836 (E.D. Va. Feb. 6, 2019) (denying motion to dismiss unjust enrichment claim where defendants claim that a direct relationship was necessary to plead such a claim, stating "[t]he only requirement is that the connection between plaintiff and defendant not be 'too attenuated'"); *Bolling v. Mercedez-Benz USA, LLC*, 2025 U.S. Dist. LEXIS 5773 (N.D. Ga. Jan. 10, 2025) (denying motion to dismiss an unjust enrichment claim where consumers bought cars from a dealership who sold the cars as a vendor for the defendant); In *re Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practices Litigation*, 955 F.Supp.2d 1311 (S.D. Fla. July 14, 2013) (similarly denying motion to dismiss an unjust enrichment claim because the price premium to a retailer conferred a benefit onto the defendant, even if it was one step removed); *Feiner v. Innovation Ventures LLC*, 2013 WL 2386656 (S.D. Fla. May 30, 2013) (same).

A direct benefit is conferred on Defendants each time a Zyn tin is sold. Thus, Defendants are subject to unjust enrichment claims in Florida, Idaho, Maine, New York, and North Dakota.

## D. PLAINTIFFS SHOULD BE FREELY GIVEN THE OPPORTUNITY TO REPLEAD THEIR COMPLAINT SHOULD THE COURT GRANT ANY PORTION OF DEFEDNANTS' MOTION TO DISMISS

Leave to amend is liberally granted; and, if this Court finds that any or all of the claims in the FACAC should be dismissed, it should allow the Plaintiffs to replead their complaint. Fed. R. Civ. P. 15(a)(2) (district courts "should freely give leave [to amend] when justice so requires"); *In re Interior Molded Doors Indirect Purchaser Antitrust Litigation*, Case No. 3:18-cv-00718-JAG (E.D. Va. Sept. 18, 2019) (this Court permitting plaintiffs to move for leave to amend the complaint with respect to any causes of action which were dismissed).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. In the alternative, Plaintiffs' request leave to amend.

DATED: March 24, 2025          Respectfully Submitted,

/s/ Lee A. Floyd
Lee A. Floyd (VSB No. 88459)
BREIT BINIAZAN, PC
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
Tel: (804) 351-9040
Fax: (904) 351-9170
Lee@bbtrial.com

Jeffrey K. Brown*
Blake Hunter Yagman (admitted *pro hac vice*)
LEEDS BROWN LAW, P.C.
One Old Country Road, Suite #347
Carle Place, New York 11514
Tel:  (516) 873-9550
jbrown@leedsbrownlaw.com
byagman@leedsbrownlaw.com

James L. Ferraro*
James L. Ferraro, Jr.*
Natalia Salas*
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel:  (305) 375-0111
jferraro@ferrarolaw.com
james@ferrarolaw.com
nsalas@ferrarolaw.com

Jason Sultzer (admitted *pro hac vice*)
Jeremy Francis (admitted *pro hac vice*)
Scott Evan Silberfein (admitted *pro hac vice*)
SULTZER & LIPARI, PLLC
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel:  (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
francisj@thesultzerlawgroup.com
silberfeins@thesultzerlawgroup.com

*  *pro hac vice forthcoming*

*Attorneys for Plaintiffs and the Proposed Classes*

**<u>Certificate of Service</u>**

I certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

/s/ *Lee. A. Floyd*
Lee A. Floyd (VSB No. 88459)
BREIT BINIAZAN, PC
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
Tel: (804) 351-9040
Fax: (904) 351-9170
Lee@bbtrial.com