IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ALLEN NEUMARK, *et al*.,
*on behalf of themselves and*
*all others similarly situated*,
      Plaintiffs,

      v.                          Civil No. 3:24cv821 (DJN)

SWEDISH MATCH NORTH
AMERICA LLC, *et al*.,
      Defendants.

## MEMORANDUM ORDER
### (Granting Defendants' Motion to Dismiss)

Plaintiffs Allen Neumark and Eric Greenwood ("Plaintiffs") bring this action against

Defendants Swedish Match North America LLC ("Swedish Match") and Philip Morris

International, Inc. ("Philip Morris") (collectively, "Defendants"), asserting various claims

pursuant to the Sherman Antitrust Act, the Clayton Antitrust Act and state antitrust laws.[1]  This

matter comes before the Court on Defendants' Motion to Dismiss.  (ECF No. 36 ("Motion").)

For the reasons set forth below, the Court hereby GRANTS Defendants' Motion.  (ECF No. 36.)

## I.      BACKGROUND

### A.    Factual Background

At this stage, the Court must accept as true the facts set forth in the First Amended Class

Action Complaint. (ECF No. 26 ("Am. Compl."))  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[1]     Plaintiffs allege antitrust violations under the laws of various states, as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands, based on the acts that form the grounds for their federal antitrust claims.  (ECF No. 26 ("Am. Compl.") ¶¶ 128–246.)

Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant Motion.

Philip Morris constitutes a tobacco company that produces Marlboro cigarettes, smokeless alternatives and other similar products. (Am. Compl. ¶ 2.) One such smokeless alternative is called "Zyn," which Philip Morris's subsidiary, Swedish Match, manufactures and sells. (*Id.* ¶¶ 2–3.) Together, Plaintiffs allege that Philip Morris and Swedish Match constitute members of "Big Tobacco." (*Id.* ¶ 2.)

Zyn qualifies as a modern oral nicotine ("MON") pouch. (*Id.* ¶ 4.) MON pouches contain, among other ingredients, high-purity nicotine and sweeteners. (*Id.*) Customers traditionally place MON pouches in their mouths between their gum and upper lip to allow for nicotine and flavors to release. (*Id.*) At present, Swedish Match sells Zyn in round tins with ten flavors and two nicotine strengths. (*Id.*)

MON products arrived in the United States in 2014, but Zyn did not begin its exponential rise until 2018. (*Id.* ¶¶ 8, 10.) Specifically, Plaintiffs allege that Swedish Match sold the following number of Zyn tins in the United States:

2018:  12.7 million tins
2019:  50.4 million tins
2020:  130 million tins
2021:  198 million tins
2022:  237 million tins
2023:  384 million tins
2024 (projected):  580 million tins

(*Id.* ¶ 8.) Plaintiffs allege that such growth came not from business savvy, but from an unlawful market monopoly. (*Id.* ¶ 9.)

Plaintiffs assert that Philip Morris's unlawful behavior began when, rather than manufacturing its own MON products, it acquired two "major competitors" in the United States

MON market (or "the Relevant Market"), resulting in a market monopoly. (*Id.* ¶¶ 11, 60.) The first of these acquisitions occurred on May 7, 2021, when Philip Morris purchased Danish MON manufacturer AG Snus AS, which sold a MON product called "Shiro." (*Id.* ¶¶ 12, 61.) Plaintiffs allege that this acquisition enabled Philip Morris's initial penetration into the MON market, but that the Shiro product "did not really catch on." (*Id.*) Philip Morris reformulated Shiro in 2022 before eventually discontinuing the product in favor of Zyn. (*Id.*)

Then, on May 11, 2022, Philip Morris purchased a 93 percent stake in Swedish Match for $16 billion. (*Id.* ¶¶ 13, 62.) Plaintiffs allege that, by February 28, 2023, Philip Morris had acquired, through one of its entities, 100 percent ownership of Swedish Match. (*Id.* ¶ 63.) This transaction, which Plaintiffs assert went "unchecked" by regulatory authorities, allowed Philip Morris to quickly overtake the Relevant Market. (*Id.* ¶¶ 13, 62.) As a result, Philip Morris's acquisition of AG Snus AS and Swedish Match "turned the Relevant Market on its head [by] making it nearly impossible to regain the ground that Philip Morris would catch on its competitors." (*Id.* ¶ 14.)

Plaintiffs allege that Philip Morris's acquisition of Swedish Match — while also withdrawing Shiro from the Relevant Market — constituted anticompetitive behavior. (*Id.* ¶¶ 15, 17.) Specifically, the acquisitions "throttled competition in a way that reduce[d] output, the incentive to innovate and the desire of new entrants to compete in the Relevant Market." (*Id.* ¶ 16.) This monopoly then harmed consumers, because low competition caused higher prices and lower-quality products. (*Id.* ¶ 18.) As a result of these events, Plaintiffs allege that Defendants violated federal and state antitrust laws. (*Id.* ¶¶ 17, 67.)

### B.    Procedural Background

On November 18, 2024, Plaintiffs filed their initial Class Action Complaint.  (ECF No. 1 ("Compl.").)  Defendants responded by filing a Motion to Dismiss on January 15, 2025.  (ECF No. 22.)  In lieu of filing an opposition to Defendants' Motion to Dismiss, (ECF No. 24 at 1), Plaintiffs filed their First Amended Class Action Complaint on February 10, 2025, (ECF No. 26). Count One asserts that Defendants violated Section One of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1.  (Am. Compl. ¶¶ 86–100.)  Count Two alleges that Defendants violated Section Two of the Sherman Act, 15 U.S.C. § 2.  (*Id.* ¶¶ 101–14.)  Count Three alleges that Defendants violated Section Seven of the Clayton Antitrust Act ("Clayton Act"), 15 U.S.C. § 18. (*Id.* ¶¶ 115–27.)  Count Four alleges violations of state antitrust laws of various states, as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands, based on the acts that form the grounds for their federal antitrust claims.  (*Id.* ¶¶ 128–246.)  Finally, Count Five alleges a claim for unjust enrichment.  (*Id.* ¶¶ 247–58.)  Based on the foregoing claims, Plaintiffs seek to certify a class of plaintiffs and be appointed as representatives of such class.  (*Id.* ¶ 259(a).)  Moreover, Plaintiffs request a decree that Defendants' merger violated federal and state antitrust law and, therefore, seek permanent divestiture or enjoinment of such merger.  (*Id.* ¶ 259(b).)  Finally, Plaintiffs seeks costs, fees and damages, including treble damages, as provided by antitrust law. (*Id.* ¶ 259(c)–(d).)

On March 3, 2025, Defendants filed the instant Motion.  (ECF No. 36.)  Plaintiffs responded on March 24, 2025, (ECF No. 38 ("Opp.")), and Defendants replied on April 7, 2025, (ECF No. 39 ("Reply")), rendering this Motion ripe for review.

4

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses.  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court accepts the well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff.  *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Federal Rule of Civil Procedure 8(a), a complaint must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  As the Supreme Court opined in *Twombly*, a complaint must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations."  *Id.*  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable."  *Id.* at 555, 570.  Thus, a complaint must assert facts that "permit[] the court to infer more than the mere possibility of misconduct based upon its judicial experience and common sense."  *Forgus v. Mattis*, 753 F. App'x 150, 152 (4th Cir. 2018).  The facts alleged must be sufficient to "state all the elements of [any] claim[s]."  *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

## III.    ANALYSIS

Within their Motion, Defendants assert a variety of arguments to support dismissal of Plaintiffs' First Amended Class Action Complaint.  Defendants first assert that Plaintiffs' Clayton Act claim (Count Three) must be dismissed, because Plaintiffs fail to plausibly allege increased market concentration resulting from a merger of horizontal competitors.  (ECF No. 37 ("Mem.") at 9–11, 15.)[2]  Alternatively, Defendants assert that Plaintiffs' Clayton Act claim fails, because Defendants do not plausibly allege a potential competition theory.  (*Id.* at 11–14.)  Next, Defendants argue that Plaintiffs' Section One Sherman Act claim (Count One) fails for the same reasons that their Clayton Act claim fails.  (*Id.* at 15–16.)  As for Plaintiffs' Section Two Sherman Act claim (Count Two), Defendants argue that this count fails, because Plaintiffs do not plausibly allege that Defendants possessed a monopoly power and engaged in anticompetitive conduct.  (*Id.* at 17–18.)  Defendants also assert that Plaintiffs' state law claims fail with their federal claims.  (*Id.* at 18–23.)  Finally, Defendants argue that Plaintiffs' unjust enrichment claims cannot proceed, because Defendants did not engage in any unjust conduct.  (*Id.* at 19.)  The Court addresses each of these arguments in turn, ultimately determining that Plaintiffs fail to plausibly state claims upon which relief may be granted.  Accordingly, for the reasons discussed below, the Court hereby GRANTS Defendants' Motion.  (ECF No. 36.)

### A.    Section Seven of the Clayton Act (Count Three)

Section Seven of the Clayton Act prohibits transactions the effect of which "may be substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18; *Fed. Trade Comm'n v. Atl. Richfield Co.*, 549 F.2d 289, 291 n.1 (4th Cir. 1977).  Congress chose not to

---

[2]    The Court utilizes the parties' pagination from their respective briefs, not CM/ECF pagination.

define "substantially" either "in quantitative terms of sales or assets or market shares or in designated qualitative terms." *Brown Shoe Co. v. United States*, 370 U.S. 294, 321 (1962). Instead, Congress's decision "indicated plainly that a merger had to be functionally viewed, in the context of its particular industry." *Id.* at 321–22. When determining whether a transaction substantially lessens competition, a Court might consider:

> that a whole or material part of the competitive activity of an enterprise, which had been a substantial factor in competition, had been eliminated; that the relative size of the acquiring corporation had increased to such a point that its advantage over competitors threatened to be 'decisive'; that an 'undue' number of competing enterprises had been eliminated; or that buyers and sellers in the relevant market had established relationships depriving their rivals of a fair opportunity to compete.

*Id.* at 321 n.36. The general language of this standard reflects "a conscious avoidance of exclusively mathematical tests." *Id.*

Consumers bringing a Section Seven Clayton Act claim must first "establish a prima facie case that a merger is anticompetitive." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). "In practical terms, this means adequately alleging facts that an acquisition creates 'an appreciable danger' or 'a reasonable probability' of anticompetitive effects in the relevant market. *Id.* at 788. But plaintiffs need not demonstrate certainties in this showing; rather, Congress was concerned with "probabilities" of anticompetitive behavior. *Brown Shoe Co*, 370 U.S. at 323.[3]

---

[3]    Plaintiffs argue that the question of whether they have alleged competitive harm "is not appropriate for this stage in the litigation," because "the bar to survive a motion to dismiss is much lower" and a plaintiff "only need to present a compelling case that predicts a possibility of substantial harm to competition." (Opp. at 8–9.) Defendants disagree, arguing that this theory requires that the Court accept "outdated precedent." (Reply at 3.) The Court agrees with Defendants. Plaintiffs cite to *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963) for their argument. But in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), noting "the unusually high cost of discovery in antitrust cases," the Supreme Court held that, to survive a motion to dismiss, a complaint alleging a violation of the Sherman Act must allege specific facts "plausibly suggesting (not merely consistent with) [an] agreement" in restraint of trade. *Id.* at

### 1.    Horizontal Merger Theory (Actual Competition)

"Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorp., Inc*, 418 U.S. 602, 618 (1974).  Here, Plaintiffs assert that the entirety of the United States qualifies as the relevant geographic market.  (Am. Compl. ¶ 32.)  Plaintiffs also allege one product market:  MON pouches.  (*Id.* ¶ 34.)  Defendants do not challenge the geographic or product markets.

A typical Section Seven Clayton Act challenge relates to horizontal transactions between competitors that increase market concentration.  *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018), *aff'd* 916 F.3d 1019 (D.C. Cir. 2019) (identifying  the "familiar" horizontal merger playbook).  Plaintiffs tend to demonstrate such anticompetitive effects "by comparing the market's concentration before and after the merger." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021) (citing *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017)).  Here, Plaintiffs' allegations fail to state a Section Seven claim for two reasons.

First, Plaintiffs' allegations regarding the market concentration before and after Defendants' merger prove entirely conclusory.  Plaintiffs begin by alleging that Defendants were "former horizontal competitors in the Relevant Market."  (Am. Compl. ¶ 88.)  Plaintiffs appear to support this contention with the following narrative:  Philip Morris entered the Relevant Market by acquiring AG Snus AS, a "major competitor" in the Relevant Market.  (*Id.* ¶¶ 60–61.)

---

557–58.  The Supreme Court later extended this standard to other causes of action in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).  As the more recent precedent, the Court will follow the pleading standard articulated in *Twombly*, not the "low bar" that Plaintiffs argue arises from *Philadelphia National Bank*.

Philip Morris then purchased Swedish Match, another "major competitor" in the Relevant Market. (*Id.* ¶ 62.) Because Philip Morris acquired a "major competitor" in the Relevant Market (Swedish Match) while owning another such competitor (AG Snus AS), this purchase qualified as an impermissible horizontal transaction. (*Id.* ¶¶ 60, 62, 88.) Accordingly, the resulting merger eliminated competition between Philip Morris and Swedish Match and established Philip Morris's monopoly power over the Relevant Market. (*Id.*)

Plaintiffs lob additional conclusory allegations regarding Defendants' acquisitions, including that Philip Morris's purchase of AG Snus AS allowed Philip Morris to "test[] the waters to see what it could get away with and ultimately driv[e] Shiro as a competitor to Zyn out of the Relevant Market." (*Id.* ¶ 61.) Moreover, Plaintiffs assert that Defendants' merger "allowed Philip Morris to quickly capture a substantial market share" and that it "turned the Relevant Market on its head – making it nearly impossible to regain the ground that Philip Morris would catch on its competitors." (*Id.* ¶¶ 13–14.) The result, Plaintiffs allege, has been:

> (1) supracompetitive prices by virtue of the fact that Defendants can charge whatever [they] please[] after removing price competition by nascent and actual competitors that have downward pricing pressure, (2) higher prices (as much as double the price) for less product than other competitors with alternative products in the Relevant Market, (3) loss of innovation and superior product as a result of Defendants' conduct, which literally removed more innovative competitors from the market and (4) because of Defendants' dominant position and the insulation that its anticompetitive conduct gave to its monopoly, a throttled incentive to compete.

(*Id.* ¶ 70.) Though a plaintiff need only plausibly allege probabilities, not certainties, of anticompetitive behavior, Plaintiffs' allegations nonetheless fail to adequately allege an appreciable danger or a reasonable probability of anticompetitive effects in the relevant market.

On similarly conclusory factual allegations, the Northern District of California granted a motion to dismiss a Section Seven Clayton Act claim that provided no "factual allegations as to market share, other competitors, or even what anticompetitive conduct is at risk of occurring in

9

these markets that may injure the plaintiffs and why it is reasonably probable to happen."

*Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1062 (N.D. Cal. 2023).  Moreover, the

court found that "Plaintiffs' general allegation that the merger may cause 'higher prices, less

innovation, less creativity, less consumer choice, decreased output, and other potential

anticompetitive effects' [] [was] insufficient."  *Id.*  The same stands true here.  Plaintiffs offer no

concrete factual allegations regarding changes in pricing or a decrease in innovation.  Moreover,

Plaintiffs' allegation that the acquisition of "major competitors . . . turned the Relevant Market

on its head" — without more — offers nothing more than conjecture.  Altogether, these

allegations fail "to raise a right to relief above the speculative level."  (Am. Compl. ¶¶ 14, 60);

*Twombly*, 550 U.S. at 555.

Second, Plaintiffs' allegations regarding AG Snus AS throughout the course of this

litigation stand contradictory.  Plaintiffs' original Class Action Complaint alleged that AG Snus

AS's product, Shiro, "never came to market in the United States."  (Compl. ¶ 46.)  Moreover,

Plaintiffs' original Class Action Complaint failed to describe AG Snus AS or Shiro as a major

competitor in the Relevant Market.  Alternatively, Plaintiffs' First Amended Class Action

Complaint alleges that AG Snus AS constituted a "major competitor[] in the Relevant Market,"

which is the United States.  (Am Compl. ¶¶ 7, 11, 60.)  Plaintiffs' First Amended Class Action

Complaint further states that Philip Morris's acquisition of AG Snus AS constituted "Philip

Morris' opening salvo into the Relevant Market," but that Shiro "did not really catch on."  (*Id.*

¶ 61.)  These allegations cannot all be true; Shiro either came to market in the United States or it

did not.

While an amended complaint supersedes the original complaint as operative, *Young v.

City of Mt. Rainier*, 238 F.3d 567, 572 (4th Cir. 2001), the Court need not turn a blind eye to

factual misrepresentations in an amended complaint.  *See, e.g.*, *Cox v. Red Hat, Inc.*, 2025 WL 889888, at \*11 (E.D. Va. Mar. 21, 2025) ("Plaintiff may not directly contradict her prior pleadings."); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171 (D.D.C. 2013), *aff'd*, 796 F.3d 1 (D.C. Cir. 2015) ("A plaintiff, however, may not plead facts in their amended complaint that contradict those in their original complaint.")  Rather, the Court may treat factual allegations from Plaintiffs' original Class Action Complaint as judicial admissions.  *See, e.g.*, *Cox*, 2025 WL 889888, at \*11 (describing a fact included in plaintiff's original complaint, but omitted from an amended complaint, as a "judicial admission"); *Colliton v. Cravath, Swaine & Moore LLP,* 2008 WL 4386764, at \*6 (S.D.N.Y. Sept. 24, 2008) (quoting *Wallace v. N.Y.C. Dep't of Corr.*, 1996 WL 586797, at \*2 (E.D.N.Y. Oct. 9, 1996)) ("Where a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'")

Accepting as true Plaintiffs' original allegation that Shiro "never came to market in the United States," (Compl. ¶ 46), Shiro does not qualify as a product in the Relevant Market, which is the United States.  (Am. Compl. ¶¶ 7, 32.)  Consequently, when Philip Morris acquired Swedish Match, they were not horizontal competitors, because Philip Morris lacked a product in the Relevant Market at the time of purchase.  (*Id.* ¶¶ 10–13.)  However, even if Shiro existed in the Relevant Market, Plaintiff's allegations in the First Amended Class Action Complaint fail to support a finding that it constituted a "major competitor" — indeed, Plaintiffs allege that Shiro "did not really catch on" — such that acquisition of AG Snus AS caused any meaningful effect on the Relevant Market.  (Am. Compl. ¶¶ 12, 61.)

11

Thus, without Plaintiffs' allegations that AG Snus AS constituted a "major competitor" in the United States MON market, Philip Morris's acquisition of Swedish Match actually constituted its first foray into the Relevant Market. As a result, the Relevant Market's concentration did not increase because of the acquisition; rather, it stayed the same. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763–64 (9th Cir. 2018) (affirming dismissal of Section Seven Clayton Act claim, because merger of a U.S. supplier with a company that could not sell into the United States did not increase concentration in the U.S. market); *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 (8th Cir. 2010) (noting that transactions involving noncompetitors "do[] not reduce the number of competitors or raise concentration in the market[]"). Plaintiffs' factual allegations therefore fail to plausibly demonstrate anticompetitive effects through a horizontal merger theory.

## 2.    Potential Competition Theory

Because Plaintiffs fail to demonstrate actual competition through a horizontal merger, their Section Seven claim survives only if they can plausibly allege a theory of potential competition. *Marine Bancorp., Inc.*, 418 U.S. at 614 (noting that Section Seven Clayton Act claims are alleged through either a showing of actual competition or potential competition). Potential competition theories pertain to mergers between firms that either "produce different products or operate in different geographic markets." *Ginsburg*, 623 F.3d at 1233. Traditionally, a merger between two unrelated companies would not affect the number of relevant market competitors or the market's concentration. *Id.* However, the merger of such companies could produce an anticompetitive effect in one of two ways: (1) "because the threat of new entry by the acquiring firm induced competitors in the acquired firm's market to perform more competitively ('perceived potential competition');" or (2) "because the merger forecloses

12

the acquiring firm's future *de novo* entry into the acquired firm's market ('actual potential competition')." *Id.* at 1234.  Plaintiffs do not assert a perceived potential competition claim; thus, the Court discusses only the showing required for an actual potential competition claim. (Am. Compl. ¶¶ 12–14; Opp. at 12–13.)

To establish an actual potential competition theory, a plaintiff must allege that the purchasing firm "ha[d] available feasible means for entering the [geographic] market other than by [the transaction]; and [] that those means offer[ed] a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." *Marine Bancorp., Inc.*, 418 U.S. at 633.  The Fourth Circuit requires "strict proof of any anticompetitive effect" and "certain" or "unequivocal" evidence of intended entry.  *Atl. Richfield Co.*, 549 F.2d at 294–95.  Moreover, the Supreme Court has cautioned that although Section Seven of the Clayton Act applies to actual and potential competition cases, "it is to be remembered that [§] 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *Marine Bancorp., Inc.*, 418 U.S. at 622–23 (quoting *Brown Shoe Co.*, 370 U.S. at 323).  The Court will first analyze whether Plaintiffs' alleged facts demonstrate Philip Morris's "certain" or "unequivocal" entry into the United States MON market, before considering whether Plaintiffs allege that such entry would have produced anticompetitive effects.

Plaintiffs point to three events from their First Amended Class Action Complaint to argue that Philip Morris would have entered the United States MON market but for purchasing Swedish Match.  (Opp. at 13.)  First, on December 3, 2019, Philip Morris's former CEO, Andre Calantzopoulos ("Calantzopoulos"), responded to a question about the company's future by stating that MON constituted "an emerging category . . . which we are looking at as well."  (*Id.*; Am. Compl. ¶ 59.)  Plaintiffs allege that this comment "demarcated a shift in Philip Morris'

business strategy to aggressively pursue entrance into the MON market." (Am. Compl. ¶ 59.) Second, Plaintiffs highlight Philip Morris's acquisition of AG Snus AS in May 2021, a move which allowed them to "initially penetrate" the MON market. (Opp. at 13; Am. Compl. ¶¶ 12, 61.) Finally, Plaintiffs note Philip Morris's "reformulation" of Shiro in early 2022 before discontinuing the product. (Opp. at 13; Am. Compl. ¶¶ 12, 61.)

Plaintiffs' First Amended Class Action Complaint offers additional allegations to support its proposition that Philip Morris would have entered the United States MON market on its own. (*See* Am. Compl. ¶ 69 ("Rather than compete on the merits using the endless arsenal of 'Big Tobacco' advantages and resources that Philip Morris has, Philip Morris instead struck a deal with its Big Tobacco competitor to monopolize the Relevant Market."); *id.* ¶ 54 (noting Philip Morris's "endless arsenal of 'Big Tobacco' advantages and resources")). Taken altogether, these allegations fall short, even at this stage, of supporting an inference of "certain" or "unequivocal" evidence of intended entry into the Relevant Market. *Atl. Richfield Co.*, 549 F.2d at 294–95.

First, Calantzopoulos's statement regarding MON products does not qualify as "certain" or "unequivocal" evidence that Philip Morris would have entered the United States MON market but for acquiring Swedish Match. Rather, Calantzopoulos's statement merely expressed an interest in the growing MON trend. But "it is to be remembered that [§] 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *Marine Bancorp., Inc.*, 418 U.S. at 622–23. Calantzopoulos's statement asserts, at most, the possibility of entering the MON market. Thus, this statement fails to support an actual potential competition claim.

Furthermore, Plaintiffs' focus on Philip Morris's purchase of AG Snus AS and the Shiro product proves misguided. As discussed above, the Court may accept as true Plaintiffs' statement in their original Complaint that Shiro "never came to market in the United States."

14

(Compl. ¶ 46.)  But potential competition claims are not concerned with markets generally; rather, the Supreme Court provides that the acquiring company must have "available feasible means" for entering a *specific* geographic market.  *Marine Bancorp., Inc.*, 418 U.S. at 633.  In other words, Plaintiffs must plead that Philip Morris certainly could have entered the Relevant Market, which here is the entire United States.  (Am. Compl. ¶ 7.)  Because Philip Morris's purchase of AG Snus AS — as well as Shiro's "reformulation" — occurred entirely outside of the Relevant Market, this transaction and product stand irrelevant to whether Philip Morris certainly could have entered the MON market in the United States.

Even if the Court were not to consider Plaintiffs' inconsistent allegations regarding Shiro's sale in the United States, the Court would reach the same conclusion.  This is because Plaintiffs allege that "the Shiro product did not really catch on."  (Am. Compl. ¶¶ 12, 62.) Moreover, Plaintiffs argue that "Shiro would have had no opportunity to meaningfully compete with Zyn in the first instance because of Zyn's market dominance."  (Opp. at 12.)  Thus, even if Philip Morris had entered the United States MON market with Shiro, Plaintiffs themselves plead that such entry would have failed to "offer a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects."  *Marine Bancorp., Inc.*, 418 U.S. at 633.

Plaintiffs' factual allegations also stand in stark contrast to the cases which Plaintiffs argue support their actual potential competition claim.  First, Plaintiffs cite *Yamaha Motor Co., Limited v. Federal Trade Commission*, 657 F.2d 971 (8th Cir. 1981) for the proposition that "other courts have held in previous Section 7 cases that [a] potential competitor's

15

anticompetitive conduct is more than enough to surpass the low bar[4] required at the motion to dismiss stage." (Opp. at 13 (citing *id.* at 978).) But in *Yamaha*, the acquiring company "was [already] selling substantial numbers of [the relevant product] in every developed market in the world, except the [relevant market]." *Yamaha*, 657 F.2d at 978. Yamaha's "management [also] had the requisite experience in the production and marketing of the [relevant product]." *Id.* Here, Plaintiffs' allegations pale in comparison.

First, Plaintiffs allege that before purchasing the Danish company AG Snus AS in 2021, Philip Morris lacked presence in the Relevant Market. (Am. Compl. ¶¶ 12, 59, 61.) Moreover, Plaintiffs assert that "the Shiro product did not really catch on" before Philip Morris eventually discontinued it. (*Id.* ¶¶ 12, 61.) Plaintiffs do not allege that AG Snus AS sold Shiro in the United States before acquisition. (*Id.*) In fact, Plaintiffs allege that before acquiring AG Snus AS and Swedish Match, Philip Morris "had no real presence in" the Relevant Market. (*Id.* ¶ 66.) Plaintiffs also offer no allegations regarding Philip Morris's technology to produce, market or sell MON products. Rather, they simply refer to the "endless arsenal of 'Big Tobacco' advantages and resources" at Philip Morris's disposal (*Id.* ¶ 69.) But generic allegations regarding Philip Morris's size, rather than specific capabilities, fail to allege an actual potential competition claim, even at the pleading stage. *See Fed. Trade Comm'n v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 928 (N.D. Cal. 2023) ("But financial and engineering capabilities alone are

---

[4]    Plaintiffs simultaneously assert that Fourth Circuit jurisprudence "require[s] a showing of clear proof" that Philip Morris would have entered the MON market in the United States, while also arguing, without citation, that the burden for this proof "is fairly low." (Opp. at 13.) While the motion to dismiss stage tests only the sufficiency of the complaint, rather than the merits of claims, Plaintiffs' "[f]actual allegations must [still] be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Twombly*, 550 U.S. at 555, 570. Whether this constitutes the "low bar" to which Plaintiffs refer, it stands as the law that the Court must follow.

insufficient to conclude it was 'reasonably probable' that [acquiring company] would enter the [relevant] market.")

Plaintiffs' citation to *United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973), *aff'd*, 418 U.S. 906 (1974) fares no better.  (Opp. at 13–14.)  In *Phillips*, the court found that the defendant constituted a potential entrant into the relevant market, because the company "had about 19,500 branded service stations located in 48 states and the District of Columbia, including one [in the relevant market]" and "ranked among the top 10 companies in [relevant product sales] sales in 30 states and marketed in every region of the continental United States except [the relevant market]."  *Phillips Petroleum Co.*, 367 F. Supp. at 1240.  Here, Plaintiffs assert no such allegations.  Rather, Plaintiffs merely allege that Philip Morris acquired a single company that produced the relevant product — which "did not really catch on" — outside of the United States.  (Compl. ¶ 46; Am. Compl. ¶¶ 12, 61.)  Moreover, Plaintiffs' repeated conclusory assertions regarding "Big Tobacco" capabilities cannot replace concrete factual allegations about Philip Morris's presence in the Relevant Market.  (Am Compl. ¶¶ 2–3, 65–66.)  Thus, Plaintiffs fail to plausibly allege that Philip Morris possessed the available means to enter the Relevant Market at the time that it acquired Swedish Match.

Finally, beyond Plaintiffs' conclusory assertions, their own factual allegations undermine the notion that Philip Morris likely would have entered the MON market but for purchasing Swedish Match.  Specifically, Plaintiffs allege that there existed "unique barriers to entry" into the Relevant Market" due to "regulatory limitations."  (Am. Compl. ¶ 38.)  As a result, "there were only five brands of Food and Drug Administration-compliant MON products in the Relevant Market as of August 8, 2016, including Swedish Match's Zyn, Dryft's DRYFT, Modoral/British American Tobacco's Velo, Burger Sohne/Altria Group, Inc.'s 'on!' product, and

Rogue Holdings LLC/Swisher International Inc.'s Rogue." (*Id.*)  These factual allegations do not lead the Court to conclude that Philip Morris's certainly could have entered into the Relevant Market but for purchasing Swedish Match; instead, the opposite appears true.

In addition to pleading that the purchasing firm possessed the means to enter the relevant market, a plaintiff asserting an actual potential competition claim must allege that "those means offer[ed] a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." *Marine Bancorp., Inc.*, 418 U.S. at 633.  Here, Plaintiffs fail to plead such facts; instead, Plaintiffs again assert the opposite.  Specifically, Plaintiffs argue that Philip Morris's acquired product, Shiro, "would have had no opportunity to meaningfully compete with Zyn in the first instance because of Zyn's market dominance." (Opp. at 12.) Plaintiffs also fail to allege that the entrance of other companies into the Relevant Market stood foreclosed. *See Atl. Richfield Co.*, 549 F.2d at 300 (noting that if the potential for other additional companies entering the market is not ruled out, it is "unlikely" that loss of one potential entrant "would have a significant anticompetitive effect").  Plaintiffs' actual potential competition claim thus fails.

In sum, Plaintiffs fail to plausibly allege a Section Seven Clayton Act claim under theories of actual competition or potential competition.  Accordingly, the Court hereby GRANTS Defendants' Motion as to Count Three.

### B.  Section One of the Sherman Act (Count One)

Defendants assert that if Plaintiffs' Section Seven Clayton Act claim fails, their Section One Sherman Act claim fails as well.  (Mem. at 16.)  Plaintiffs appear to agree, stating that, because they properly alleged a Section Seven Clayton Act Claim, "the same holds true regarding allegations under Section 1 of the Sherman Act." (Opp. at 16.)  Plaintiffs then cite

numerous cases standing for the proposition that the two claims rise and fall together.  (*See id.*)  The Court agrees with the parties that failure to state a Section Seven Clayton Act Claim dooms a Section One Sherman Act claim.  *See, e.g.*, *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 486 (5th Cir. 1984) ("[B]ecause we conclude . . . that the acquisition . . . did not violate section seven of the Clayton Act, a fortiori, no combination occurred in violation of section one of the Sherman Act."); *White Consol. Indus., Inc. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986) ("[T]he plaintiffs' failure to sustain proof of potential anticompetitive effects under Section 7 of the Clayton Act precludes them from successfully establishing proof of a conspiracy in restraint of trade under the more vigorous standard for Section 1 of the Sherman Act."); *Vantico Holdings S.A. v. Apollo Mgmt., LP*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003) ("Because § 1 of the Sherman Act looks to the probable effects of an agreement, there is no substantive difference between the standards underlying a violation of § 7 and § 1.").  Because the Court determined above, *supra* Section III.A, that Plaintiffs fail to plausibly allege a Section Seven Clayton Act violation, Plaintiffs' Section One Sherman Act claim also fails.[5]  Accordingly, the Court hereby GRANTS Defendants' Motion as to Count One.

---

[5]    Because the Court determined that Plaintiffs' Section One Sherman Act claim fails alongside their Section Seven Clayton Act claim, the Court need not address Plaintiffs' *per se* violation and "Rule of Reason" arguments.  (Opp. at 16–18.)  However, the Court notes that Plaintiffs allege a *per se* violation of the Sherman Act for the first time in their Opposition.  (*Id.* at 16–17.)  The Court reminds Plaintiffs that they "may not introduce new allegations or new facts in an opposition to a defendant's motion to dismiss."  *Hooker v. Disbrow*, 2017 WL 1377696, at *4 (E.D. Va. Apr. 13, 2017).

### C.    Section Two of the Sherman Act (Count Two)

Plaintiffs allege two variations of Section Two Sherman Act claims. [6] (Am. Compl. ¶¶ 101–14.)  First, Plaintiffs allege actual monopolization, (*Id.* ¶¶ 102–04), which requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).  Second, Plaintiffs allege attempted monopolization, (Am. Compl. ¶¶ 105–14), which requires "(1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." *Id.* at 285 (citing *Spectrum Sports Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)).

Although slightly different analyses underly actual monopolization and attempted monopolization claims, each must include some type of anticompetitive conduct.  *See Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 178 (4th Cir. 2014) (noting that the requirement of anticompetitive conduct applies to "both monopolization and attempt claims").  The Court thus focuses its analysis on whether Plaintiffs plausibly allege that Philip Morris's acquisition of Swedish Match constituted anticompetitive conduct. The Court ultimately determines that Plaintiffs fail to do so.

---

[6]    Litigants typically bring merger challenges under Section Seven of the Clayton Act. *Fraser v. Major League Soccer, LLC,* 284 F.3d 47, 61 (1st Cir. 2002).  And while a plaintiff may still challenge a merger under Section Two of the Sherman Act, Section Seven Clayton Act claims require "much less" than Section Two claims.  *Id.*  Thus, Defendants argue that when a Section Seven claim fails, a Section Two claim similarly fails.  (Mem. at 17–18.)  Plaintiffs disagree, but cite no authority for their position.  (Opp. at 19.)  While the Court tends to agree with Defendants, the Court will nevertheless consider the merits of Plaintiffs' Section Two claim.

Possession of monopoly power proves unlawful only when it is coupled with anticompetitive conduct. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 407 (2004). Conduct qualifies as anticompetitive if it harms "the competitive process and thereby harm[s] consumers." *Loren Data Corp.*, 501 F. App'x at 282. But the Sherman Act stands unconcerned with "conduct which is competitive, even severely so." *Spectrum Sports Inc.,* 506 U.S. at 458. Rather, the Sherman Act punishes "conduct which unfairly tends to destroy competition itself." *Id.* Thus, simply alleging "harm to one or more competitors will not suffice." *Loren Data Corp.*, 501 F. App'x at 282 (quoting *United States v. Microsoft Corp.,* 253 F.3d 34, 70–71 (D.C. Cir. 2001)).

Plaintiffs argue that Philip Morris engaged in anticompetitive behavior when, rather than compete on its own "merits" with Swedish Match, it instead "restrict[ed] competition by sidelining itself, its deep resources, and the ability to innovate, in service of Swedish Match's pre-existing monopoly." (Opp. at 19.) Plaintiffs cite *In re Juul Labs*, 555 F. Supp. 3d 932 (N.D. Cal. Aug. 2021) in support of their position. (*Id.*) But Plaintiffs' reliance on this case proves misguided. In *In re Juul Labs*, the court found that the plaintiffs adequately alleged anticompetitive behavior based on the defendant's participation in the relevant market before the acquisition. *In re Juul Labs*, 555 F. Supp. 3d at 961. Specifically, the plaintiffs asserted that the acquiring company (1) had an existing product on the market that constituted the seller's primary competitor, (2) had spent $100 million securing prime shelf space for its competitive product, (3) had explicitly agreed to exit the market and (4) stated that it would re-enter the market absent the deal. *Id.* at 940–41, 964.

Here, Plaintiffs allege no analogous facts. Rather, as discussed extensively above, Plaintiffs attempt to rely on Philip Morris's acquisition of AG Snus AS as evidence of Philip

Morris's presence in the Relevant Market before purchasing Swedish Match.  (Am. Compl. ¶ 12); *see supra* Section III.A.  But AG Snus AS's MON product, Shiro, never came to market in the United States, meaning it had no position whatsoever in the Relevant Market.  (Compl. ¶ 46.)  Thus, Plaintiffs fail to allege any overlap between Philip Morris's and Swedish Match's MON activities, let alone that Shiro constituted Zyn's primary competitor.  Moreover, Plaintiffs' First Amended Class Action Complaint offers no allegations regarding Philip Morris exiting or reentering the MON market in the United States.  Nor could they, as Shiro, failed to come to market in the United States.  (Compl. ¶ 46.)  Thus, the facts presented in *In re Juul Labs* prove remarkably distinct from Plaintiffs' factual allegations.

Moreover, Plaintiffs' First Amended Class Action Complaint stands devoid of facts that demonstrate anticompetitive conduct.  While Plaintiffs repeatedly allege that Philip Morris's acquisition of Swedish Match proved anticompetitive, (*see, e.g.*, Am. Compl. ¶¶ 17, 27, 29, 67, 69, 89), these allegations constitute legal conclusions and thus need not be accepted by the Court. *Iqbal*, 556 U.S. at 678.

Plaintiffs also fail to offer, nor can the Court locate, any authority that stands for the proposition that a non-market participant purchasing a market participant constitutes anticompetitive behavior.  Importantly, the acquisition did not increase Swedish Match's MON share in the Relevant Market, a hallmark of anticompetitive conduct.  Rather, Philip Morris, who lacked a presence in the Relevant Market, acquired Swedish Match, leaving Zyn's share of the MON market in the United States unchanged.  The Court fails to see how such maintenance of the status quo could qualify as "conduct which unfairly tends to destroy competition itself." *Spectrum Sports Inc.,* 506 U.S. at 458.  *Compare Ginsburg*, 623 F.3d at 1233 (noting that transactions involving noncompetitors "do[] not reduce the number of competitors or raise

concentration in the market[]") *and Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1261 (11th Cir. 1998) (finding no market interference when "under the facts pled there exists no allegation that [defendant's] actions increased its market share in the [relevant] market"), *with Grinnell Corp.*, 384 U.S. at 576 (finding monopolization where defendant had engaged in a series of acquisitions to amass market share and then engaged in conduct to maintain its monopoly power).

Plaintiffs' First Amended Class Action Complaint also alleges that Defendants "exclude[d] competition . . . to willfully acquire and maintain monopoly power for Zyn in the relevant market." (Am. Compl. ¶ 87.) This conduct, as Plaintiffs assert, "had an anticompetitive effect in the Relevant Market including by keeping others out of the Relevant Market, which maintained the supracompetitive prices that Plaintiffs . . . paid for Zyn." (*Id.* ¶ 89.) But Plaintiffs offer no facts in support of these allegations, leaving the Court no basis upon which it could find that Plaintiffs raise a right to relief above the speculative level.[7] *Twombly*, 550 U.S. at 555.

Additionally, plaintiffs may allege anticompetitive conduct by proffering facts demonstrating that the defendant lacked a legitimate business reason for its actions. *Loren Data Corp.*, 501 F. App'x at 283. To this point, Plaintiffs offer only conclusory allegations: "Defendants' conduct has no legitimate business purpose or pro-competitive benefits – consumers have less options, pay higher prices and are forced to buy less innovative and creative

---

[7]    For example, whom did Defendants exclude from the Relevant Market? How did the prices for MON products change? How did the quality of MON products vary? How were competitors' incentives to compete "throttled"? While Plaintiffs need not prove their allegations, they must still allege facts that demonstrate the plausibility of their claims for relief. Here, Plaintiffs offer only antitrust buzzwords and legal conclusions inartfully disguised as well-pleaded facts. These fall well short of that required at the pleading stage.

MON products."  (Am. Compl. ¶ 90.)  Because these allegations constitute legal conclusions, the Court need not accept them as true.  *Iqbal*, 556 U.S. at 678.  Thus, for numerous reasons, Plaintiffs failed to adequately allege anticompetitive conduct.

In sum, because Plaintiffs fail to plausibly allege that Defendnats engaged in anticompetitive conduct, both their monopolization and attempted monopolization claims under Section Two of the Sherman Act fail.  Thus, the Court hereby GRANTS Defendants' Motion as to Count Three.

### D.    State Antitrust Claims (Count Four)

Next, Plaintiffs allege violations of the antitrust laws of various states, as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands, based on the acts that form the grounds for their federal antitrust claims.  (*Id.* ¶¶ 128–246.)  Both parties acknowledge that these state antitrust claims fail if Plaintiffs' federal antitrust analogs do not survive.  (Mem. at 18–19; Opp. at 21.)  The Court agrees.  *See, e.g.*, *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002), *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810 (4th Cir. 2003) (dismissing state antitrust and unfair trade practices claims that mirrored federal claims); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4642285, at *11-12 (E.D. Pa. Oct. 17, 2017) (same); *In re Plavix Indirect Purchaser Antitrust Litig.*, 2011 WL 335034, at *5 (S.D. Ohio Jan. 31, 2011) (same); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006) ("Plaintiffs fail to state a claim under the Sherman Act, and since the state antitrust law claims are based on the same allegations, those claims are also dismissed.").

Because the Court determined above that Plaintiffs fail to plausibly plead federal antitrust causes of action under the Clayton Act and Sherman Act, Plaintiffs' state law claims based upon the same allegations also fail. The Court therefore need not address the parties' alternative arguments regarding Plaintiffs' state law claims. Accordingly, the Court hereby GRANTS Defendants' Motion as to Count Four.

### E.    Unjust Enrichment (Count Five)

Finally, Plaintiffs allege that Defendants' anticompetitive conduct raised prices for Zyn and thus Defendants unjustly enriched themselves with ill-gotten profits. (Am. Compl. ¶¶ 248, 251.) Defendants' alleged state and federal antitrust violations constitute the conduct underlying this claim. (*Id.* ¶¶ 247, 254, 256.) Defendants assert that when antitrust violations underlying an unjust enrichment claim fail, no unjust enrichment occurs; thus, the unjust enrichment claim must also be dismissed. (Mem. at 19.) Plaintiffs disagree, arguing that "unjust enrichment claims are independent and are not duplicative of antitrust claims because unjust enrichment has entirely different elements and a completely different theory of damages." (Opp. at 23.) The Court agrees with Defendants.

First, even case law that Plaintiffs cite for their position does not support Plaintiffs' theory. *See, e.g.*, *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *25 (N.D. Cal. Aug. 11, 2015) ("[T]o the extent an unjust enrichment claim is based wholly upon a predicate antitrust or consumer protection claim, the unjust enrichment claim falls with the predicate claim.") Moreover, the remaining cases that Plaintiffs cite involve substantive antitrust claims that survived a motion to dismiss, a state of affairs that does not exist in this case. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 432 (E.D. Va. 2019) (denying motion to dismiss as to Section One Sherman Act claims); *In re Interior Molded Doors*

25

*Antitrust Litig.*, 2019 WL 4478734, at *7 (E.D. Va. Sept. 18, 2019) (same); *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 945 (D.N.M. 2023) (same).  Thus, Plaintiffs fail to offer justification for their argument that unjust enrichment claims may survive when the Court dismisses their predicate claims.

Rather, case law overwhelmingly supports dismissal of unjust enrichment claims where the underlying antitrust violations fail.  *See, e.g.*, *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *111 (D.N.J. June 6, 2024) (dismissing all unjust enrichment claims, because they stood premised on dismissed antitrust claims); *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *16–17 (S.D.N.Y. Mar. 31, 2021) (same); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) (same).  Thus, because Plaintiffs fail to plausibly allege state or federal antitrust claims upon which the Court can grant relief, their unjust enrichment claim necessarily fails.  Accordingly, the Court hereby GRANTS Defendants' Motion as to Count Five.

## IV.    CONCLUSION

For the reasons set forth herein, the Court hereby GRANTS Defendants' Motion to Dismiss, (ECF No. 36), and DISMISSES WITH PREJUDICE Plaintiffs' claims.  Because Plaintiffs have already had an opportunity to amend their Complaint, additional amendment would prove futile.  *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).  As the Court does not grant leave to amend, this Order qualifies as final and appealable.  *See Britt v. DeJoy*, 45 F.4th 790, 796 (4th Cir. 2022) (holding that an order dismissing a case without leave to amend is final and appealable).  Should Plaintiffs desire to appeal, written notice of appeal must be filed with the Clerk of the Court within thirty (30) days of the date of entry hereof.

Failure to file a notice of appeal within that period may result in the loss of the right to

appeal. Fed. R. App. P. 4.

The Court DIRECTS the Clerk to CLOSE this case.

Let the Clerk file a copy of this Memorandum Order electronically and notify all counsel

of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  September 18, 2025